LAW OFFICE OF

## JESSE M. SIEGEL

The Woolworth Building
233 Broadway, Suite 707
New York, New York 10279

(Tel) 212-207-9009
(Fax) 212-732-1339

JesseMSiegel@aol.com

## REQUEST TO BE FILED UNDER SEAL

June 8, 2020

## BY EMAIL

Hon. Jed S. Rakoff, District Judge
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007

**Rule 32 Sentencing Memorandum in the Matter of**
*United States v. Lawrence Walsh,* 18 Cr. 874 (JSR).

Dear Judge Rakoff:

We have been doing this for a very long time. For almost 34 years, we have handled cases involving young black and brown men raised in terrible circumstances, who have done terrible things, and been locked up in terrible numbers.

But seldom, if ever, have we seen someone whose life experience was worse than that of Lawrence Walsh. From an oxygen-deprived birth to a drug abusing, seventeen year-old mother, to his detention at the Covid-19 riddled Queens GEO Private Detention Facility ("Queens GEO"), he has experienced virtually every risk factor, social pathology, and personal horror that has resulted in so many young black and brown men being incarcerated in this country. His life story is one of abandonment, violence, ███████████████, drug abuse and institutional failure.

To be sure, Lawrence is not unique in the types of experiences he has had. But he may be unique in the sheer number of horrible experiences he has had. These experiences not only make it unsurprising that he wound up committing crimes, but also that he committed the types of crimes he did.

Hon. Jed S. Rakoff
June 8, 2020
Page 2

     Lawrence is also unusual in that, despite all this, there is something inside him that has allowed him to feel genuine remorse for the things he has done, and seek to atone for his misdeeds by cooperating with the government. Before this, he walked away from gang life as a member of the Crips. He has a seven year-old daughter, and wants nothing more than to support her and give her the type of parental love and attention he did not receive. Being the father of a young girl makes him feel remorse for exploiting and victimizing young girls more acutely. He has a pro-social goal, to purse a career in the culinary arts, a field in which he has some experience. In short, despite the horror of his life, and the terrible crimes in which he was involved, he has strength of character that provides much hope that he can lead a positive life once released from incarceration.

     For these and other reasons discussed below, we respectfully submit a sentence of time served, equivalent to a term of imprisonment of about 21 months[1], would be "sufficient, *but not greater than necessary*" to achieve the purposes of sentencing set forth in Title 18, United States Code, section 3553(a)(2). 18 U.S.C. § 3553(a) (emphasis added).

## Personal Background

     Lawrence's life is described in excruciating detail in the mitigation report prepared by Carmeta Albarus of CVA Consulting, attached hereto as **Exhibit A** ("Mitigation Report"), and summarized in the psychological report of Dr. N.G. Berrill, of the New York Center for Neuropsychology & Forensic Behavioral Science, attached hereto as **Exhibit B** ("Psychological Report.") While there is no point in repeating everything in them, we will set forth here some of their lowlights, as necessary for our arguments. (Alternatively, the Court may prefer to review the reports at this point before proceeding.)

     Lawrence's grandmother, Michelle Walsh, was 18 years old when she gave birth to his mother, Renee Walsh. Michelle was not yet married to Renee's father, William Walsh, who was "Caucasian, a heroin addict and an abusive husband." (Mitigation Report at 2.) Michelle described Renee as "always a troubled child," who was "disturbed by the estrangement from her father," which "manifested in her behavior." (Mitigation Report at 3.)

     Renee was 17 or 18 when she gave birth to Lawrence, after a one-night stand with a neighbor, Johnny Lee. Renee was unprepared and unsuited for motherhood. Indeed, she was unaware she was pregnant until almost her seventh month, did not even know she had gone into labor, and had "little to no health awareness" during pregnancy; Michelle did not know whether Renee was using drugs or alcohol during the pregnancy. (Mitigation Report at 4.)

     Lawrence was born "blue," with the umbilical cord wrapped around his neck, depriving

---

[1] Lawrence was arrested on December 12, 2018, and has been detained since, a period that will

Hon. Jed S. Rakoff
June 8, 2020
Page 3

him of oxygen. This condition, asphyxia, can cause "long term neurological or brain disabilities and developmental delays." (*Id.*) At 16 months, Lawrence developed a high fever and had a seizure, requiring hospitalization. At 18 months, he fell down a flight of concrete stairs, sustaining a head injury for which he received no medical care. (Mitigation Report at 4-5.)

Renee did not tell Johnny Lee that he was Lawrence's father; he already had nine children and would not have cared. After, he found out from a friend, he went to see Lawrence, but shortly thereafter was sent to prison. He provided no support and played virtually no role in Lawrence's life. (Mitigation Report at 5.)

Renee played only a bit role in Lawrence's life. She was often kicked out of the house, as she abused drugs and stole from her mother. Michelle obtained custody of Lawrence, as, she said, "Renee did not want to be bothered with raising children." (Mitigation Report at 5.) When he was about 14 or 15, she moved to North Carolina and he had almost no contact with her.

Lawrence's grandmother, Michelle, worked and was unable to supervise him or protect him from his uncle, Tatham, a violent psychopath who lived in the house and physically abused Lawrence. Once, he put Lawrence, then 4 years old, in a clothes dryer and turned it on; Lawrence recalled feeling that he was dying, and came out crying and in pain. (Mitigation Report at 6.) Lawrence's sister, Lichelle Walsh, said Tatham abused drugs and was mentally disturbed and violent; especially when drunk, he would physically attack Lawrence. (Mitigation Report at 10.)

Lawrence's mother, grandmother and babysitter also beat him. The babysitter was "'old school,'" and believed in corporal punishment; Michelle said the babysitter beat him until he had welts covering his body. She told the babysitter to stop – not out of concern for Lawrence, but because she did not want to be blamed if authorities saw his injuries. (Mitigation Report at 8.)

At 6, Lawrence was taken to a cookout by a paternal uncle. Lawrence was upstairs, watching television, when ███████████████████████████████. Lawrence did not tell anyone about the incident, but it had a profound, lingering effect on him. He had trouble concentrating or focusing in school, and had to repeat the first grade. By the ninth grade, he was having anxiety and anger issues. (Mitigation Report at 7-8.)

The family lived in conditions of extreme poverty, which contributed to Lawrence's insecurities, especially as an adolescent. Michelle struggled to pay the bills and Lawrence was afraid they would be evicted and become homeless. The electricity and heat were cut off frequently, the yard was unkempt, and space was tight given the number of people living there. (Mitigation Report at 10.)

Also, Michelle kept several dogs, but did not clean up after them. Lawrence was teased for smelling like dog feces. Friends stayed away from the house. He was bullied at school for wearing clothes that smelled like dogs, as well as for being of mixed racial heritage. (Mitigation

Hon. Jed S. Rakoff
June 8, 2020
Page 4

Report at 10-11.)

While in middle school, Lawrence ████████████████████████████
████████████████████████████████████████████. Although he
was maintained in general classes, he received the support of a special education teacher in the
classroom, counseling, and extended time to complete tests. (Mitigation Report at 11-13.)  He
dropped out of school at 17.

Not surprisingly, Lawrence began smoking marijuana at the age of 13, and his use
increased as he got older.  (The Court may recall from the trial of co-defendant Luidji Benjamin,
that, by the time he committed the instant offenses, he was smoking marijuana constantly,
existing in a cloud of smoke that certainly did not help his judgment.)  He also began trying other
drugs (Mitigation Report at 13.)

By 17, Lawrence's life was even less stable than it had been, as his grandmother lost her
home.  Not wanting to burden her, he felt pressure to fend for himself financially.  Against this
backdrop, he joined the Crips.  As Michelle saw it, Lawrence was especially vulnerable to peer
pressure because he wanted to feel like he belonged or was accepted by others.  Although
Michelle's friend, Allan Jones, invited him to stay with him in Queens, "it was difficult for
Lawrence to see a clear path forward when the cloud of abuse, neglect, deprivation, and
homelessness shadowed him." (Mitigation Report at 13.)  He tried living with his mother in
North Carolina for a summer, but wound up hanging out with wrong crowd, and being arrested,
although the charge was subsequently dismissed.  He returned to New York, threatened by
homelessness and poverty, and ultimately moved in with Jones.  (Mitigation Report at 14.)



**Psychological Evaluation**

Hon. Jed S. Rakoff
June 8, 2020
Page 5

      With the Court's approval, and at the request of the undersigned, Dr. N.G. Berrill of The New York Center for Neuropsychology & Forensic Behavioral Science examined Lawrence at Queens GEO.  (His report is attached hereto as **Exhibit B**.)  Dr. Berrill interviewed Lawrence and administered various tests to him.



Hon. Jed S. Rakoff
June 8, 2020
Page 6

## Mitigation Report

In detailing Lawrence's social history, the Mitigation Report finds numerous mitigating factors relevant to sentencing.  These include:

- Born at risk for impairment to neurological, psychological, and social development due to lack of neo-natal care and his suffering from asphyxia (lack of oxygen) at birth.

- ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, experienced throughout his developmental years increased the risk for poor cognitive and social skills with negative consequences as he transitioned through adolescence into adult life.

- Lack of effective mental health interventions since childhood exacerbated the risk for poor emotional and social controls as well as for poor choices in reaction to psychosocial stressors.

- Brain/Head trauma beginning in infancy increased the risk for mental, emotional, behavioral, and social difficulties.

- Physical abuse and neglect in childhood contributed to Lawrence's difficulties, which could be seen as illustrative of research findings that childhood victims of abuse and neglect are at higher risk than their non-maltreated peers for a range of cognitive, emotional, behavioral and social difficulties that can extend into adult life.

- ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

- Lack of supervision and structure was devastating and did lead to a susceptibility to outside influences, particularly gang members offering the promise of familial support and protection.

- Raised in a home and social environment where risk factors were pervasive, and so significantly outweighed any protective factors that may have been available.

- Failure of parents, grandmother, and other adult caregivers to provide the safety, nurture, and support necessary for healthy development.

- Family history of substance abuse, mental/emotional disturbance, domestic abuse, unstable sexual and social relationships as well as other disorders increased the bio-psychosocial risk to Lawrence of incurring similar difficulties.

- Deprivation that impacted financial and emotional wellbeing increased the risk for below average or poor outcomes in health, academic, occupational, and behavioral functioning that can extend into adult life with legal consequence.

Hon. Jed S. Rakoff
June 8, 2020
Page 7

- Institutional failure, as indicated in the inadequate interventions by school and Child Protective Services, put him at risk for underachievement and inappropriate attempts to survive including delinquency.

- ███████████████████████████████████████████████████████.

- ██████████████████████████████████ not far removed chronologically from his childhood, and thus he was still close psychologically to the disturbing events that helped to influence his cognitive, emotional, and social development.

- Attachment to young daughter is commendable and is a motivating factor to undergird the possibility for rehabilitation.

- Acceptance of responsibility as demonstrated in plea of guilty.

- Cooperation in the instant case including testimony.

- Remorse expressed during interviews come across as genuine.

- Prolonged sentence involving incarceration might be counterproductive, given the risk of harm in an environment where other inmates could seek to exact retaliation for his cooperation in the instant case.

- Capacity for change likely in a setting or under conditions that allow for safe access to self-improvement programs, mental health services, substance abuse treatment, and other appropriate resources that support the goal of rehabilitation.

(Mitigation Report at 17-19.)


## The Offenses, Arrest and Guilty Plea

      Lawrence was arrested on December 12, 2018, and charged in the first count of a two-count indictment with conspiracy to commit sex trafficking (18 U.S.C. §1594(c)).  The indictment charged the co-defendant, Luidji Benjamin, with both conspiracy to commit sex trafficking and sex trafficking of a minor (18 U.S.C. §§ 1591(a), (b)(2), and 2.)

      Pursuant to a cooperation agreement with the government, Lawrence pled guilty, on April 15, 2019, to a seven-count superceding information charging him with conspiracy to commit sex trafficking (18 U.S.C. § 1594(c)) (Count One); sex trafficking (18 U.S.C. §§ 1591(a), (b)(2) and 2) (Count Two); violation of the Travel Act (18 U.S.C. §§ 1952(a) and (b)(2)) (Count Three); attempted Hobbs Act robbery (18 U.S.C. §§ 1951 and 2) (Count Four); conspiracy to commit Hobbs Act robbery (18 U.S.C. § 1951) (Count Five); use, carrying and possession of a firearm (18 U.S.C. §§ 924(c)(1)(A)(i) and 2) (Count Six); and distribution of narcotics (21 U.S.C. §§ 841(b)(1)(C) and (D)) (Count Seven).

Hon. Jed S. Rakoff
June 8, 2020
Page 8

Lawrence has been detained since being arrested, a period that will be 18 months on the date of sentence. (As noted, he has served the equivalent of a 21-month term of imprisonment, with credit for good time served.)

### The Presentence Investigation Report

We do not object to Probation's calculation of Lawrence's advisory sentencing guidelines range. After applying a grouping analysis and multiple count adjustment, they find he has a Total Offense Level of 33, and an advisory sentencing guidelines range, in criminal history category II, of 168 to 210 months. In addition, he faces a consecutive mandatory minimum sentence of five years on Count Six (the firearms offense).

We note, however, that the government was unaware of the conduct underlying Counts Three through Seven before Lawrence revealed it during proffer sessions, and Lawrence was not initially charge in Count Two, which charged the substantive offense of sex trafficking. Based solely on the information of which the government was aware before the cooperation process – *i.e.*, having to do with the original charged offense, Count One - Lawrence's Total Offense Level would be 31, yielding an advisory sentencing guidelines range, in criminal history category II, of 121 to 151 months, (*see* PSR at ¶¶39-52, 77, 78), and he would not be subject to a mandatory minimum sentence.

### Substantial Assistance

In determining the extent and value of a cooperator's efforts, "substantial weight" is to be given to the government's evaluation of the individual's assistance. U.S.S.G. §5K1.1, application note 3. In their letter submitted pursuant to U.S.S.G. § 5K1.1 ("Gov't Letter"), the government describes how Lawrence provided substantial assistance to the government by providing "substantial information concerning the sex trafficking of his co-defendant, Benjamin," testifying at Benjamin's trial, and ████████████████ (Gov't Letter at 2.) The government's letter makes clear that Lawrence's assistance was extensive and undertaken at substantial risk.

We submit that each of the factors set forth in section 5K1.1(a), to be considered by a court in determining whether and how much to reduce a sentence for a defendant who has provided substantial assistance to the government, speaks in favor of the departure requested here:

*(1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered (U.S.S.G. section 5K1.1(a)(1));*

Hon. Jed S. Rakoff
June 8, 2020
Page 9

Having presided over Luidji Benjamin's trial, the Court is able to evaluate the significance and usefulness of Lawrence's testimony on its own. According to the Government, his "assistance was unquestionably significant, substantial and useful ... [H]e provided detailed, consistent information about his and Benjamin's sex trafficking conspiracy, which corroborated Victim-1's and Victim-2's testimony at trial. (Gov't Letter at 5); *see also* Gov't Letter at 2 (his testimony provided "critical corroboration supporting the testimony of the two minor victims ..."). His testimony "was particularly important in light of the challenges relating to the Victims' testimony," as the Victims were reluctant to testify. (Gov't Letter at 5.) Lawrence's willingness to testify allowed the Government to proceed against Benjamin even knowing the victims might not be willing to do so. (*Id.*)

In addition, the information provided by Lawrence was useful to the Government in allowing the government to prepare for trial and in its broader investigation. (Gov't Letter at 4-5.) ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. (Gov't Letter at 4-5.)

*(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant (U.S.S.G. section 5K1.1(a)(2));*

The Government believes Lawrence's information was "truthful, complete and reliable." It was corroborated by other witnesses and by other information, including social media posts and online advertisements. Lawrence did not minimize his own involvement in the conspiracy and accepted responsibility for it. (Gov't Letter at 6.) He "provided specific, incriminating details about his involvement in the charged conduct ...) (Gov't Letter at 4.) He also provided information ████████████████████████████████████████ Benjamin, further "demonstrat[ing] his commitment to complete candor." (Gov't Letter at 6.) Moreover, he provided information about his other criminal activities, of which the Government was unaware and for which he would not have been charged absent his cooperation. (Gov't Letter at 4.)

*(3) the nature and extent of the defendant's assistance (U.S.S.G. section 5K1.1(a)(3));*

The assistance provided by most cooperators is limited to meeting with the government and providing information. Lawrence, on the other hand, testified in open court over two days. He also met with the Government more than a dozen times. (Gov't Letter at 3.) He was pulled from general population each time, where the frequency of meetings would have been noted by other inmates, marked him as a cooperator, and exposed him to retaliation.

*(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance (U.S.S.G. section 5K1.1(a)(4));*

Lawrence has put himself and his family in real and substantial danger by cooperating with the government. The government notes the inherent risk in cooperating, especially where,

Hon. Jed S. Rakoff
June 8, 2020
Page 10

as here, the crimes committed carry severe penalties, and ████████████████████
████████████ (Gov't Letter at 7.) Lawrence was in danger while detained at MCC Manhattan,
necessitating that he be moved to Queens GEO, where he remains.

Should Lawrence be sentenced to additional time in prison, this will present ongoing
danger for him. As the Court is undoubtedly aware, inmates newly arrived at prisons are made
to show their paperwork, including sentencing transcripts, to other inmates to prove they did not
cooperate; Lawrence will be unable to do so.

Finally, as noted by the government, Lawrence' cooperation has potentially jeopardized
his legal position. He revealed to the government extensive information about his own criminal
conduct of which they were unaware, and for which he would not have been prosecuted and
faced sentencing had he not cooperated. (*See*, Gov't Letter at 4.)

*(5) the timeliness of the defendant' assistance (U.S.S.G. section 5K1.1(a)(5)).*

Lawrence's assistance was extremely timely. He began meeting with the government
about two months after being arrested, which allowed him to be available to the government
during its preparation for trial. (Gov't Letter at 7.)

## Sentencing Under Section 3553

The Court is required to impose a sentence that is "sufficient, *but not greater than
necessary*" to achieve the purposes of sentencing set forth in Title 18, United States Code,
section 3553(a)(2). 18 U.S.C. § 3553(a) (emphasis added). The Second Circuit has underlined
this requirement: "Plainly, if a district court were to explicitly conclude that two sentences
equally served the statutory purpose of §3553(a), it could not, consistent with the parsimony
clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).
Thus, a court is to impose the *lowest* sentence that accomplishes the various purposes of
sentencing.

In determining a sentence, the Court shall consider the factors set forth in section
3553(a), including:

> (1) the nature and circumstances of the offense and the history and
> characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
>> (A) to reflect the seriousness of the offense, to
>> promote respect for the law, and to promote just
>> punishment for the offense;

Hon. Jed S. Rakoff
June 8, 2020
Page 11

> (B) to afford adequate deterrence to criminal
> conduct;
>
> (C) to protect the public from further crimes of the
> defendant, and
>
> (D) to provide the defendant with needed
> educational or vocational training, medical care, or
> other correctional treatment in the most effective
> manner

* * * *

The Second Circuit has emphasized, "Although the sentencing judge is obliged to consider all of the sentencing factors outlined in Section 3553(a), the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances. That is the historic role of sentencing judges, and it may continue to be exercised." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

To begin, while the Court is required to calculate Lawrence' actual advisory sentencing range, a more appropriate "benchmark" from which to depart because of his assistance to the government is the sentence he likely would have received had he not cooperated. As noted above, based on the original charge, Lawrence faced an advisory sentencing guidelines range of 121 to 151 months, and no mandatory minimum sentence. While we would not presume to predict what sentence the Court might have imposed had Lawrence simply pled guilty to the original charge, it certainly would have been far less than the guidelines range he now faces, from additional charges based on information disclosed during the cooperation process.

We respectfully submit Lawrence's history and characteristics, the danger he might face if sentenced to additional time in prison, the harsh conditions of his pre-trial confinement, especially during the Covid-19 pandemic, and the unlikelihood that he will receive necessary psychiatric treatment while in prison, are additional factors which, combined with his substantial assistance to the government, make a sentence of time-served appropriate.

## The history and characteristics of the defendant.

Lawrence's history and characteristics provide substantial mitigation and support for the sentence requested. The miserable childhood and adolescence Lawrence suffered are relevant not merely because he deserves sympathy and a break, but also because the circumstances he endured are directly related to the nature of the crimes that brought him before the Court.

Hon. Jed S. Rakoff
June 8, 2020
Page 12

 Add in his psychiatric problems, and the fact that he was constantly high on drugs he took to numb the pain he had suffered as a child and continued to suffer ████████████████, and the criminal activity with which he became involved is hardly surprising, even if not excused by these things. As Dr. Berrill noted, "Lawrence's involvement in this activity ████████████████████████. Given his many psychological deficits and intellectual limitations, Lawrence was not well equipped to assess the wrongfulness of his conduct related to the instant offense."

It should also be noted that Lawrence was, when he committed these offenses, extremely young: ████████████████████████████, about 22 when he committed the sex trafficking offenses, and younger than 22 when he committed the other offenses. While old enough to be treated as an adult, such a young person- even a sober one of average intelligence, without mental health problems - does not have the maturity and life experience of an older person, and cannot be expected to exhibit the judgment of an older person. *See, Gall v. United States*, 552 U.S. 38, 57-58 (2007); *Johnson v. Texas*, 509 US 350, 367 (1993); U.S.S.G. section 5H1.1.

Yet, Lawrence's personal characteristics provide much reason to hope that he will continue the process of turning his life around he began by cooperating with the government, and become a productive member of society. He is genuinely remorseful, as illustrated by his statements to Dr. Berrill, Ms. Albarus, and Probation recognizing the wrongfulness of his conduct; in particular, he spoke of the wrongfulness of involving minors in prostitution. His acknowledgement seems sincere, especially as he connects what he did to the fact that he has a seven year-old daughter.

Lawrence has many good qualities. The Government's letter attests to the dedication and honesty he brought to the process of cooperating. They note, in particular, his candor in acknowledging his own role in the sex trafficking offenses, and disclosing other criminal activities of which the government was unaware. He is dedicated to providing his daughter with the love and attention of which he was deprived as a child. He has pro-social goals, including pursuing a career in culinary arts. He has identified The Ready, Willing and Able organization, also known as the Doe Fund, as a possible source of assistance. (Mitigation Report at 17.)

Most importantly, Lawrence's cooperation indicates his commitment to changing his life. His decision to cooperate has made it impossible for him to return to the places where, and people with whom, he committed crimes. He has truly chosen to put himself in a position where he *has* to change his life.

**The nature and circumstances of the offense.**

Admittedly, this is not a factor that favors leniency. Lawrence has admitted and accepted

Hon. Jed S. Rakoff
June 8, 2020
Page 13

responsibility for participating in very serious crimes, which had profound effects on the victims.

Nonetheless, as argued above, Lawrence's involvement in these offenses has to be evaluated in light of his life experience.

## The need for the sentence to reflect the seriousness of the offense, promote respect for the law, promote just punishment for the offense, and provide general and specific deterrence.

Given the length of sentences commonly imposed in federal court, it is easy to lose sight of the fact that a sentence of time served equivalent to a 21-month term of imprisonment is a significant punishment. We submit that, under these circumstances, and in light of his cooperation, a sentence of time served would be sufficient to recognize the seriousness of the offense, promote respect for the law, impose just punishment for the offenses, and provide general and specific deterrence.

The harshness of Lawrence's pretrial confinement also bears on sentencing, insofar as one of the purposes of sentencing is to afford just punishment for the offense and respect for the law. 18 U.S.C. §3553(a)(1). Lawrence has been detained since his arrest on December 12, 2018, a period of about 18 months, at MCC Manhattan and Queens GEO, jails not "designed for long term stays." *See United States v. Behr*, 2006 WL 1586563 *5 (S.D.N.Y. 2006) (Sweet, J.) (further noting that harsh conditions at MCC were recognized by Judge Kimba Wood as a basis for a substantial sentence reduction). Inmates' movements are severely restricted at all times. They have little opportunity to participate in social programs, very limited access to personal development programs, exercise, physical training, or recreation, and almost no opportunities to be outdoors.

The Supreme Court has recognized that because pre-trial confinement is an administrative, as opposed to judicial, form of detention, the conditions of confinement may not rise to the level of punishment. *Bell v. Wolfish*, 441 U.S. 520, 537-38 (1979). But, as Judge Weinstein of the Eastern District observed, "The inevitable consequences of pretrial incarceration, particularly when prolonged beyond a short period, are undeniably severe." *United States v. Gallo*, 653 F.Supp. 320, 336 (E.D.N.Y.1986).

Even pre-*Booker*, the Second Circuit held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures," *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (*per curiam*), because harsh conditions of confinement could be regarded as a mitigating factor pursuant to U.S.S.G. §5K2.0. *Id.* (internal citation omitted.) Sentencing judges have based downward departures on findings of unduly harsh conditions of pre-trial confinement. *See, e.g., United States v. Francis*, 129 F.2d 612 (S.D.N.Y. 2001) (Patterson, J.) (Departing one level because of harsh conditions of pre-trial confinement endured by illegal reentry defendant for 13 months at Hudson County Correctional Center). Post-*Booker*, concerns that authorized departures from the sentencing guidelines when they were considered mandatory may now justify non-guidelines sentences pursuant to Title 18, United States Code, section 3553(a).

Hon. Jed S. Rakoff
June 8, 2020
Page 14

The conditions under which Lawrence has been detained at Queens GEO have been particularly harsh because it includes the four months of the Covid-19 pandemic. The facility was clearly unprepared to deal with such a medical calamity. Inmates are housed in dorms holding up to forty inmates, and the disease quickly spread through them, as the facility had nowhere to place those who contracted it. Lawrence reports that, on his unit of about 35, most inmates got sick, including him. He had shortness of breath, headaches, a sore throat, and body aches. Like many in his dorm, he did not receive medical attention, as he did not have a fever. The dorm was locked down in quarantine, with movements severely restricted.

It should go without saying that a sentence should not be one that exposes a defendant to danger. If he receives additional time in prison, Lawrence will be in danger. As noted, newly arrived inmates are required to show their papers, including sentencing minutes, to other inmates to establish they didn't cooperate. Lawrence will not be able to do so, as he did cooperate. Moreover, his cooperation is already well known, as he testified in open court. As the government notes, some of the individuals against whom Lawrence provided information are members of violent gangs, which have widespread presence in the federal prison system.

**The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

In light of his serious mental health problems, Dr. Berrill states that Lawrence requires ██████████████████████████████████████████████████████████████████ While he may be able to get treatment for substance abuse, we are not optimistic he will receive necessary psychiatric treatment while incarcerated.

We are attaching, as **Exhibit C**, an article entitled "Health Care in the Federal Prisons: Fact or Fiction," which appeared in the Californian Journal of Health Promotion. Daniel S. Murphy, *Health Care in the Federal Bureau of Prisons: Fact or Fiction*, California Journal of Health Promotion, Vol. 3, Issue 2, 2005, at 23. In addition to providing substantial anecdotal evidence from inmates, the author, a former federal inmate now at Appalachian State University, quotes a 1994 report from the United States General Accounting Office, which states:

> Inmates with special needs, including women, *psychiatric patients*, and patients with chronic illnesses, were not receiving all of the health care they needed at the three medical referral centers we visited [Butner, North Carolina; Lexington, Kentucky; Springfield, Missouri]. This situation was occurring because there were insufficient numbers of physicians and nursing staff to perform required clinical and other related tasks ... As a result, some patients' conditions were not improving and others were at risk of serious deterioration.

Hon. Jed S. Rakoff
June 8, 2020
Page 15

*Id*. at 26-27 (Journal pagination) (emphasis added).

To the objection that conditions might have improved since the GAO report of 1994, we are also attaching, as **Exhibit D**, a copy of an article appearing in the April, 2009, issue of the American Journal of Public Health, entitled, "The Health and Health Care of US Prisoners: Results of a Nationwide Survey." Andrew P. Wilper, MD, MPH, et al., *The Health and Health Care of US Prisoners: Results of a Nationwide Survey,* American Journal of Public Health, Vol. 99, No. 4, April 2009, at 666 (journal pagination). The authors "analyzed the prevalence of chronic illnesses, *including mental illness*, and access to health care among US inmates," and concluded, "Many inmates with a serious chronic physical illness fail to receive care while incarcerated." (*Id*. at 666) (emphasis added.) Further, "More than 800,000 inmates report having 1 or more chronic medical conditions, and their access to medical care appears to be poor, particularly in jails." (*Id*. at 669.) Distinguishing federal prisoners from state and local jail inmates, the report found, "Among inmates with a persistent medical problem, 13.9% of federal inmates, 20.1% of state inmates, and 68.4% of local jail inmates had received no medical examination since incarceration." (*Id*.) Of more than 1 in 5 inmates taking a prescription medication before entering prison or jail, 26.3% of federal inmates stopped taking the medication upon incarceration. (*Id*.)

These articles may not provide an absolutely definitive description of the health care, including mental health care, currently available in federal prisons. Nevertheless, we have not found any articles or studies suggesting that conditions have significantly improved. In fact, a March 2016 report by the Inspector General, U.S. Department of Justice, attached hereto as **Exhibit E**, found chronic understaffing in federal prison health service units. Noting the Bureau of Prisons' responsibility to provide medically necessary healthcare to prisoners, the report states: "However, recruitment of medical professionals is one of the BOP's greatest challenges and *staffing shortages limit inmate access to medical care*, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs." (*Id*. at *i*) (emphasis added.) Only 83% of health service positions were filled. Further,

> Although BOP policy states that the vacancy rate shall not exceed
> 10 percent during any 18-month period, we found that only 24 of
> 97 BOP institutions had a medical staffing rate of 90 percent or
> higher as of September 2014. Further, 12 BOP institutions were
> medically staffed at only 71 percent or below, which the BOP's
> former Assistant Director for Health Services and Medical Director
> described as crisis level.

(*Id*.) In Fiscal Year 2014, "20 BOP institutions had a medical staff vacancy rate of 25 percent or higher and 3 institutions had a vacancy rate of 40 percent or higher." (*Id*. at 2.)

Not surprisingly, the BOP's inability to recruit medical professionals is caused by "its geographic locations and local market competition, the limits on the pay it can offer its medical staff, and its correctional setting." (*Id*. at 7.) The report notes, "Specifically, we found that the

Hon. Jed S. Rakoff
June 8, 2020
Page 16

salaries and incentives the BOP offers are not competitive with those of the private sector,
particularly given the need for the BOP to compensate its employees for the safety and security
factors intrinsic to working in a correctional setting." (*Id.*)

Sentencing Lawrence to additional time in prison will only delay the treatment he needs
to both feel better and continue the process of becoming a useful member of society. On the
other hand, once he is on supervised release, his probation officer will be able to help him access
such treatment. In this way, a longer prison sentence would be contrary to the goal of ensuring
he receives the treatment he needs "in the most effective manner," and counter-productive.

### Conclusion

Ultimately, it is Lawrence's substantial assistance to the government that speaks most
forcefully in favor of the sentence of time-served. Not only was it very productive and done at
substantial risk. It demonstrates most clearly that, despite the crimes he has committed,
Lawrence is dedicated to becoming a better person who will contribute to his community.

For the foregoing reasons, we respectfully ask the Court to sentence Lawrence to time-
served.

Because of the sensitive nature of the information discussed herein, we also ask that this
letter be filed under seal.

Respectfully Submitted,

/s/
Jesse M. Siegel

cc. A.U.S.A. Jacob Gutwillig
    A.U.S.A. Mollie Bracewell
    (By email)

# Exhibit A

CVA Consulting Services Inc.
144 West 127th Street
New York, NY 10027
(646) 698-2172 / Fax: (646) 698-2173)
cvaconsulting@hotmail.com

May 28, 2020

Jesse M. Siegel, Esq.
Law Office of Jesse M. Siegel
The Woolworth Building
233 Broadway
Suite 707
New York, NY 10279

Re:    United States of America vs. Lawrence Walsh

Dear Mr. Siegel:

Pursuant to your request, the following is a mitigation report prepared on behalf of your client, Lawrence Walsh. This report is based on an investigation of Mr. Walsh's social history. Interviews were conducted with Mr. Walsh as well as with some members of his family and persons known to him socially. These interviews were with Michelle Walsh (grandmother), Renee Walsh (mother), Lichelle Walsh (sister), Allan Jones (family friend), Jolan McCants (best friend), Valery Giralt (childhood friend). In addition, reviews were done of records from Malverne Senior High School, Maurice W. Downing School, Herbert T. Herber Middle School, Malverne Union Free School District (special education), Cornerstone of Rhinebeck, Plea agreement, Court Testimony, Pre-sentencing Report by the US probation officer (dated 2/10/2020).

WALSH, LAWRENCE

## Introduction

Lawrence Walsh is a 27-year-old African American male currently incarcerated as he awaits sentencing. He has pled guilty, in accordance with a plea agreement, to a seven-count Indictment. He expressed remorse for his actions, which is in keeping with his acceptance of responsibility and cooperation in the instant case. During interviews, his depressed mood affected his ability to focus consistently, but his responses revealed various bio-psychosocial factors that seriously impacted his development. These factors include ██████████ physical abuse, domestic violence, drug abuse, deprivation, learning disability, emotional disturbance, and homelessness.

## Family History

Lawrence Walsh was born on February 2, 1993 in Mineola, Long Island, New York. He is the only child born to the union of Renee Walsh and Johnny Lee. He was raised primarily by his maternal grandmother, Michelle Walsh, because his parents failed to play an active role in his life. He only knows his father by name Johnny Lee as they did not have a relationship. His relationship with his mother was fractured early in his childhood. Reportedly, his mother now resides with her lover in North Carolina. Given his parents' negligence, his maternal grandmother became his primary caregiver and guardian.

Michelle Walsh acknowledged that she became Lawrence's guardian due to the negligence of his parents. She was born on December 7, 1955 in the Bronx in a family system where her maternal grandmother was her primary caregiver. According to Michelle, her maternal grandmother was from Jamaica and instilled values associated with Jamaican child rearing practices. She explained that her grandmother was strict with children. She added that her grandmother also believed in hard work and taking responsibility. Michelle related that she strayed from her grandmother when she married William Walsh in 1977 on her 22nd birthday. She described William as Caucasian, a heroin addict, and an abusive husband.

Michelle's union with William produced two children, Renee Walsh (Lawrence's mother) and Tatham Walsh. Renee was born on September 23, 1974, when Michelle was 18 years old and before her marriage to William. Tatham was born on February 21, 1979, after

2

WALSH, LAWRENCE

Michelle and William separated.  Michelle recalled that she left William while she was pregnant with Tatham and she returned to her grandmother's home.  She said William refused to support their children after she left him.

According to Michelle, she worked two jobs and left her two young children in the care of her grandmother.  She said the arrangement with her grandmother worked well for her children. However, on April 29, 1986, Michelle's grandmother died from complications of a stroke.  The loss was a devastating blow for the family, especially for Michelle's first child, Renee, who needed close supervision.

Renee was always a troubled child, Michelle stated.  It appeared that Renee's troubles started with the estrangement from her father William.  According to Michelle, Renee was disturbed by the estrangement from her father and it manifested in her behavior.

Renee was enrolled in a Catholic School to give her the best opportunity to stay focused academically, according to Michelle.  However, Renee's demeanor in school signaled that she was emotionally troubled.  Michelle said teachers noted Renee was introverted and did not interact with classmates or with staff.

In 1988, Michelle moved to the Long Island community of Uniondale to join her paternal grandmother.  "I felt it was a better environment for the kids," she remarked.  However, Renee continued to show signs of emotional disturbance.   Michelle's other child, Tatham, also appeared emotionally disturbed.  Eventually, Renee and Tatham became addicted to drugs and gravitated to the streets.

Michelle disclosed that she was unable to give her children the supervision they needed. She said her work schedule started early in the morning, when she delivered papers, and then she would go to her job at JP Morgan Chase before returning home at around 9 p.m.

Michelle's inability to supervise her children continued after the family moved to the West Hempstead area of Long Island in 1990.  It was in West Hempstead that Renee became involved with Johnny Lee (Lawrence's father).

Renee was 17 years old when she met Johnny Lee.  They met because they lived near to each other Renee said, and it was not a relationship based on love.  She said Johnny Lee is older

3

WALSH, LAWRENCE

than her and, at the time they met, she was not even sure of her sexual orientation or whether she wanted a relationship. She, however, found Johnny Lee to be "smart and funny," and so she enjoyed being in his company. This led to a one-night stand with Jonny Lee, by which she became pregnant with Lawrence.

According to Renee, she did not realize she was pregnant until almost seven months into her pregnancy. She recalled that her teachers felt something was wrong with her when she started to lose weight. She said the teachers called her mother to a meeting at the school, after which she was taken to a doctor. This is confirmed by Michelle as she recalled taking Renee to the doctor due to the teacher's concern. During the medical exam, Renee was found to be almost seven months pregnant.

Renee said she was miserable and embarrassed upon discovering she was pregnant. She said a major concern was that family members would judge her harshly for getting pregnant so young and for someone like Johnny Lee. In recalling Renee's pregnancy, Michelle indicated that it was troubling because, though she was Renee's mother, she was not even told the identity of the expectant father.

**Early Childhood**

Renee did not receive pre-natal care and, according to Michelle, it is not known whether Renee was using drugs or alcohol during the pregnancy. Michelle indicated that Renee had little to no health awareness during the pregnancy. Renee did not even know when she was in labor, Michelle said. The baby (Lawrence) was born with the umbilical cord wrapped around his neck, thus depriving him of oxygen. "He was born blue," Michelle stated.

Reports published online, including from the National Institutes of Health, indicate that deprivation of oxygen at birth (asphyxia) can cause long term neurological or brain disabilities and developmental delays. Michelle recalled that Lawrence had to be placed in an incubator for a day or two before he was released to the family.

When Lawrence was about 16 months, he developed a high fever and suffered a seizure. He was admitted to Mercy Hospital. At 18 months old, he fell down a flight of concrete stairs

4

and hit his head.  He had a swelling to his head after he fell down the stairs, according to Michelle  He did not receive medical attention for the head trauma.

According to Lawrence's mother, Renee, he reached his developmental milestones early. However, Renee admits that she was not the primary caregiver for Lawrence, as her mother Michelle took over that role.  Renee was not seeing Lawrence consistently because of her unstable lifestyle including drug abuse and casual relationships.

Renee reported she did not tell Johnny Lee he was Lawrence's father.  She felt that Johnny Lee would not have cared to hear she was pregnant with his child, as he already had nine children before Lawrence was born.  She said Johnny Lee found out from one of his friends that Lawrence was his child.  However, Johnny Lee did not provide any support.  Johnny Lee went to see the baby and was arrested shortly after and sent to prison, according to Renee.

Allan Jones, a military veteran, said he tried to fill a void in Lawrence's life.  He described Lawrence's mother, Renee, as a "pretty girl" who was one of many women with children by Johnny Lee.  Allan reported that he had an on and off relationship with Renee's mother, Michelle, and so he tried to give a helping hand in raising Lawrence.

Reportedly, Michelle was granted custody of Lawrence by Child Protective Services (CPS).  According to Michelle, she gained custody because Renee did not want to be bothered with raising children.  Michelle indicated that the CPS involvement occurred after Renee had her third child.   "All three of Renee's children are by different fathers." Michelle stated.   She indicated that Renee's unstable romantic relationships contributed to neglect of the children including Lawrence.

Renee's recollection is that when Lawrence was about 7 years old, she became involved with Moses Jacob, the father of her second child.  She and Moses were living together when she gave birth to Lichelle Walsh on April 2, 2000.  Her relationship with Moses ended after she gave birth to the child.   Almost four years after she gave birth to Lichelle, she became pregnant by Steven (Bucky) Desmond.  She gave birth to Taylor Walsh on June 29, 2004.  When Taylor reached 4 years old, she left New York to move to North Carolina, where she reportedly lives with a female lover.

WALSH, LAWRENCE

Lawrence had an early awareness that neither of his parents saw him as a priority.  He heard that his father Johnny Lee had a lot of kids.  He observed that his mother was in and out of the house.  He recalled a period when his mother lived with one of her boyfriends.  That was a period Lawrence hardly saw his mother.

In the absence of his mother, Lawrence looked to his maternal grandmother Michelle for support.  His happy memories revolve around the times his grandmother tried to ensure he had a good Christmas.  Those were the only happy times he could recall and even those times did not leave him with anything specific to remember.

Lawrence stated that whatever good memories his grandmother gave him paled in comparison to the disturbing events to which he was exposed.  According to Lawrence, during his early childhood he was the only kid in the house, as his mother had not yet given birth to his siblings.  As such, he was subject to the full impact of his mother's inability to care for him.

**Exposure to Drugs and Physical Abuse at Home**

Lawrence was exposed early in childhood to his mother's drug abuse.  He noted that his mother would get kicked out of the house either for drug abuse or for stealing from his grandmother.   His mother's problems increased his risk for abuse.  The risk came not only from his mother, but also from the caregivers to whom his mother entrusted him.  These caregivers were his Grandma Michelle and his Uncle Tatham.

Allan Jones, the family friend, recalled an incident in which Tatham put Lawrence in a clothes dryer and turned it on.  He said Tatham was extremely abusive towards Lawrence.  Lawrence said the clothes dryer incident occurred when he was about 4 years old.  He recalled feeling he was dying as he bounced around in the dryer.  When the dyer stopped spinning, he came out crying and in pain.  According to Lawrence, his grandmother reprimanded his uncle over the incident, but such reprimands were ineffective.

Lawrence related that his grandmother did not do enough to protect him from her son, Tatham.  He observed his grandmother and Tatham arguing regularly, but Tatham's behavior did not change.

WALSH, LAWRENCE

One of the scare stories Lawrence heard about his family was associated with his mother and Tatham's father. He heard that his grandfather was an Irishman given to drug abuse and domestic violence. He heard that his grandmother was beaten by his grandfather constantly. The way his grandfather died also filled Lawrence with foreboding. "I heard he was high on drugs when he nodded off and hit his head and died, and then the body was cremated and the ashes scattered in the park where he used to hang out and get high on drugs."

Lawrence indicated that it was hard to ignore stories about the family, as he felt his family background was having repercussions on him. Although he tried to stay out of harm's way, his mother and uncle would do things that made trouble seem inevitable for him. There was no relief. He recalled that even video games he received as gifts were stolen by his mother and uncle to buy drugs.

Of concern, too, was the lack of supervision by Lawrence's grandmother Michelle. Based on her work schedule, Michelle could not give Lawrence the attention he needed to feel secure. He learned to keep his mouth shut rather than express his needs, because he did not want to be treated like a burden.



Lawrence indicated ████████████████ continued to lurk in his psyche though he did not tell anyone about it. He had difficulty concentrating or focusing when he was at school. According to Lawrence, he repeated the first grade in school. By the time he reached the ninth grade, school records cited that he was having anxiety and anger issues. Reportedly, he was

7

WALSH, LAWRENCE

diagnosed early in elementary school with ███████████████████████ ██████████████
████████████████

 A distressful reality for Lawrence was that ████████████████ he had to return to a home where he faced physical abuse. He remained wary of his Uncle Tatham's volatile temper, and he fretted about the abuse from his grandmother and his mother. According to Lawrence, his grandmother and mother beat him excessively. He said they beat him with whatever was at hand.

 Michelle stated that it was unduly difficult to care for Lawrence without financial support from his mother. She indicated that the challenge of caring for Lawrence without financial support contributed to the abuse he suffered. She said that despite her limited funds, she had to hire a babysitter to stay in the house while she went to work. She blamed the babysitter for the abuse as, according to her, the babysitter was "old school" and believed in corporal punishment.

 According to Michelle, the babysitter beat Lawrence until welts covered his body. "I told the babysitter to stop beating him because I don't want to be blamed if the authorities see those marks," Michelle said. She indicated, however, that it was a failure on her part to allow the babysitter to beat Lawrence.

 Michelle expressed that Lawrence's difficulties stemmed primarily from parental neglect. None of his parents took an interest in him, Michelle stated. "I was only the grandmother." She said his paternal uncle, Brandon Felton, came around occasionally to see him. She gave Brandon credit for trying to help Lawrence to feel a part of the paternal side of the family. Lawrence also had kind words for his Uncle Brandon, whom he said visited him and took him fishing occasionally. He also spoke highly of Allan Jones, the family friend, whom he said spent time with him.

 Lawrence was thankful for the efforts of Uncle Brandon and Allan, but their efforts could not compensate for the neglect by his parents. His relationship with his mother became virtually non-existent after she moved to Virginia. His father remained in New York but showed only shallow interest in seeing him. One day his father (Johnny Lee) came to the house to ask him, "Do you know who I am?" When Lawrence replied in the negative, Johnny Lee stated, "Well

WALSH, LAWRENCE

I'm your dad." That encounter with Johnny Lee illustrated the limited interaction between father and son over the years.

Michelle noted that Lawrence suffered a lot of heartache due to his father's broken promises. She said Johnny Lee engaged in a pattern of making promises to Lawrence but never kept them. For instance, Johnny Lee would promise to visit Lawrence or to buy things for him, such as X-Box, but those promises were broken.

According to Michelle, Lawrence was about 11 years old when Johnny Lee made an appearance and then disappeared. Lawrence was devastated when he realized his father's promises were false.

Jolan McCants, a childhood friend of Lawrence's, corroborated that Lawrence was emotional about the lack of parental support. According to Jolan, his mother (Susan McCants) tried to be a mother-figure to Lawrence. Jolan related that his mother was also close to Lawrence's grandmother, Michelle, which helped to create the semblance of an extended family.

In the absence of his father, Lawrence also looked to Jolan's father to be a substitute dad. It was obvious to Jolan, however, that Lawrence needed a full-time father, rather than a substitute to give him the manly guidance and assurance he deserved.

Jolan recalled that Johnny Lee came around "a couple times" and give Lawrence empty promises. According to Jolan, Lawrence would talk about his father in glowing terms based merely on the promise of a relationship. Jolan noted the sadness in Lawrence when it became clear that Johnny Lee was not serious about being a father. "After that Lawrence just stopped talking about his father," Jolan remarked.

**Issues of Identity**

The lack of healthy and secure relationships at home impacted Lawrence's sense of self and social identity. His sister, Lichelle Walsh, noted that it was difficult for Lawrence to feel socially confident, and he would stay by himself and play video games. She and her sister were younger than Lawrence, and so the age gap plus conditions in the home stymied the forming of any close sibling relationship. "He was older and in his own world," Lichelle stated.

9

WALSH, LAWRENCE

Lichelle noted that the behavior of caregivers was averse to Lawrence's need for mutually beneficial relationships.   She confirmed that Uncle Tatham abused drugs and was mentally disturbed and violent.   She said Uncle Tatham, especially when he was drunk, physically attacked Lawrence.   Lichelle also recalled that whenever her mother came to the house, it was to abuse drugs and alcohol with Uncle Tatham rather than to see to the welfare of the children.

Unlike Lawrence, Lichelle had a relationship with her father.  She indicted that her father's support helped her to be more resilient than Lawrence in response to the abuses at home. Lawrence did not have the support of a father, though, according to Lichelle, he was happy for her and told her she should strive to do better than he did.

Lichelle reportedly attended Jackson College in Michigan in 2018 to study broadcast journalism. She said that last year she chose to return to New York to assist her grandmother and sister.   She indicated that it was a blow to learn that while she had been fortunate enough to go to college in 2018, Lawrence would get arrested later that year.

Lawrence indicated that his social insecurities began to solidify during adolescence.  He lived in constant fear of eviction and homelessness, as his grandmother struggled to pay household bills.  The light and heat at home were cut off regularly, Lawrence said.  He felt the deterioration at home was noticeable to neighbors.  The front lawn was unkempt and had more dirt than grass, he said.   He recalled also that the house was small in relation to the number of family members living there, and the cramped space was a constant reminder that there was nowhere for him to take refuge.

Another bother for Lawrence was that his grandmother had several dogs, which added to the poor condition of the home.  He noted that his grandmother loved dogs, but she did not have time to take care of them.  There was so much dog feces at home that kids in the neighborhood teased him for smelling like dog dung.

Valery Giralt, a childhood friend, confirmed that Lawrence was bullied in school. Lawrence was a quiet kid who rarely talked to anyone and he was teased regularly, Valery said. Valery, who attended school with Lawrence, noted that a trigger for the teasing was that

WALSH, LAWRENCE

Lawrence had to wear clothes that smelled of the dogs in his home.    In recalling their time in school, Valery said he did not like to go to Lawrence's home because of the dogs there.

According to Valery, Lawrence tried to fit in at school by joining the football team in middle school.  However, Lawrence had to try harder than his peers to win approval both on the football field and in the classroom.   He was a good defensive player on the field and he also wanted to show he could do well in class, Valerie recalled.   As he strived to fit in, Lawrence's poor academic performance was frustrating for him and added to his concerns about his peers' perception of him.

In addition to deprivation, Lawrence's light complexion made him an easy target for bullying.  He had to contend socially with his mixed racial heritage, as he did not seem to fit neatly into the category of either black or white.  He related that it was difficult to make friends in school, if to try and do so only increased his risk for discrimination, teasing, and physical assault.  In school, he felt his peers talked about him derisively because "I was high color with a black grandmother and didn't have my parents in my life."

### Emotional and Learning Disabilities in School

Records from the Malverne Union Free School District in Long Island indicate emotional disturbance and learning disability affecting Lawrence's performance in school.   The records are from 2008 to 2010, which covers from the 8th grade to the 10th grade.  In late 2008, the school district's Committee on Special Education (CSE) classified Lawrence's disability as Other Health Impairment.  At the time, he was 15 years old and in the 9th grade.



The CSE decided to keep him enrolled in the general education curriculum but with the support of a special education teacher in the classroom.   Counseling by the school counselor also formed part of his regimen or Individualized Education Program (IEP).

The annual IEPs show continued concern about Lawrence's need for special services to improve his academic and social-emotional functioning.   The 2009—2010 IEP cited that

11

WALSH, LAWRENCE

Lawrence needed to develop "compensatory strategies to address learning difficulties." The IEP cited the need for improvement in reading, mathematical concepts, written expression, organizational and study skills, completion of class assignments and homework.    Also noted was the need for Lawrence to be granted extended time to complete standardized tests.

The IEP for 2009 -- 2010, stated that Lawrence was not disruptive in the classroom, and he acted friendly to peers and respectful to adults. However, there were noted weaknesses such as his lack of engagement in the lesson, "easily fades into the background and zones-off," lack of confidence in his skills, and he may have difficulty engaging with others outside of the school environment.

Further noted was the need for Lawrence to resolve anxiety and anger related issues, to develop organization and planning skills, to develop better coping skills, to become more aware of his strengths and weaknesses, and to take pride in his abilities.

According to Lawrence's grandmother (Michelle), Lawrence was hampered in school by ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. "It was a challenge," she remarked.

Michelle expressed concern that Lawrence was never tested to see if there were any lingering effects from the oxygen deprivation at birth. Her recollection is that Lawrence was not even referred for evaluation for learning problems until he reached middle school. She felt the referral for evaluation should have been done much earlier in his childhood, and it should have included consideration of whether the oxygen deprivation at birth was contributing to his poor performance.    Michelle added that on one occasion she visited Lawrence's classroom to observe him, and he was jumping all over the place and going under other students' desk.

Based on the school records, the school district wanted Michelle to take Lawrence for outpatient counseling while he was in the 9th grade. There is no indication in the school records that he received such counseling.

Certain disciplinary incidents noted in the school records suggest Lawrence's vulnerability to inappropriate behavior in response to emotional and learning difficulties.    In

12

WALSH, LAWRENCE

2008, 2009, and 2010 he was penalized in school for various incidents. These incidents included marijuana possession/smoking, lateness, absences, and missing class.    The school records also indicate that he dropped out of school in October 2010, when he was 17 years old.

## Exposure to the Streets

Lawrence indicated that his drift towards the streets came against the backdrop of a lack of supervision and support at home.  He recalled that when he was 13 years old, he started to smoke marijuana in response to peer pressure. He said his marijuana use increased as he got older and he added other drugs.  He recalled that at 17 years old, a friend led him to join the Crips street gang.    He related that by the time he joined the gang, he was under a lot of pressure to fend for himself financially and, as he navigated the streets, he felt a heightened need for protection.

Uncertainty about his living arrangement helped to steer Lawrence to affiliation with gang members.  His grandmother lost her home in West Hempstead, apparently due to financial difficulties.  The issue of shelter, and not wanting to feel like a financial burden, made him grasp at whatever support he found on the street.  This pressure to survive on the streets felt urgent despite the offer of shelter extended by Allan Jones, his grandmother's friend.

Allan corroborated that he agreed for Lawrence to move into his home in the Laurelton area of Queens, New York.  However, it was difficult for Lawrence to see a clear path forward when the cloud of abuse, neglect, deprivation, and homelessness shadowed him.

During her interview for this report, Michelle acknowledged that the disruptions Lawrence faced in childhood contributed to his current difficulties.    She indicated that the instability in the family affected his social interactions.  She noted that Lawrence was the type of child who was especially vulnerable to peer pressure as he so wanted to feel like he belonged or was accepted.    She said a problem he faced in the community was gang activity, as the older gang members would seek out vulnerable kids like him to recruit into the gangs.

At around 18 years old, Lawrence went to North Carolina to reside with his mother, Renee.    According to Renee, she invited Lawrence to join her in North Carolina so he could try and stabilize his life. She said he was with her in North Carolina for only the summer, as he was

13

WALSH, LAWRENCE

hanging out with the wrong crowd and getting caught up in "some stuff."   Lawrence was arrested in North Carolina on December 30, 2011, when he was 18 years old.   The disposition in that case was one of dismissal of the charge on January 25, 2012.

After the dismissal of the charge in North Carolina, Lawrence returned to New York to a situation of homelessness and dire financial need.   He was no longer a minor and so he was aware his grandmother might not feel obligated to keep him.   He was again faced with the challenge of having to adapt to streets where he felt unsafe, and in need of protection and support to survive.

Lawrence admits that he was drawn into associations that held out the promise of protection or support, but still left him in harm's way.   He recalled a gang related incident in which a rival gang member hit him in the head with a gun.   Reportedly, he was treated at Mercy Medical Center in Rockville Center, New York, for the head injury.

Lawrence indicated that ████████████████████helped to influence his social choices.   He said those feelings contributed to his signing up on a dating site to seek relationships.



and activities resulting in his arrest for the charges in the instant case.   Lawrence has expressed remorse and shame for his actions.   He indicated that he is disturbed by the choices he made.

14

WALSH, LAWRENCE

While he acknowledges the effect of his actions on others, Lawrence also feels badly about how those choices reflect upon him as the father of a young daughter.

## Fatherhood

Lawrence is the father of 7-year-old ████████. ████ resides with Lawrence's grandmother Michelle.    Lawrence's relationship with his daughter's mother, Charisma Hammett (age 31) was unstable.   He said Charisma needed to get her life in order, and so his grandmother had to take custody of his daughter.

Lawrence expressed motivation to improve, so he can play a positive role in the life of his daughter upon his release.    When asked about Lawrence's relationship with his daughter, Michelle expressed that he is keen on becoming a better father than his father was to him. Michelle confirmed that she has custody of ████ and they reside in the Long Island community of Lynbrook.

## Mental Health History

████████████████████████████████████████ ████████████████████████ Educational records indicate that he had emotional and learning disabilities including anxiety and deficits in reading and math.  Of note is that Lawrence was born deprived of oxygen; a condition that carried the risk of impairment to neurological and mental development.  Lawrence has indicated that throughout his life he has ██████████████████.   During interviews for this report, he indicated feeling depressed about events in his life including his current legal situation.

## Physical Health

Reportedly, Lawrence was incubated at birth because of oxygen deprivation.   His grandmother reports that he suffered from a high fever and seizure at 16 months old for which he was hospitalized.   He has a history of head trauma.  The first incident of head trauma occurred when he was 18 months old and fell down a flight of concrete stairs.   He did not receive medical attention after the fall, though there was a swelling on his head.   Given his childhood history of physical abuse and neglect, there is the possibility that he suffered other head injuries in childhood.   The other reported incident of head trauma occurred at around age 19 when a

15

WALSH, LAWRENCE

rival gang member hit him in the head with a gun.   He reportedly received in-patient care at Mercy Medical Center, Rockville Center, New York, for that head injury.  Phone contact with Mercy Medical Center revealed that Lawrence's name comes up in the hospital's system, but it would take some time for the hospital to ascertain if treatment records were still available.  There is also a reported history of Lawrence getting treatment at Firehouse Health Center in Queens, New York, due to chest pains and low blood pressure in 2018.

## History of Substance Abuse

Lawrence reported a history of substance abuse beginning at 13 years old when he started smoking marijuana.  He also reports that he started to consume alcohol in his teens and that by his early 20s, he was using drugs such as Xanax, Percocet, Oxycodone, Valium and Molly.  He sought to address his drug use when he gained admission to the Cornerstone Treatment Facility in Long Island on November 6, 2014.  He was diagnosed with cannabis and nicotine dependence.

The Cornerstone records indicate primary psychosocial stressors included economic pressure and the disruptive relationship he had with both parents.  He was unable to complete the full 30-day program at Cornerstone due to medical insurance issues, but he indicated that he would seek outpatient treatment.  It does not appear that he was able to access outpatient treatment.

The Cornerstone records indicate that Lawrence was taking certain medications: thiamine hcl (vitamin B1), milk of magnesia, Vistaril (an antihistamine that can be used to treat anxiety), bismuth subsalicylate (Pepto-Bismol), Tylenol and clonidine, multivitamins, and folic acid.

## Education History

Lawrence attended school in the Malverne School District, Long Island, New York, up until the 10th grade.   According to the school district's records, he dropped out of Malverne High School in October 2010.  His educational development was affected by emotional and learning deficits and stressors related to family and social issues.    During interviews for this report, he expressed interest in obtaining a GED diploma while in custody.

16

WALSH, LAWRENCE

## Employment History

Lawrence reported that his employment history mainly consisted of short term or odd jobs.   After he dropped out of school at age 17, it was difficult for him to find long-term employment.   He recalled working at a juice bar called Power for six months and earning $10.00 per hour.   He reported that his vocational goal is to qualify for a career in culinary arts.

## Arrest and Conviction History

Lawrence was arrested for the instant offense on December 12, 2018 and has been in federal custody since that date.   On April 15, 2019, he pleaded guilty, in accordance with a plea agreement, to Counts 1 through 7 of the indictment.   The criminal record outlined in the US probation officer's pre-sentence report (PSR) is acknowledged.

## Post Arrest Functioning

Lawrence has expressed remorse and stated that he regrets his actions.   He has a clearer understanding of the misguided need for gang affiliation and now repudiates further association. He has been cooperative with the legal process related to the instant case.   He indicated a desire for change, which he sees as entailing reorienting his life to become a productive member of his community and a supportive father to his daughter.   As part of his rehabilitation goals, he would like the opportunity to improve his educational and vocational skills, especially in the area of training for a career in the culinary arts.   He also indicated that he is considering the option of assistance/services from the Ready, Willing & Able organization (also known as DOE Fund) in New York. That organization, according to its website, provides a 12-month residential paid work program "complemented by holistic social services, career training, education, and sobriety support."

## Mitigation

Lawrence's social history provides several mitigating circumstances that should be considered at sentencing.  These include, but are not limited to, the following.

- Born at risk for impairment to neurological, psychological, and social development due to lack of neo-natal care and his suffering from asphyxia (lack of oxygen) at birth.

17

WALSH, LAWRENCE

- , experienced throughout his developmental years increased the risk for poor cognitive and social skills with negative consequences as he transitioned through adolescence into adult life.

- Lack of effective mental health interventions since childhood exacerbated the risk for poor emotional and social controls as well as for poor choices in reaction to psychosocial stressors.

- Brain/Head trauma beginning in infancy increased the risk for mental, emotional, behavioral, and social difficulties.

- Physical abuse and neglect in childhood contributed to Lawrence's difficulties, which could be seen as illustrative of research findings that childhood victims of abuse and neglect are at higher risk than their non-maltreated peers for a range of cognitive, emotional, behavioral and social difficulties that can extend into adult life.

- ████████████████████████████████████████████████████████████

- Lack of supervision and structure was devastating and did lead to a susceptibility to outside influences, particularly gang members offering the promise of familial support and protection.

- Raised in a home and social environment where risk factors were pervasive, and so significantly outweighed any protective factors that may have been available.

- Failure of parents, grandmother, and other adult caregivers to provide the safety, nurture, and support necessary for healthy development.

- Family history of substance abuse, mental/emotional disturbance, domestic abuse, unstable sexual and social relationships as well as other disorders increased the bio-psychosocial risk to Lawrence of incurring similar difficulties.

WALSH, LAWRENCE

- Deprivation that impacted financial and emotional wellbeing increased the risk for below average or poor outcomes in health, academic, occupational, and behavioral functioning that can extend into adult life with legal consequence.

- Institutional failure, as indicated in the inadequate interventions by school and Child Protective Services, put him at risk for underachievement and inappropriate attempts to survive including delinquency.

- 

- Age at time of initiation into prostitution was not far removed chronologically from his childhood, and thus he was still close psychologically to the disturbing events that helped to influence his cognitive, emotional, and social development.

- Attachment to young daughter is commendable and is a motivating factor to undergird the possibility for rehabilitation.

- Acceptance of responsibility as demonstrated in plea of guilty.

- Cooperation in the instant case including testimony.

- Remorse expressed during interviews come across as genuine.

- Prolonged sentence involving incarceration might be counterproductive, given the risk of harm in an environment where other inmates could seek to exact retaliation for his cooperation in the instant case.

- Capacity for change likely in a setting or under conditions that allow for safe access to self-improvement programs, mental health services, substance abuse treatment, and other appropriate resources that support the goal of rehabilitation. This is further enhanced by his rejection of further gang affiliation.

## Conclusion

Lawrence was born and raised in circumstances not only adverse to his development, but also clearly contributory to the difficulties that have resulted in legal consequences. He has

19

WALSH, LAWRENCE

taken responsibility for his actions by pleading guilty and, despite possible risk to his safety, was cooperative in testifying and bringing about a disposition in the instant case.    Lawrence's demeanor during interviews for this report indicates depression associated with lingering stressors from childhood and his current situation.    His responses also indicate remorse for his actions and an openness to the possibility for improvement or change.    A strong motivating factor is the relationship with his young daughter, ███ who is 7 years old.    His time in custody has allowed him to see the possibility of improving his vocational options, preferably in culinary arts, to become a supportive father and productive member of society.   As he presents for sentencing, his social history inclusive of mitigating circumstances merits consideration.

Respectfully submitted

Carmeta Albarus, LCSW-R

LICENSED CLINICAL SOCIAL WORKER
LIC # R-051798-1

20

# Exhibit B

# Exhibit C

Murphy, Daniel S. Medical Care in the Federal Bureau of Prisons: Fact or Fiction. California Journal of Health Promotion, Spring, 2005. 3(2): 23-37. The version of record is available open access at: http://www.csuchico.edu/cjhp/3/2/index.htm Permission to archive in NC DOCKS e-repository received from editor, Michele Mouttapa, Oct. 27, 2010.

# Health Care in the Federal Bureau of Prisons: Fact or Fiction

## Daniel S. Murphy

### *Appalachian State University*

## Abstract

Having spent five years imprisoned in Federal Medical Centers (FMC), I have substantive experience with the health care delivery system of the Federal Bureau of Prisons (FBOP). Intimately familiar with the symbolic quality of health care provided, I lived the rationing of health care practiced by FBOP medical personnel, and saw the organized denial of medical care to wards of the FBOP. Medical care within the FBOP is symbolic, with minimal expectation of improving prisoners' health. Discretionary medicine is top-down FBOP policy. The symbolic health care(less) provided by the FBOP is the focus of the present article.

© 2005 Californian Journal of Health Promotion. All rights reserved.
*Keywords: Federal Bureau of Prisons, prison health care, deliberate indifference*

## Introduction

Are prisoners' rights to medical care, such as those afforded under the Eighth Amendment that bans cruel and unusual punishment, being met? Are rights provided by the due process clauses of the Fifth and Fourteenth Amendments being upheld? Are standards of health care established by Congressional mandate, Supreme Court rulings, and policy directives contained in the U.S. Department of Justice Health Services Manual, being met by the Federal Bureau of Prisons (FBOP) health care delivery system?

Issues discussed are based upon the author's personal experience(s) while imprisoned in two Federal Medical Centers (FMC) of the FBOP; interviews conducted with prisoners over a five-year term of imprisonment; interviews with prisoners during and since release; academic training garnered through completion of Ph.D. post-release; and an in-depth analysis of medical directives including: Federal Bureau of Prisons policy statements, United States Department of Justice (DOJ) Policy Statements and statistics, United States General Accounting Office reports, and information provided by the American Correctional Association. Prison policy statements delineate health care mandates while ethnographic data describe the reality of health care(less) provided.

## Methodology

As a Convict Criminologist (an ex-prisoner who has academic training), I had the opportunity to analyze prison culture from the perspectives of participant and observer. Caged within the razor-wire of federal prison, I witnessed and chronicled significant deprivations of "normal" life inherent in the warehousing of human beings - "The Society of Captives" (Sykes, 1958). Elements of prison life researched include: the health care delivery system, the economic system of the imprisoned, process of spoiled identity, and prison as the university of crime. The methodology implemented includes identifying variables of interest, bringing the topic to life through qualitative (ethnographic) research, and comparing observations and interview notes with discussion and descriptions contained in social theory (Cressey, 1963; Irwin, 1970, 1980, 1985, 2005; Morton, 2006; Richards, 1995, 1997; Richards & Jones, 1997). The following focuses upon the crisis known as health care in the FBOP.

## The Right to Timely and Adequate Medical Care

Does a prisoner confined in the FBOP have the right to timely and adequate medical care? While it is true that prisoners lose many of the rights they previously enjoyed prior to incarceration, "the one right that they do retain,

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

under the Eighth Amendment, is the right to be protected against cruel and unusual punishment (*Bell v. Wolfish*, 1979)." "There is no iron curtain drawn between the Constitution and the prisons of this Country (*Wolf v. McDonnell*, 1974)."

In 1972, a United States District Court ruled that the Alabama correctional system violated inmates' rights under the Eighth and Fourteenth Amendments by not providing "adequate" and "sufficient" medical care for prisoners (*Neuman v. Alabama*, 1974). In *Estelle v. Gamble* (1976), the United States Supreme Court ruled that "an inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical torture of a lingering death." In *Gregg v. Georgia* (1976), the United States Supreme Court ruled that "[the] infliction of such unnecessary suffering [is] inconsistent with contemporary standards of decency."

*Estelle v. Gamble*, supra, sets forth the "deliberate indifference standard to serious medical need" as the measure to determine whether or not a state [FBOP] has breached its constitutional duty to provide medical care. McLaren (1997, pp. 369-371) observes that, "It was established in *Gamble*, deliberate indifference to serious medical needs of prisoner's constitutes unnecessary and wanton infliction of pain." The court held "[d]eliberate indifference by prison personnel to a prisoner's serious illness or injury constitutes cruel and unusual punishment contravening the Eighth Amendment" (*Gamble*, supra).

Courts have defined serious medical need as "a condition diagnosed as requiring medical treatment or one for which the need for medical treatment would be obvious even to a layperson" (*Hampton v. Holmesburg Prison Officials*, 1976; 1977). "[H]ighly contagious or dangerous conditions for which treatment is mandated by statute" (*French v. Owens*, 1982). "[C]onditions diagnosed as serious and that threaten substantial harm if not treated or that may result in serious injury when requests for treatment are denied" (*Freeman v. Lockhart*, 1974).

"[I]njuries that are severe and obvious" (*Smith v. Sullivan*, 1977). "[C]hronic disabilities and afflictions" (*Barksdale v. King*, 1983).

The Supreme Court, in *De Shaney v. Winnebago County Social Services* (1989), recognized the total dependence of prisoners upon the prison agency for health care and safe conditions of confinement. Justice William Renquist clearly enunciated the obligations of prison custodians, stating:

> "[W]hen the State [FBOP] takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being... The rationale for this principle is simple enough: when the State [FBOP] by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs- e. g. food, clothing, shelter, medical care, and reasonable safety-it transgresses the substantive limits on State [Federal] action set by the Eighth Amendment. . ."

The prisoner is unable to get a second opinion. Life or death of those imprisoned is dependent upon the medical care provided by the FBOP.

Whereas legal precedent applies equally to men and women prisoners, *Women Prisoners of the District of Columbia Department of Corrections v. District of Columbia* (1994), addressed prison conditions specific to female prisoners. In this case the court found Eighth Amendment violations due to lack of medical care, sexual harassment, and inferior living conditions.

> "After an extensive trial, the court concluded that civil rights violations were established conclusively by the plaintiffs and that prison officials had deviated from the standard of acceptable mental health care for women prisoners, had tolerated deficient gynecological examinations and testing, and had maintained inadequate testing for sexually transmitted diseases. The court,

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

applying the 'deliberate indifference' standard [Estelle v. Gamble (1976)], further found liability for inadequate health education, prenatal care, ineffective prenatal education, and overall inadequate prenatal protocol. In a scathing portion of the opinion, the judge found that shackling of female prisoners in the third trimester of pregnancy and immediately after childbirth violated contemporary standards of decency. The belief that adequate medical care exists in women's prisons may be on the brink of serious reexamination in light of the revelations of facts in this case (McLaren, 1997, pp. 369-371)."

The medical needs of women in prison must be provided for at acceptable community standards (see Palmer, 1994; Pollock-Byrne, 1990; U.S. Department of Justice [DOJ]; 1997). The hard reality is that they are not being met.

## U.S. Department of Justice Policy Statements: Medical Care in the FBOP

On March 26, 2005, the Federal Bureau of Prisons made "available information to help meet the requirements of the Correctional Officers Health and Safety Act of 1998 which requires that the Attorney General and the Secretary of Health and Human Services provide guidelines for infectious disease prevention and detection, and treatment of inmates and correctional employees who face exposure to infectious diseases in correctional facilities. Clinical guidelines are being made available to the public for informational purposes only. The FBOP does not make any promise or warrant these guidelines for any other purpose, and assumes no responsibility for any injury or damage resulting from the reliance thereof" (Federal Cure, 2005). Please note how the FBOP delineates symbolic medical care through obfuscation: "for informational purposes only... The FBOP does not make any promise or warrant these guidelines for any other purpose, and assumes no responsibility for any injury or damage resulting from the reliance thereof." These are the smoke-and-mirror tactics implemented by the FBOP to distort the reality of medical care available within the Federal Prison system.

In theory, directives contained in FBOP prisoner health care policy statement, as delineated in the U. S. DOJ Health Services Manual (1997), "appear" to meet the required level of humane treatment. Federal directive and Supreme Court rulings mandate provision of necessary medical care at levels comparable to accepted community standards. DOJ rules state that health care requirements take precedent over security concerns "whenever possible." It appears FBOP health care directive (U.S. DOJ, 1997) assures humane treatment of prisoners, yet the author suggests that the reality of health care in the FBOP is symbolic in nature. Symbolic medical care is a common theme among prisoners interviewed:

> "These people don't give a rat's ass about you. They don't care if you're sick or dying. This so called medical care ain't nothin but a big show. These doctors, hell most of em ain't even doctors, fill out their little forms so they can say they're doin somethin for ya. They ain't. They don't care if you live or die. It's all just a show for the public."

Health care services provided by the FBOP are symbolic in that they are predicated upon a system of economic justification, rather than motivated by need to provide adequate medical care. A prisoner described the reality as: "It is all just a show for the public, a bureaucratic paper trail to justify fiscal expenses. It is the sick and dying prisoners who pay the price, very often the ultimate price: death."

FBOP health care policy portends to provide medical care "consistent with acceptable community standards." Section 1 of the DOJ (1997) FBOP Health Services Manual Mission Statement issues the following mandate:

> "The health care mission of the Federal Bureau of Prisons is to provide necessary medical, dental, and mental health services to inmates by professional staff, consistent with acceptable community standards." (p. 1)

The stated function of FBOP health care policy is to provide humane medical treatment for

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

prisoners. When compared to the actual quality of medical services provided, health care in the FBOP is symbolic by design. In reality, health care does not meet the standards delineated in the DOJ policy statements. The vast divide between stated health care policy and the reality of health care provided by the FBOP, contravenes both Supreme Court rulings and Congressional mandate.

The FBOP medical care mission statement states that "health care requirements take primacy over security concerns whenever possible." This is patently false rhetoric. Greenberg (1988, pp. 167-170) discusses the contradiction between the goals of FBOP health care requirements and security concerns: "the stated health care policy of the FBOP gives precedent to medical care over security requirements whenever possible. In reality, the converse is true" (see Anno, 1991). The normative expectation of adequate health care in the prison setting is diametrically opposed to the security function of the FBOP. Citing the possibility of "an incompatibility between medical and correctional guidelines [that] should be resolved, as far as practical, in favor of medicine," the FBOP presents a front that health care requirements take precedent over security concerns. The phrase "as far as practical" is an open-ended ambiguous definition allowing the FBOP free hand justification, which places security concerns over prisoner's health care needs. This is an excellent example of conflict theory which maintains that those in power (in this case the FBOP) make the rules to benefit themselves at the expense of prisoners in their charge.

An inherent problem in the DOJ Health Services Manual (1997) that delineates policy directives contained in the FBOP Health Services Manual Mission Statement, is the definition of "acceptable community standards." Fleisher and Rison (1997, p. 329) question "what do the terms 'adequate,' 'reasonable,' 'appropriate,' and 'acceptable' mean for prison officials who must design and deliver inmate medical care?" Definitional ambiguity allows the FBOP free reign to contravene legal obligations contained in the U.S Constitution, Congressional mandates, Supreme Court rulings, and DOJ

policy statements. The FBOP puts forth, for public consumption, an image of compassionate health care for those under its charge. Yet within the context of definitional confusion, the FBOP minimizes and skirts Constitutional, Supreme Court, and Congressional mandate.

**Symbolic Medical Care**
Today the Federal Bureau of Prisons operates a symbolic medical care system. It is out of legal compulsion, not the welfare of prisoners, that limited medical care is rationed. On February 10, 1994, the United States General Accounting Office (GAO) submitted a report entitled "Bureau of Prisons Health Care: Inmates' Access to Health Care is Limited by Lack of Clinical Staff." The report was submitted to the Subcommittee on Intellectual Property and Judicial Administration, the Committee on the Judiciary, and the House of Representatives. The GAO (1994) provided an assessment of the quality of medical care provided by FBOP physician assistants:

> "Many physician assistants in BOP lack generally required education and certification and are not receiving adequate supervision from physicians. At the three centers we visited, 11 of 27 physician assistants had neither graduated from a program approved by the American Medical Association nor obtained certification from the National Commission on Certification of Physician Assistants." (p. 11)

The General Accounting Office (1994) assessment of medical care provided by the FBOP describes the inadequate health care available to federal prisoners:

> "Inmates with special needs, including women, psychiatric patients, and patients with chronic illnesses, were not receiving all of the health care they needed at the three medical referral centers we visited [Butner, North Carolina; Lexington, Kentucky; Springfield, Missouri]. This situation was occurring because there were insufficient numbers of physicians and nursing staff to perform required clinical and other related tasks. For example, physicians did not

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

always have enough time to supervise physician assistants who provided the bulk of the primary care given to inmates, and nurses did not have sufficient time to provide individual and group counseling to psychiatric patients. As a result, some patients' conditions were not improving and others were at risk of serious deterioration." (p. 2)

Insufficient medical care staff is a function of dual realities -an exploding prison population in conjunction with proportionately decreasing funds available for health care services.

Fleisher and Rison (1997, pp. 327-334) note that for the fortunate few, some sick and dying prisoners are sent to "contract medical facilities." The fortunate prisoner may receive an operation, or treatment for serious medical conditions at a local contract hospital (public hospitals the FBOP sends prisoners to receive medical care beyond the scope of services the FBOP is able to provided), only to be returned to the "total institution of prison" (Goffman, 1961) and be treated with neglect. I knew prisoners who received adequate medical attention at a contract medical facility only to be returned to prison and die under lock and key because adequate health care was not maintained. The author suggests, and documents, that post-operative care in the prison setting is at best substandard, and that ongoing care for serious medical conditions falls well below the level of acceptable community standards.

Perhaps our society rationalizes the lack of proper medical care provided to those imprisoned because, after all, the prisoner can be viewed as somewhat less of a human being. It is society that attaches the label "prisoner," while sublimating the human being. Berkman reported:

> "The buildup in the prison population has been accompanied by a systematic campaign to dehumanize those in prison. Politicians and policymakers increasingly use terminology such as 'animals' and 'sub-humans' to describe street criminals. The intended result is to demonize those in

prison, implicitly relieving society of any obligation to supply decent living conditions or medical care." (pp. 1616-18)

The dehumanization process allows the FBOP symbolic presentation of health care to go unquestioned. Dehumanizing justifies substandard treatment. Substandard treatment is cost effective. Reducing expenditures on medical care frees more resources for human warehousing -- and the cycle of inhumanity disgracefully rages on.

**Reality of Medical Care at Federal Medical Centers: Voices From Within**
Many prisoners entering the federal prison system suffer from malnutrition and disease stemming from poverty, alcohol or drug abuse, poor medical care, risky lifestyles, and the incessant demands of life on the streets. Many have contracted diseases such as HIV/AIDS, TB, hepatitis, and cirrhosis of the liver. The compromised health of many of those entering prison poses a serious challenge to the health care delivery system of the FBOP. What is the response by the FBOP to the medical needs of those entering prison, and what is the long range plan for medical care of prisoners incarcerated with sentences that span decades? How do FBOP health care workers determine who needs and/or receives medical attention? By comparing FBOP policy statements, which in theory govern medical care practices, to testimonies of those imprisoned, insight may be gained from these questions.

Excerpts from interviews conducted with prisoners housed in four FBOP Federal Medical Centers (FMC Rochester, FMC Carville, FMC Lexington, and FMC Fort Worth) follow. This section is intended to replace the myth that those incarcerated are nothing but a bunch of tough guys with tattoos lifting weights. They are people, thousands of them, sick and dying in indignation.

A prisoner interviewed described being poor and using drugs beginning at an early age. He is a black man from the ghettos of Washington, D.C. He spent four years, between the ages of two and six, in and out of hospitals receiving skin

grafts for burns that resulted when a babysitter placed him in a bath of scalding water. At the time of this interview the individual was 38 and had been locked-up since he was 21 years old:

> "The first time I got loaded-up (high on drugs), God damn, I was 12 or 13 and living in a foster home. I done some crazy shit and now my body's paying the price. Now I just want to be a peaceful old man."

This is just one example of thousands that illustrates the compromised health and the pre-existing conditions with which many suffer as they enter prison. Pre-existing conditions, many predicated upon risky behaviors on the street, pose a serious challenge for the FBOP.

Many prisoners in the FBOP have a history of drug and alcohol abuse. One such prisoner was remanded to a FMC for alleged mental health counseling and alcohol/drug abuse treatment. He describes his condition at the time of incarceration:

> "When I first got to prison I had the DT's-shaking, paranoid, frantic. I could not stand to have nobody touch me or talk to me. The first year was really rough because of the alcohol. Before coming to prison I was doing at least a 6-pack of beer every night after work, and two cases on the weekends."

Many enter prison with severe drug/alcohol addictions. While in the county jail awaiting transport to a federal medical facility I saw a fellow prisoner who was a 25-year old heroin addict. They confined this person, who had become addicted to heroin while serving his country in the Vietnam War, in a cell to dry out cold turkey. I observed the horror of someone suffering withdrawal without medical assistance. I will never forget watching this man pace in circles sweating profusely and shivering at the same time, as he described the sensation of a snake trying to crawl out of his belly and up his throat.

**Politically Rationed Health Care in the FBOP**
Is the delivery of medical care within the FBOP politically rationed? Is someone who complains

-- desperately attempting to receive medical care -- subject to retaliatory denial of such care? A prisoner who was having difficulty urinating described the politics of health care within the FBOP:

> "Navy doctors are politically inclined to go along with the system. [In referencing "Navy doctors" the respondent is referring to the government branch of Public Health Services (PHS). These medical technicians support the FBOP medical staff. They wear uniforms similar to those of Naval officers]. A lot of politics involved in getting medical procedures. They look at the background, your PSI [pre-sentence investigation report] and your team reports [evaluations prepared by a prisoner's councilor and unit representative]. This decides what medical procedures you get. Two men died this week. If you don't know somebody on the outside who can step on their feet, the BOP doctors feet, then they just give you a aspirin and forget you."

Another prisoner supports this position stating "If you get injured, hurt, or sick, they give you aspirin, aspirin. It takes months before you get medical attention."

I personally experienced the political rationing of medical care by the FBOP. Becoming very ill while imprisoned, my weight dropped from 214 to 157 pounds, pleading with FBOP doctors for medical care, I was told I was suffering the shock of adjusting to prison (which they had conveniently called post traumatic stress disorder) (see Murphy, 2004). I was passing blood via ten to 14 bowel movements per day. In desperation, I contacted my family who convinced a Senator to contact the Federal Medical Center (prison) on my behalf. In short order I was taken to a contract hospital and diagnosed with Crohn's Disease (ulceration's of the intestine). This disease is chronic, and if untreated potentially terminal (my eldest sister died of Crohn's Disease in 2003). I was one of the lucky few, for in prison, resources needed to mobilize political pressure are rare.

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

The symbolic nature of medical care within the FBOP is not provided out of compassion, but rather due to legal compulsion. The FBOP is rationing medical care. A prisoner described the quality of the medical care to which he was subjected:

> "In this system, medical attention is deliberate indifference. This Federal Medical Center is not a real medical facility. There are over 150 men in wheelchairs. There are maybe 50 men in wheelchairs on the third floor of my unit, and there's only one elevator. If there is a fire, we're all toast (see Caroit (2005) "133 Killed in Dominican Republic Prison Fire"). This place has no handicapped bathrooms or showers. Men are always falling out of their wheelchairs on the steep ramps."

Description of the inhumane medical care provided by the FBOP is echoed by another prisoner:

> "If you come here in a bad medical state, you go out in a black bag with a tag on your toe. Critical care cases are supposed to go to a different FMC. Yet there are people here with AIDS, cancer, liver disease, TB, and so on. I'd say 70 percent of the prisoners here are on respite [medically unassigned]. They don't have the facilities to care for these men. In the health care unit much of the care is provided by ICP's [inmate care providers]. These are inmates who have received very little training. They are given a fancy diploma that don't mean nothin'."

Based upon my personal experience, the (symbolic) medical care provided by the FBOP does not rise to the level of accepted community standards as required by law. For many imprisoned, their original sentence has been convoluted into a death sentence due to substandard health care.

It is easier for the average citizen to believe that prisoners are treated with compassion rather than come to understand the true nature of medical care provided by the FBOP. The following excerpt gives insight into the quality

of medical care provided those incarcerated. The prisoner interviewed was in a wheelchair. He was wearing a pair of shorts that did not fit, and a T-shirt. He was not wearing shoes. His feet were bleeding. An uncomfortable wardrobe was the least of his problems.

> "I been here a year and because of my large size, I have yet to get clothes, or even underwear. I been sick here twenty times. I came here from a hospital on the streets where I was suffering heart failure. Since I have come here I have had to buy antibiotics and painkillers from other inmates because the prison doctor won't give me any. Recently I woke up about 1:00 A.M. with congested heart failure. The emergency button in the medical wards don't work. I couldn't breathe, my temperature was up, and I was foaming at the mouth. My roommate in the medical-acute dorm, which has 25 men suffering with MS [multiple sclerosis], MD [muscular dystrophy], and so on, and everybody is in a wheelchair, he called the cop. The CO [prison guard] called the nurse. The nurse refused to come check my condition. The CO said she can't do anything for me."

Conflicting with the medical needs of prisoners are the security requirements of the FBOP. Fleisher and Rison (1997, p. 323) outline this dilemma, "Security is a primary concern in corrections, even during the delivery of medical care to inmates" (see Anno,1991; Greenberg,1988). However, The FBOP medical care mission statement delineates that health care requirements take primacy over security concerns -"whenever possible." The conflicting dualism of security versus health care was underscored in an interview with a prisoner I knew very well. He was taken to a contract hospital for a five-way heart bypass:

> "I'm in the operating room, already prep'ed for surgery. The HACK [prisoner argot for prison guard: hopeless asshole carrying keys (Murphy, 2004)] had me handcuffed to the operating table. I couldn't believe it, but this HACK was going to stay in the operating room for the whole operation. The doctor

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

comes in and tells the HACK to take the cuffs off. The HACK refused and said something about security requirements. The doctor explained to this lard head that in addition to being under anesthesia, he was going to cut apart my ribcage and remove my heart from my body. He explained that it was pretty much clear that I wasn't going nowhere. The fucking HACK still refused to take off the cuffs. Now the doctor got pissed. He told the HACK that if my heart stopped and they had to hit me with the paddles, the cuffs would conduct electricity and I'd get severely burned. The HACK told the doctor that if that were the case, I'd just have to get burned. The doctor went ballistic. He called the warden right from the operating room. I told the doctor that I refuse the operation, and that I was going to sue these bastards. After a shouting match with the warden, the doctor handed the phone to the HACK. Next I knew the cuffs were off and the operation was on."

The length to which the FBOP goes to ensure security in the face of medical need is amazing. I interviewed a prisoner who is a quadriplegic. He is paralyzed from the neck down and confined to a wheelchair. He had made great progress by the time I interviewed him, training his diaphragm to drive the breathing process, for previously he was bound to a mechanical respirator (similar to Christopher Reeves). I recount the events described by the prisoner:

"These assholes are totally unbelievable. I have been paralyzed for over a decade and these fucker's still chain me to my chair [wheel chair] when I go out on medical [a trip to a medical contract facility]. I got shot and my fucking spinal cord was busted up. What do these assholes figure, I'm going to escape, I'm going to run the 440, or do these stupid assholes figure I'm goin' to fly away? And they put me through this shit every time. The good news is that the doctors at the hospital make these fucking assholes take the chains off as soon as we show up.

The functional conflict between the medical needs of a prisoner and the security

emphasis of the FBOP is further underscored by an ex-con who is a medical doctor. Berkman's (1995) analysis appeared in the American Journal of Public Health:

Beneath the talk of health care systems and public health planning, there is the stark reality of individuals grappling with illness and possible death in an inhumane environment. During my second bout with cancer, I was almost totally paralyzed from the neck down, able only to breathe and minimally use my hands. Yet, I was kept shackled to the bed, the guard coming by regularly to check the restraints. Prisoners struggle to live, or die, surrounded by people whose primary responsibility is to confine them, not care for them. There is no comforting touch, no human solidarity in the face of suffering or death." (pp. 1616-1618)

Section 1 of the U.S. Department of Justice (1997:2) Health Services Manual Mission Statement decrees the level of health care provided prisoners must be "consistent with acceptable community standards." Is a system of health care in which people are struggling to live or die, surrounded by people whose primary responsibility is to confine them, not care for them, consistent with acceptable community standards? Is the FBOP meeting the standards of care ordered by the Supreme Court? Has contemporary philosophy of "throw away the key" usurped the Eighth Amendment guarantee against cruel and unusual punishment? Are prisoner's human beings, subhuman, or just a number?

**Voices From Within: Media Accounts**
A staff article in the Miami Herald, citing an Associated Press release (2005), describes the horrific conditions pregnant women face while incarcerated. "A former inmate is suing over the death of her baby, born over a cell toilet even though she complained of labor pains for nearly 12 hours. The mother was leaking amniotic fluid, running a fever, had complained for nearly 12 hours about labor pains, and had asked repeatedly to be taken to a hospital before the March 5th birth. 'What she went through no one

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

should have to go through,'" stated the women's attorney.

Those facing complicated medical issues may receive a minor sentence, which may be convoluted into a death sentence due to medical neglect. Cauvin (2005) described the tragic circumstances surrounding the death of a quadriplegic sentenced to ten days of jail confinement for possession of marijuana used for medicinal purposes. Due to complications the defendant was taken to a contract hospital (because his place of confinement could not meet his medical needs) on the first day of his incarceration. Five days later the defendant died. The inquiry into the matter revealed that the defendant was "susceptible to swift deterioration requiring acute- care hospitalization." Should our civilized society take solace in the fact that it was determined this individual required special care, only after his death?

von Zeilbauer & Plambeck (2005) reported that a former nuclear scientist convicted of taking skis from his ex-wife's house died on the tenth day of confinement. He suffered Parkinson's disease, yet "the medical director had cut off all but a few of the 32 pills he needed each day to quell his tremors. . . Over the next 10 days he slid into a stupor, soaked in his own sweat and urine... But he never saw the doctor again and the nurses dismissed him as a faker" (p. 1). No matter the judicial intention, does this deliberate indifference not boil down to a death sentence?

**Prison Population Explosion: Strains on FBOP Health**
Due to rapid growth of the prison population, health care for those incarcerated in the FBOP is compromised. Presently, the United States incarcerates the highest percentage of its citizenry, as well as the highest raw number of individual citizens among all industrialized nations of the world (Walmsley, 2003). Presently, there are in excess of 2.1 million people confined in U.S. prisons (Harrison & Beck, 2005). It is estimated that in the year 2005 at least 640,000 prisoners will return to "our" communities (The Sentencing Project,

2004) bringing with them the ravages resultant of denied medical care.

A result of the upsurge in human warehousing is "selective incapacitation" (the theory that removing offenders from society will reduce crime: utilitarian philosophy), and "presumptive or prescriptive sentencing guidelines," (incarcerating offenders for multiple decades per offense). Given the contemporary penal philosophy of "throw away the key," the FBOP is forced to provide medical care within a fixed budget, while concomitantly experiencing an exploding population base (Blumstein, Cohen, & Nagin, 1978; Hagan, 1994).

The FBOP espouses practical health care solutions for meeting prisoners' medical needs. Medical care provided by the FBOP is, in part, an economic function of a fixed operating budget, compromised by an increasing prison population. As the Federal prison population continues to skyrocket, limited funds available for health care must be used to treat greater numbers of prisoner's. Also, medical support staff in the FBOP must care for increasing numbers of patients. As case-loads placed upon medical support staff continue to grow, and money available for health care continues to dwindle, the quality of medical care for prisoners proportionally decreases. The "practical" solution for the FBOP symbolic health care delivery system is to reduce health care services.

The real mission of the FBOP is not to medically or otherwise rehabilitate, but to function as a vehicle for extracting punitive retribution. The needs of those imprisoned are secondary to the fiscal bottom line. Fiscal incentive, not humane consideration, is the driving force behind the FBOP health care delivery system.

**Prison: A "Health Maintenance Organization" (HMO)**
Fleisher and Rison (1997, p. 327) observe that the FBOP operates the 'the nation's largest health maintenance organization." Correctional health care delivery systems have been viewed as the original managed care setting, in the sense

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

that there is a fixed budget for the provision of medical care regardless of prison population size. Douglas and Mundey (1995, p. 98-100) argue that "Managed care is a health care delivery system in which costs, accessibility, quality and outcomes of care across a continuum of health services are tightly regulated using various rules, guidelines, and oversight methods." If the segment of the prison population in need of medical care exceeds projection, the FBOP has no alternative than to reduce the quantity and quality of medical services available. Such cutbacks reflect the "practical" application of "symbolic" medical care within the FBOP. In today's policy of human warehousing, fiscal resources are simply not available to meet health care needs.

Ballooning health care costs are a dilemma shared by both the public and private sectors. However, the precipitous increase in the prison population is a function of Congressional policy -"throw away the key." Due to the politically engineered prison population explosion, the health care delivery system of the FBOP has been forced to ration medical care and reduce the quality of health care provided. Crawford and Moses (1995) reported:

> "Private insurers fiercely defend the need to control their risk; 'correctional insurers,' on the other hand, must deal with 'mandatory enrollment.' Correctional institutions cannot limit the number of patients they will insure. This inability to control assumed risk is further exacerbated by a number of institutional conditions: an increase in time served, the increased violence of some segments of the offender population, and the greater prevalence of infectious diseases in crowded facilities." (pp. 120-121)

For a given fiscal year, Congress allocates the FBOP a fixed budget. Funds available for health care are predetermined to accommodate a population of X. However, if the population increases to 2X, the same fiscal budget must accommodate. Yet, the FBOP population has soared from 24,252 in 1980 (FBOP, 2005) to approximately 179,000 prisoners midyear 2004 (Harrison & Beck, 2005). Moreover, the federal

prison system's growth has outpaced the state prison growth for the past decade (Harrison & Beck, 2005). In other words, if the FBOP is allocated $100 to care for 100 prisoners over a fiscal year, that breaks down to one dollar per prisoner. If the prison population increases to 200 prisoners over the fiscal year, the same $100 is available, thereby decreasing funding from one dollar per prisoner to 50 cents. Amplifying the situation, there are currently more critically, chronically, and mentally ill prisoners in the FBOP than in any other period in U.S. history (FBOP, 1995). Further, *Corrections Compendium* (1998) reported that 30 percent of the FBOP prisoner population is chronically or critically ill.

## Guerilla Healthcare Techniques: Self-Survival or Die

While imprisoned, I observed various methods prisoners used to survive, despite limited, rationed, symbolic health care service. These methods of self-preservation are routine behavior patterns prisoners implement to maintain and improve their health. For many, these are self-driven programs embraced in an attempt to stay alive.

Given the lack of adequate medical care provided by the FBOP health care delivery system, four forms of self-maintenance implemented by various prisoners' were identified. These include: the walker, the health-nut, the weight lifter, and the maintenance-man. A fifth approach, the sessile state, is the all too frequent destruction of health that results from the soul-crushing despair of incarceration, in conjunction with inadequate medical care.

## The Walker

Many of the elderly prisoners are walkers. Their mantra is "move it or lose it." They walk the track several times per day in endless circles going nowhere. Their self-reliance often yields improvements in health. Many of those implementing the walking approach to self-maintenance shed weight. Diabetics interviewed reported their reliance on insulin was reduced. Several indicated their blood pressure was lowered as a result of their walking. An additional benefit to the "walker" is the social

D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37

and emotional support provided through the interaction with those whom they walk. Many of the prisoners interviewed explained that they had no choice but to walk. In the face of inadequate medical care, many believed if they did not do something for themselves, they were destined to die in prison.

**The Health-Nut**
The health-nut relies on nutrition and vitamins for health maintenance. These prisoners practically exist on fruits and vegetables purchased on the prison's black market. Prison culture has its own economic system. Cigarettes and stamps, available for purchase at the prison commissary, are the usual forms of currency. These staples are used to purchase commodities ranging from legal services provided by a "jail-house attorney," to food stolen from the kitchen. The health-nut shunned the slop passed off as food in the prison chow hall. As of January 1, 1996, on average, the FBOP spent $2.74 on food per prisoner per day. This equates to roughly ninety cents per meal (Camp & Camp, 1996). In spite of the atrocity called food put forth by the FBOP, the culinary cuisine of the health-nut was usually prepared in microwave ovens located in some cell units. I was amazed at the gourmet quality meals many were able to miraculously create with limited supplies available.

**The Weight Lifter**
The weight lifter implements a combination of exercise and self discipline to maintain health. The myth that prisoners are muscle bound weight lifters was not born out in my experience. In fact, the vast majority of those I observed lifting weights were not huge burley men. These were individuals who found disciplined commitment to a structured activity as their mechanism of survival. For many this was a revelation, a life-changing awakening. In their life on the street, many of the prisoners interviewed did not have a firm grasp of what discipline or commitment meant. In the prison setting, these individuals not only used the activity of weight lifting as a method of health maintenance, but found direction through the commitment of training everyday.

Despite the positive gains associated with weight lifting, an understanding of commitment, discipline, and improved health, the FBOP has eliminated weight lifting as a tool for self-improvement. On October 1, 1996, Congress passed the Zimmer Amendment. One feature of this legislation was the prohibition of weight lifting equipment (Zimmer Amendment, 1997).

The Zimmer Amendment was a stopgap measure that expired at the end of the fiscal year, 1997. This legislation was replaced by H.R. 816, the "Federal No Frills Prison Act of 1997" (105 Congress, February 25, 1997). H.R. 816 states in part:

> "No Federal funds may be used to provide any of the following amenities or personal comforts in the Federal prison system: (3) Instruction (whether live of through broadcasts), or training equipment, for boxing, wrestling, judo, or karate, or any other martial art, or any bodybuilding or weight lifting equipment, of any sort."

Subsequently the FBOP has adopted practices that reflect the Zimmer Amendment. The October 1, 1997, to September 30, 1998 budget bill H.R. 2267 contains a provision similar to the Zimmer amendment that prohibits the purchase or replacement of weight lifting equipment.

Through legislative action, Congress and the FBOP have taken from the prisoner far more than just weights. Many of those incarcerated had discovered a sense of commitment and discipline through weight lifting. More than physical development, many grew in strength of character. Additionally, weight training was for many a means of improving and maintaining health. It may be argued that a large sum of money was saved in health care expenditure as a result of improved health associated with weight training. Does it not make sense -economic, intellectual, and emotional- to provide those incarcerated with the opportunity to improve their health and grow in character through the disciplined commitment of lifting weights?

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

**The Maintenance-Man**

The maintenance-man implements a rounded approach to personal health care. John Irwin, in his book *The Felon* (1970) describes this rounded approach to surviving in prison as the "gleaner." Irwin states "one very important dimension of this style of adaptation, is the tendency to pick through the prison world (which is mostly chaff) in search of the means of self-improvement" (p. 158) (see Cressy, 1963; Lemert, 1972).

Rather than committing to one of the categories preciously discussed, the maintenance-man borrows a bit from each. He frequently walks. He is concerned with nutrition. He lifts weights, and often engages in aerobic exercise. In addition, the maintenance-man spends time in the library, takes classes, or enrolls in the limited programs provided by the FBOP. Also, the maintenance-man often embraces religious activities. He is a renaissance man, treating not only his physical health, but a rounded approach of body, mind, and soul.

**The Sessile State**

The fifth approach, implemented by so very many prisoners, is antithetical to a positive state of health. In the sessile state, the prisoner seems to grow roots to the seat of a metal folding chair. Stationed in from of a TV, the physiologically beleaguered and often psychologically broken prisoner, wastes away in an endless progression of stagnation. They do not receive adequate medical care, and as a result, their health spirals downward. It is often a slow, agonizing death, which I observed over and over again.

**Conclusion and Recommendations**

Many prisoners are condemned to death due to a lack of fundamental medical care. The FBOP attempts to balance limited funds available for health care services with an exploding prison population. It is Congress who approves or disapproves FBOP funding requests, and it is Congress who has passed the retributive sentencing laws - which created an explosion in the federal prison population. The imbalance between finances available for health care services and the exploding prison population results in the rationing of health care available to the prisoner. Budget constraints are reducing health care services below the cruel and unusual punishment threshold established in the Eighth Amendment. The quality of health care provided in the FBOP does not rise to the level of acceptable community standards. The Draconian sentencing policies of "throw away the key" have created human warehousing heretofore unseen in the first-world nations this century.

As a civilized society, those imprisoned are entitled to humane treatment. By reducing the present rush to punishment, thousands of first time non-violent offenders would be deflected from the prison system. This would stem the tide in the relentless process of prison construction. Refocusing social conscience would greatly reduce budgetary demands on the FBOP (see Pepinsky, 1991; Pepinsky & Quinney, 1991).

Many entering prison come from a background of poverty. By providing prisoners health management training, prison related health care expenses would be reduced. Implementing suggested health care management tools, the health status of the prisoner would improve over the course of incarceration. Upon release, the former prisoner will be better equipped to maintain a healthy life style, and thus a reduction in social costs associated with subsidized health care. Additionally, the implementation of a healthy lifestyle may lead to a reduction in criminal activity and reduce recidivism.

It is imperative that an independent advocate be established to campaign for the health care rights of prisoners. The FBOP has entered into a symbolic process of rationed health care. If a prisoner does not have someone on the outside to fight for medical care on his/her behalf, that individual may be subject to rationed medical care. If an individual is not familiar with how to initiate a court proceeding to force the delivery of health care, that individual may be subject to discretionary care. An independent advocate would facilitate the right to timely and adequate medical care on the prisoner's behalf.

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

An area of future research should focus upon the bio-ethical issues associated with inmates being used as "lab rats" within the total institution of prison. Researchers rely upon "informed consent" as an element in meeting the guidelines of institutional review boards. I suggest that research be conducted into the viability of obtaining truly informed consent behind the razor wire of our country. Researchers typically do not live the reality of prison. They do not fully understand that prison is spelled H-E-L-L. They cannot fully comprehend that a prisoner will do virtually anything to leave the hell called prison. In full bold letters the informed consent form may read, in prison argot, "you ain't got nothin' commin'." Researchers typically will not understand that this translates to the prisoner; 'If I do this, I know that agreeing to participate will get me a step or two closer to the gate.' Further, history – the most accurate predictor of future actions – shows that powerless prisoners fall victim to the powerful bureaucracy.

Lastly, further research need be conducted into the application of community corrections. By sentencing first time, non-violent offenders to the "university of crime," our system is producing "damaged goods" (Hochstetler & Murphy, 2004). Our prison system is producing a very dangerous group of "gladiators" who will return to our communities. We need to avoid incarceration whenever possible in order to avoid the deleterious consequences of living the prison experience. Additionally, further research need be conducted in order to measure the positive consequences of keeping first time, non-violent individuals out of prison. Researchers need quantify the positive ramifications of keeping individuals in the community setting, keeping them in close relationships with their partners and children, allowing them the opportunity to find and maintain employment, as well as the opportunity for pursuit of education, and simply avoiding the label and associated stigma of ex-con.

## References

Anno, J. B. (1991). Analysis of inmate/patient profile data. Washington, DC: Blackstone Associates, Inc.

Associated Press. (2005). Ex-inmate sues over death of baby born over toilet. Retrieved March 1, 2005, from http://www.miami.com/mld/miamiherald/news/state/103891131.htm?1c

Berkman, A. (1995). Prison health: The breaking point. American Journal of Public Health, 85, 1616-18.

Blumstein, A., Cohen, J., & Nagin, D. (1978). Deterrence and incapacitation: Estimating the effects of criminal sanctions on crime rates. Washington, DC: National Academy of Sciences.

Camp, G., & Camp, C. (1996). The corrections yearbook. South Salem, NY: Criminal Justice Institute.

Caroit, J. (2005). Gang fight and fire in overcrowded prison in Dominican Republic kill 133 inmates. The York Times, March 8, Section A, 12.

Cauvin, H. (2005). Report clears D.C. judge of misconduct in inmate's death. Washington Post, March 18, 2005, B05.

Corrections Compendium. (1998). Inmate health care, part II. Corrections Compendium, 23, 17.

Crawford, C. A., & Moses, M. C. (1995). NIJ reports help practitioners through health care maze. Corrections Today, 57, 120-121.

Cressey, D. R. (1963). The prison: Studies in institutional organization and change. New York: Holt, Rinehart & Winston.

Douglas, T., & Mundey, L. (1995). Making managed care principles work in the correctional setting, Corrections Today, 57, 98-100.

Federal Bureau of Prisons Fact Card. (1995). Washington, DC: U.S. Department of Justice, Federal Bureau of Prisons.

Federal Bureau of Prisons. (2005). About the Federal Bureau of Prisons. Retrieved May 5, 2005, from http://www.bop.gov

Federal Cure. (2005). Federal Bureau of Prisons clinical practice guidelines. Retrieved March 28, 2005, from http://www.FedCure.org

Fleisher, M. S., & Rison, R. H. (1997). Health care in the Federal Bureau of Prisons. In J. W. Marquart & J. R. Sorensen (Eds.), Correctional contexts: Contemporary and classical readings (pp. 327-334). Los Angeles: Roxbury.

Goffman, E. (1961). Asylums: Essays on the social situation of mental patients and other inmates. Garden City, NY: Rutgers University Press.

Greenberg, M. (1988). Prison medicine. American Family Physician, 38, 167-170.

Hagan, J. (1994). Crime and disrepute. Thousand Oaks, CA: Pine Forge Press.

Harrison , P. M., & Beck, A. J. (2005). Prisoners at midyear 2004. Washington, DC: Bureau of Justice Statistics.

Hochstetler, A., & Murphy, D. S. (2004). Damaged goods. Crime and Delinquency, 50, 436-457.

Irwin, J. (1970). The felon. Englewood Cliffs, NJ: Prentice Hall.

Irwin, J. (1980). Prisons in turmoil. Boston: Little Brown and Company.

Irwin, J. (1985). The jail. Berkeley, CA: University of California Press.

Irwin, J. (2005).The warehouse prison: Disposal of the new dangerous class. Los Angeles: Roxbury.

Lemert, E. (1972). Human deviance, social problems, and social control. Englewood Cliffs, NJ: Prentice Hall.

McLaren, J. (1997). Prisoners' rights: The pendulum swings. In J. M. Pollock (Ed.), Prisons: Today and tomorrow (pp. 369-371). Gaithersburg, MD: Aspen Publishers.

Miami Herald. (2005). Ex-inmate sues over death of baby born over Tampa jail toilet. Retrieved March 21, 2005, from http://www.miami.com

Morton, J. B. (2006, in press). Implications for corrections of an aging prison population. In R. Tewksbury (Ed.), Behind bars: Readings on prison culture.

Murphy, D. S. (2004). Pre-prison, prison, and post-prison: The link between the pains of imprisonment and onset of post traumatic stress symptoms. (Doctoral dissertation, Iowa State University, 2004).

Palmer, J. W. (1994). Constitutional rights of prisoners. Cincinnati, OH: Anderson.

Pepinsky, H. E. (1991). The geometry of violence and democracy. Bloomington, IN: Indiana University Press.

Pepinsky, H. E., & Quinney. R. (1991). Criminology as peacemaking. Bloomington, IN:Indiana University Press.

Pollock-Bryne, J. M. (1990). Women, prison, and crime. Pacific Grove, CA: Brooks/Cole.

Richards, S. C. (1995). The structure of prison release: An extended case study of prison release, work release, and parole. New York: McGraw Hill.

Richards, S. C. (1998). Critical and radical perspectives on community punishment: Lessons from the darkness. In J. I. Ross (Ed.), Cutting the edge: Current perspectives in radical/critical criminology and criminal justice (pp. 122-144). New York: Praeger.

Richards, S. C., & Jones, R. S. (1997). Perpetual incarceration machine. Journal of Contemporary Criminal Justice, 13, 180-194.

Sykes, G. (1958). Society of captives: Study of maximum security prison. Princeton, NJ: Princeton University Press.

The Sentencing Project. (2004). Research on recidivism and re-entry. Washington, DC: Sentencing Project.

United States Department of Justice. (1997). Health services manual. Washington, DC: United States Department of Justice.

United States General Accounting Office. (1994). Bureau of prisons health care: Inmate's access to health care is limited by lack of clinical staff. Report to the Chairman, Subcommittee on Intellectual Property and Judicial Administration, Committee on the Judiciary, House of Representatives.

von Zielbauer, P., & Plambeck, J. (2005). As health care in jails goes private, 10 days can be a death sentence. New York Times, February 27, Sec. 1, 1.

Walmsley, R. (2003). World prison population list. London, UK: Home Office.

*D. Murphy/ Californian Journal of Health Promotion 2005, Volume 3, Issue 2, 23-37*

Author Information
Daniel S. Murphy, Ph.D.
Appalachian State University
E-Mail: murphyds@appstate.edu

# Exhibit D

| RESEARCH AND PRACTICE |

# The Health and Health Care of US Prisoners: Results of a Nationwide Survey

| Andrew P. Wilper, MD, MPH, Steffie Woolhandler, MD, MPH, J. Wesley Boyd, MD, PhD, Karen E. Lasser, MD, MPH, Danny McCormick, MD, MPH, David H. Bor, MD, and David U. Himmelstein, MD

The prison population of the United States has quadrupled in the past 25 years, and the country now incarcerates more people per capita than any other nation. Worldwide, imprisonment per 100 000 ranges from 30 in India to 75 in Norway, 119 in China, 148 in the United Kingdom, 628 in Russia, and 750 in the United States.[1]

Currently, nearly 2.3 million US inmates (about 1% of US adults) must rely on their jailers for health care.[2] Although prisoners have a constitutional right to health care through the Eighth Amendment's prohibition of "cruel and unusual" punishment,[3] periodic scandals, as well as previous studies, indicate that prisoners' access to health care and the quality of that care are often deficient.[4,5] Indeed, citing deplorable conditions in California's prison system, a federal judge recently removed prison health care from the state's control.[6] However, there is little nationally representative data on the health and health care of America's prisoners.

Inmates have high rates of chronic medical conditions, especially viral infections. In addition, substance abuse and mental illness are common among inmates.[7,8] We are not aware of any study analyzing the prevalence of common chronic conditions or of access to medical and psychiatric care among the incarcerated population as a whole. Therefore, we sought to determine the prevalence of select chronic diseases, access to health services, and pre- and postincarceration psychiatric treatment among the US inmate population.

## METHODS

We analyzed data from the 2004 Survey of Inmates in State and Federal Correctional Facilities (SISFCF) and the 2002 Survey of Inmates in Local Jails (SILJ). The US Census Bureau conducted these surveys for the Bureau of Justice Statistics. Participation in the

*Objectives.* We analyzed the prevalence of chronic illnesses, including mental illness, and access to health care among US inmates.

*Methods.* We used the 2002 Survey of Inmates in Local Jails and the 2004 Survey of Inmates in State and Federal Correctional Facilities to analyze disease prevalence and clinical measures of access to health care for inmates.

*Results.* Among inmates in federal prisons, state prisons, and local jails, 38.5% (SE=2.2%), 42.8% (SE=1.1%), and 38.7% (SE=0.7%), respectively, suffered a chronic medical condition. Among inmates with a mental condition ever treated with a psychiatric medication, only 25.5% (SE=7.5%) of federal, 29.6% (SE=2.8%) of state, and 38.5% (SE=1.5%) of local jail inmates were taking a psychiatric medication at the time of arrest, whereas 69.1% (SE=4.8%), 68.6% (SE=1.9%), and 45.5% (SE=1.6%) were on a psychiatric medication after admission.

*Conclusions.* Many inmates with a serious chronic physical illness fail to receive care while incarcerated. Among inmates with mental illness, most were off their treatments at the time of arrest. Improvements are needed both in correctional health care and in community mental health services that might prevent crime and incarceration. (*Am J Public Health.* 2009;99:666–672. doi: 10.2105/AJPH.2008.144279)

surveys was voluntary, and prisoners' answers were anonymous and confidential.

### Data Sources

The 2004 SISFCF consisted of in-person surveys of state and federal prisoners designed to provide nationally representative data on prison inmates. Between October 2003 and May 2004, inmates provided demographic, criminal justice, and health information to interviewers. The 2002 SILJ employed a virtually identical methodology and questionnaire.

The surveys employed a 2-stage sample design, selecting prisons in the first stage and inmates in the second stage. The Census Bureau preselected the 21 largest state prisons for inclusion in the survey. Remaining state prisons were stratified by census region; those with larger inmate populations were more likely to be included in the survey. Of 1585 state prisons, 301 were selected for participation in the SISFCF, of which 287 participated. Two prisons refused to participate, and 12 were deemed "out of scope": 2 were jails,

1 was under federal jurisdiction, 4 had closed, and 5 no longer housed inmates of the gender for which the facility was originally chosen. Of 16 152 randomly selected inmates, 14 499 completed interviews. The total response rate was 89.1%.

Three federal prisons were preselected. The remaining federal prisons were stratified by security level; those with larger inmate populations were more likely to be included in the survey. Of 148 eligible federal prisons, 40 were selected and 39 participated in the survey (1 prison refused to participate). A computer that was supplied with a list of all inmates selected inmates from within a facility using a random start point and a predetermined skip interval. Of 4253 randomly selected federal inmates, 3686 completed interviews. The total response rate was 84.6%.[9]

The Census Bureau conducted the SILJ from January to April 2002 using a similar 2-stage sample design. Researchers conducting the SILJ preselected 234 jails for inclusion to ensure that facilities with large numbers of men,

| RESEARCH AND PRACTICE |

women, or juveniles had a higher probability of selection than would jails with smaller numbers of these individual groups. The remaining facilities were stratified by inmate population, and facilities housing larger inmate populations were more likely to be included in the survey. Of 3365 jails, 465, including those that were preselected, were systematically selected, and 417 participated in the survey; 39 refused to participate, and 9 had closed or housed no inmates. From within each institution, interviewers selected inmates using a predetermined random start and sample selection rate. Of 7750 randomly selected jail inmates, 6982 completed interviews. The total response rate was 84.1%.[10] For all 3 surveys, the Census Bureau provided weights that adjusted for nonresponse and sample design in order to yield national estimates.

For both the SISFCF and the SILJ, inmates answered questions about symptoms or medical diagnoses received prior to incarceration, including diabetes mellitus, hypertension, HIV/AIDS, paralysis, prior or current malignancy (breast, cervical, colon, leukemia, lung, ovarian, prostate, testicular, uterine, or other ["other" was not included in the local jail survey]), stroke or brain injury, angina, arrhythmia, arteriosclerosis, prior myocardial infarction, or other heart problem (coronary, congenital, rheumatic). Inmates also reported on persistent problems with kidneys, asthma, cirrhosis, hepatitis, arthritis, or a sexually transmitted diseases. Surveyors did not use health records to confirm diagnoses.

Inmates were queried about serious injuries they had sustained since being incarcerated that were caused by an accident or a physical or sexual assault. We defined "serious injuries" as those resulting from knife or gunshot wounds and those causing broken bones, internal injuries, or loss of consciousness.

Inmates also answered questions about their health care since incarceration. Such care included tuberculosis skin test and treatment of a positive test, receipt of prescription medications before and after admission, blood tests (otherwise unspecified), and visits to a doctor, nurse, or other health care worker for a persistent health problem.

The SISFCF and SILJ assessed self-reported mental illnesses, including any prior diagnosis of depressive disorder, bipolar disorder,

schizophrenia, posttraumatic stress disorder (PTSD), anxiety or panic disorder, personality disorder, or other mental condition. Inmates answered questions about medications for psychiatric illness at any point in the past, in the year prior to admission, at the time of arrest, and since incarceration. Inmates also reported mental health counseling at any time in the past, in the year prior to admission, at the time of arrest, or following admission.

We determined the self-reported prevalence of common chronic conditions that routinely require ongoing medical treatment, including diabetes mellitus, hypertension, prior myocardial infarction, persistent kidney problems, persistent asthma, cirrhosis, and HIV/AIDS.

In addition, we created another category defining inmates as having "any chronic condition" if they reported any condition likely requiring follow-up medical attention, even if not identified as causing a persistent problem by the inmate. In this category, we included a prior diagnosis of 1 or more of the following: diabetes mellitus, hypertension, HIV/AIDS, paralysis, prior malignancy (excluding skin cancers), prior stroke or brain injury, angina, arrhythmia, arteriosclerosis, myocardial infarction, other heart problems (coronary, congenital, rheumatic), persistent kidney problems, current problems with asthma, and persistent problems with cirrhosis, persistent hepatitis, and arthritis. The SISFCF included a question about "other" types of cancer, a question not included in the SILJ. "Other cancer" adds only 9160 and 704 individuals to state and federal "chronic" indicators, respectively. We did not include pregnancy or sexually transmitted diseases other than HIV/AIDS in our definition of "any chronic condition."

We compared the crude and age-adjusted prevalence of selected chronic conditions among inmates with the prevalence of such conditions among a nationally representative sample of the noninstitutionalized US population from the 2003–2004 National Health and Nutrition Examination Survey (NHANES).[11] The 2003–2004 NHANES included questions regarding a prior diagnosis of diabetes mellitus, hypertension, myocardial infarction, and persistent asthma that were nearly identical to those of the inmate surveys, and staff for the 2003–2004 NHANES tested participants aged 18 to 49 years for HIV. We included comparisons of

both crude and age-adjusted prevalences of these chronic conditions among inmates and the nonincarcerated population.

Because most standard access to care measures, such as having a usual source of care or avoiding needed care because of costs, are meaningless in incarceration settings, we developed 5 clinically based access to care measures:

1. *Access to medical examinations.* To assess this measure, we created a marker for inmates with a persistent medical problem routinely requiring medical assessment. For this indicator, we first combined inmates reporting pregnancy at the time of admission with those reporting a persistent problem with diabetes mellitus, the heart or kidneys, hypertension, cancer, stroke or brain injury, paralysis, cirrhosis, arthritis, asthma, hepatitis, or a sexually transmitted disease. (Unfortunately, the surveys did not specifically assess access to care for inmates with HIV.) We then determined whether medical personnel had examined inmates for their persistent conditions at any time since incarceration.

2. *Access to pharmacotherapy.* To assess this measure, we first determined the number of inmates who had a condition routinely treated with pharmacotherapy (hypertension, diabetes mellitus, stroke or brain injury, persistent arthritis, asthma, cirrhosis, or HIV/AIDS) and had been taking a prescription medication at the time of admission. We then determined whether these prisoners continued taking that medication following incarceration. Surveyors did not collect medication names or query inmates about new medications begun during incarceration.

3. *Access to prescription medication.* To further assess access to prescription medication, we determined the number of inmates who had received any prescription drug for any indication prior to incarceration. We then determined the proportion of such inmates who did not receive that medication following incarceration.

4. *Access to laboratory tests.* To assess this measure, we defined prisoners as needing routine laboratory monitoring if they had 1 of the following conditions: diabetes mellitus, persistent hypertension, kidney

| RESEARCH AND PRACTICE |

problems, cirrhosis, prior myocardial infarction, or HIV/AIDS. We then determined whether these prisoners had undergone at least 1 blood test of any kind since incarceration.

5. *Adequacy of acute care.* To assess this measure, we analyzed data from inmates with a serious injury (knife or gunshot wounds, broken bones, internal injuries, being knocked unconscious, or sexual assault). We then determined whether these prisoners received any medical examination for their injuries.

Finally, we focused on receipt of mental health care. For inmates reporting any prior diagnosis of a mental condition, we determined the proportion ever receiving a medication for that condition. Next, we determined the proportion of this population taking medication at the time of arrest and since incarceration. We also determined the proportion of inmates with any history of a mental condition who had ever received counseling, who had received counseling in the year prior to admission, and who had received counseling since incarceration. Finally, we repeated all mental health analyses using only those inmates with a prior diagnosis of bipolar disorder or schizophrenia.

**Statistical Analysis**

We used SAS version 9.1 (SAS Institute Inc, Cary, NC) to analyze bivariate relationships. We used SUDAAN version 9.0.3 (Research Triangle Institute, Research Triangle Park, NC) to estimate variance via restricted-access SILJ design variables. For the SISFCF, we calculated variance using the generalized variance estimates available with the survey documentation. We applied sample weights supplied by the Bureau of Justice Statistics to account for nonresponse and survey design and to yield national estimates. We performed direct age standardization via published techniques.[12]

**RESULTS**

Based on our analysis, US federal prisons held 129196 inmates and state prisons 1225680 in 2004. In 2002, local jails held 631241 inmates. The overwhelming majority of inmates were male, were younger than 35 years, and were disproportionately Black or

Hispanic. About 200000 (10%) were military veterans. The majority were parents of minor children or at the time of incarceration or at the time of the survey.

Nonresponse to individual items was uncommon. Among federal inmates, 2.1% were missing data on prescription medications at admission and 2.8% on prior diagnosis of PTSD; 6.0% were missing data for HIV testing and 15.8% for duration of incarceration. No data were provided for sexual assault or gunshot wounds in federal prisons. Among state inmates, 1.2% were missing data on prescription medications at admission and 1.7% on prior diagnosis of PTSD; 4.0% were missing data regarding HIV testing and 6.3% for duration of incarceration. Among jail inmates, 0.5% were missing data on the duration of incarceration and 2.2% on prior diagnosis of PTSD; 5.2% were missing data on HIV testing.

**Chronic Medical Problems**

Chronic conditions were common among inmates; 49702 federal inmates (38.5% [SE=2.2%]), 524116 state inmates (42.8% [SE=1.1%]), and 244336 local jail inmates (38.7% [SE=0.7%]) had at least 1 chronic medical condition (Table 1).

Inmates had rates of diabetes, hypertension, prior myocardial infarction, and persistent asthma comparable to those of the US noninstitutionalized, nonelderly population. However, following age standardization to the 2000 US census, the prevalence of these conditions appeared to be higher for inmates than for the general population, except for prior myocardial infarction among jail inmates (Table 2; see also the appendix to Table 1, available as a supplement to the online version of this article at http://www.ajph.org). More than 20000 inmates reported testing positive for HIV,

**TABLE 1—Demographic and Health Characteristics of Inmates in US Federal and State Prisons and In Jails: SISFCF, 2004, and SILJ, 2002**

| | Federal Inmates | | State Inmates | | Jail Inmates | |
|---|---|---|---|---|---|---|
| | No. | % (SE) | No. | % (SE) | No. | % (SE) |
| Total | 129196 | 100 | 1225680 | 100 | 631241 | 100 |
| Men | 120150 | 93.0 (0.6) | 1142989 | 93.3 (0.4) | 558182 | 88.4 (0.3) |
| Age, y | | | | | | |
| 13–35 | 64692 | 50.1 (2.0) | 654505 | 53.4 (1.0) | 408321 | 64.7 (0.7) |
| 36–50 | 50180 | 38.8 (2.2) | 465874 | 38.0 (1.1) | 196420 | 31.1 (0.7) |
| > 50 | 14324 | 11.1 (2.7) | 105302 | 8.6 (1.4) | 26500 | 4.3 (0.4) |
| Parent of minor child[a] | 87618 | 67.8 (1.6) | 706942 | 57.7 (0.9) | 355963 | 56.4 (0.7) |
| Race | | | | | | |
| Non-Hispanic White | 33599 | 26.0 (2.4) | 431449 | 35.2 (1.2) | 226209 | 35.8 (1.1) |
| Non-Hispanic Black | 55947 | 43.3 (2.1) | 496745 | 40.5 (1.1) | 252116 | 39.9 (1.2) |
| Hispanic | 32414 | 25.1 (2.1) | 222451 | 18.2 (1.3) | 116316 | 18.4 (0.9) |
| Other | 7235 | 5.5 (2.8) | 75036 | 6.1 (1.4) | 36600 | 5.8 (0.4) |
| Military veteran | 12562 | 9.7 (2.7) | 127509 | 10.4 (1.4) | 58761 | 9.3 (0.5) |
| Any mental health condition[b] | 19117 | 14.8 (2.6) | 312768 | 25.5 (1.3) | 157634 | 25.0 (0.7) |
| Any chronic medical condition[c] | 49702 | 38.5 (2.2) | 524116 | 42.8 (1.1) | 244336 | 38.7 (0.7) |

*Note.* SISFCF = Survey of Inmates in State and Federal Correctional Facilities; SILJ = Survey of Inmates in Local Jails. Median duration of incarceration in months (interquartile range) was as follows: for federal inmates, 29 (12–61); for state inmates, 27 (9–67); for jail inmates, 2 (0–4).

[a] Defined as being a parent at time of survey or during incarceration.
[b] Defined as having a prior diagnosis of depressive disorder, bipolar disorder, schizophrenia, posttraumatic stress disorder, anxiety disorder, panic disorder, personality disorder, or other mental health condition.
[c] A chronic condition was defined as affirmative response when asked about the following: HIV/AIDS; prior malignancy (excluding skin cancers) including breast, cervical, colon, leukemia, lung, ovarian, prostate, testicular, uterine, and other ("other" not included in the jail group); hypertension; stroke or brain injury; angina; arrhythmia; arteriosclerosis; myocardial infarction; other heart problem (coronary, congenital, rheumatic); persistent kidney problems; persistent paralysis; current problems with asthma; cirrhosis; persistent hepatitis; persistent arthritis.

| RESEARCH AND PRACTICE |

**TABLE 2—Age-Standardized Prevalence of Select Chronic Conditions Among Adult Federal and State Prisoners, Jail Inmates, and the Noninstitutionalized US Population: SISFCF, 2004, SILJ, 2002, and NHANES, 2003–2004**

| Condition | Federal Inmates, % (SE) | State Inmates, % (SE) | Jail Inmates, % (SE) | US Population,[a] % (SE) |
|---|---|---|---|---|
| Diabetes mellitus | 11.1 (3.6) | 10.1 (2.0) | 8.1 (1.7) | 6.5 (0.5) |
| Hypertension | 29.5 (2.9) | 30.8 (1.5) | 27.9 (2.1) | 25.6 (1.0) |
| Prior myocardial infarction | 4.5 (4.5) | 5.7 (2.8) | 2.1 (0.4) | 3.0 (0.3) |
| Persistent kidney problems | 6.3 (4.0) | 4.5 (1.7) | 4.1 (0.8) | … |
| Persistent asthma | 7.7 (2.8) | 9.8 (1.4) | 8.6 (1.0) | 7.5 (0.6) |
| Persistent cirrhosis | 2.2 (3.9) | 1.8 (1.8) | 1.8 (0.7) | … |
| Persistent hepatitis | 4.6 (2.9) | 5.7 (1.5) | 4.6 (1.4) | … |
| HIV[b] | 0.9 (3.2) | 1.7 (1.8) | 1.6 (0.3) | 0.5 (0.1) |

*Note.* SISFCF = Survey of Inmates in State and Federal Correctional Facilities; SILJ = Survey of Inmates in Local Jails; NHANES = National Health and Nutrition Examination Survey. Prevalence was standardized to the 2000 US population 18 years and older by direct age standardization. Inmates younger than 18 years represented 0% of federal inmates, less than 1% of state inmates, and 4.8% of all jail inmates.

[a]The 2003–2004 NHANES did not include questions regarding persistent kidney problems, cirrhosis, and hepatitis.
[b]For HIV, only populations aged 18–49 years are included to allow comparison with NHANES data, which was derived from laboratory data.

including 1023 federal inmates (1.0% [SE=3.1%]), 15 115 state inmates (1.6% [SE=1.6%]), and 4245 local jail inmates (1.2% [SE=0.2%]); this prevalence was double that of the noninstitutionalized 2003–2004 NHANES population. These percentages did not substantially change when only inmates aged 18–49 years (the age group that underwent HIV testing in the NHANES sample) were included.

**Access to Medical Services**

Among inmates with a persistent medical problem, 13.9% of federal inmates, 20.1% of state inmates, and 68.4% of local jail inmates had received no medical examination since incarceration. More than 1 in 5 inmates were taking a prescription medication for some reason when they entered prison or jail; of these, 7232 federal inmates (26.3%), 80 971 state inmates (28.9%), and 58 991 local jail inmates (41.8%) stopped the medication following incarceration. Prior to incarceration, slightly more than 1 in 7 inmates were taking a prescription medication for an active medical problem routinely requiring medication (as defined in the Methods section). Of these, 3314 federal (20.9% [SE= 6.7%]), 43 679 state (24.3% [SE=3.3%]), and 28 473 local jail inmates (36.5%

[SE=1.7%]) stopped the medication following incarceration.

Only a small portion of prison inmates (3.9% [SE=6.5%] of federal and 6.4% [SE=3.2%] of state inmates) with an active medical problem for which laboratory monitoring is routinely indicated had not undergone at least 1 blood test since incarceration. However, most local jail inmates with such a condition (60.1% [SE=1.8%]) had not undergone a blood test.

Following serious injury, 650 federal inmates (7.7%), 12 997 state inmates (12.0%), and 3183 local jail inmates (24.7%) were not seen by medical personnel (Table 3).

**Mental Health**

Mental health problems were ubiquitous: 19 117 federal inmates (14.8% [SE=2.6%]), 312 768 state inmates (25.5% [SE=1.3%]), and 157 634 local jail inmates (25.0% [SE=0.7%]) had at least 1 previously diagnosed mental condition (Table 1); most of them had taken medications at some point prior to incarceration. However, a much smaller proportion of inmates with a mental health diagnosis were taking psychiatric medication at the time of their arrest: 25.5% (SE=7.5%) of federal, 29.6% (SE=2.8%) of state, and 38.5% (SE=1.5%) of local jail inmates. Among inmates with a previously diagnosed mental

condition who had been treated with a psychiatric medication in the past, 69.1% (SE=4.8%) of federal, 68.6% (SE=1.9%) of state, and 45.5% (SE=1.6%) of local jail inmates had taken a medication for a mental condition since incarceration. A similar pattern was apparent for prearrest and postincarceration counseling (Table 4).

Among prison inmates with schizophrenia or bipolar disorder who had ever been treated with psychiatric medication, the proportion on treatment was approximately 1 in 3 at the time of arrest and nearly 2 in 3 during incarceration (see appendix to Table 2, available as a supplement to the online version of this article at http://www.ajph.org). Among jail inmates with schizophrenia or bipolar disorder, the pattern of low treatment rates at arrest and high treatment rates following incarceration was also present, although less pronounced than in the prison population.

**DISCUSSION**

Mass incarceration as part of the war on drugs has created a burgeoning inmate population in the United States. Earlier studies of inmates have been based on extrapolations from noninstitutionalized Americans, single institutions, or data from either federal or state prisons alone or jail systems alone. Our study adds to the existing literature by analyzing a large, nationally representative sample of the entire US inmate population. More than 800 000 inmates report having 1 or more chronic medical condition, and their access to medical care appears to be poor, particularly in jails. Our data also demonstrate that prisons are holding and treating many mentally ill people who were off treatment at the time of arrest.

Our age-standardized prevalence estimates for rates of hypertension and diabetes are higher than estimates from earlier population-based projection models (18.3% and 4.8%, respectively).[13] Although the rates of asthma in our study were similar to the rates in the earlier study (8.5%),[13] our figures include only those with active asthma, whereas the earlier estimates included any prior diagnosis. Furthermore, the earlier projections were based on models that used data from NHANES III that included laboratory testing (diabetes) and physical examination (hypertension) as part of diagnostic criteria;

| RESEARCH AND PRACTICE |

**TABLE 3—Access to Medical Care for Inmates of Federal Prisons, State Prisons, and Local Jails: SISFCF, 2004, and SILJ, 2002**

| Condition | Federal Inmates, No. or % (SE) | State Inmates, No. or % (SE) | Jail Inmates, No. or % (SE) |
|---|---|---|---|
| Persistent medical problem[a] | | | |
| Inmates with problem | 43 059 | 465 682 | 214 812 |
| Inmates with problem not examined by medical personnel | 13.9 (4.5) | 20.1 (2.1) | 68.4 (1.1) |
| Active medical problem requiring prescription medication[b] | | | |
| Inmates on prescription medication at time of incarceration | 18 728 | 181 994 | 90 283 |
| Inmates not continued on same medication during incarceration | 20.9 (6.7) | 24.3 (3.3) | 36.5 (1.7) |
| Prescription drug use | | | |
| Inmates on prescription drugs at time of incarceration | 27 522 | 280 036 | 141 133 |
| Inmates not continued on medication during incarceration | 26.3 (4.9) | 28.9 (2.6) | 41.8 (1.4) |
| Active medical problem routinely requiring blood test[c] | | | |
| Inmates with problem | 23 467 | 240 960 | 106 539 |
| Inmates with problem but with no blood test since admission[d] | 3.9 (6.5) | 6.4 (3.2) | 60.1 (1.8) |
| Serious injury[e] | | | |
| Inmates with serious injury, no. | 8431 | 107 989 | 12 887 |
| Inmates not examined following serious injury, % (SE) | 7.7 (10.6) | 12.0 (4.6) | 24.7 (3.9) |

*Note.* SISFCF = Survey of Inmates in State and Federal Correctional Facilities; SILJ = Survey of Inmates in Local Jails.
[a]Persistent medical problems included pregnancy at time of admission, diabetes mellitus, persistent heart or kidney problems, persistent hypertension, cancer, stroke or brain injury, paralysis, cirrhosis, arthritis, asthma, hepatitis, or a sexually transmitted disease.
[b]Active medical problems included hypertension, stroke, diabetes mellitus, heart problem, kidney, arthritis, asthma, hepatitis, cirrhosis, and HIV/AIDS.
[c]Active medical problems routinely requiring blood tests included diabetes, persistent kidney problems, HIV, persistent hypertension, prior myocardial infarction, and cirrhosis.
[d]Defined as inmates who probably needed blood testing but had not received any since incarceration.
[e]Serious injuries included knife or gunshot wounds, broken bones, sexual assault, internal injuries, and being knocked unconscious. Responses to sexual assault were missing for federal inmates in the SISFCF.

including these measurements as part of the diagnostic criteria among inmates would have increased our prevalence estimates.[13]

Improved management of chronic conditions in prisons and jails may have important implications for community health and in reducing health care disparities, because the vast majority of inmates are eventually released. Approximately 12 million inmates are released annually (William J. Sabol, PhD, chief, Corrections Statistics, Bureau of Justice Statistics, oral communication, April 2008). This high turnover of a population with elevated rates of treatable conditions offers a substantial public health opportunity. Indeed, in response to a congressional request, the National Commission on Correctional Health Care issued an extensive report in 2002 titled *The Health Status of Soon-To-Be-Released Inmates*[8]; although it included recommendations of specific strategies to improve inmates' health, no

congressional action has ensued (R. Scott Chavez, PhD, MPA, vice president, National Commission on Correctional Health Care, oral communication, July 2008). Nonetheless, minimizing inmates' physical and mental disability is an important step in reintegrating them into family and employment roles.

The prevalence of HIV in prisons is higher than in the noninstitutionalized population, although it is declining.[14,15] A high incidence of blood-borne illnesses among inmates has also been documented.[16,17] Limited privacy in prison may make prisoners reluctant to comply with treatment of HIV, and sexual coercion and bartering may facilitate transmission. Similarly, untreated bleeding injuries (as documented in our data) pose an obvious transmission risk. Hence, poorly managed HIV may lead prisons to function as "amplifiers" of this and other infectious illnesses and add to the burden of untreated and advanced disease borne by

inmates, families, and communities following inmates' release.

We estimate that nearly 500 000 inmates have a previously diagnosed mental condition. Moreover, Bureau of Justice Statistics estimates that include undiagnosed symptoms of mental health problems (such as hallucinations) suggest that the number of inmates with a psychiatric illness may be even higher.[18] The rates of mental illness among inmates are thought to be higher than among the US population as a whole. Although we did not directly compare rates of mental illness among inmates and the general US population, our estimates were derived directly from inmates, as opposed to a representative sampling of unincarcerated Americans.[13]

Sadly, in the United States, many inmates do not receive psychiatric treatment at the time of arrest, even those with schizophrenia or bipolar disorder. However, the low rate of treatment of inmates prior to arrest could be viewed as hopeful news, implying that greater access to outpatient mental health care might reduce the staggering toll of crime and incarceration.[19]

As with indicators for access to medical care, access to psychiatric care appears to be worse in jails than in prisons. The jump in rates of psychiatric treatment during incarceration may reflect limited access to psychiatric treatment among those with mental disorders prior to incarceration, and prisons' new societal role as asylums following the mass closures of inpatient mental health facilities in the 1980s (the largest mental institutions in the United States are urban jails[7]); conversely, psychiatric medications may be overprescribed in prisons. Furthermore, the use of psychiatric medication is measured differently than that of other prescription drugs. The increase in counseling from prearrest to incarceration supports the notion that a genuine improvement in the availability of psychiatric care occurs during incarceration.

Vast improvements in inmate health care are possible. Salutary reforms could include decreasing incarceration rates; making health care systems in prison nonprofit and autonomous from prison authorities; increasing communicable disease education, prevention, and treatment[20–22]; making condoms available[23]; improving care for chronic conditions; providing targeted cancer screening[24]; increasing the

| RESEARCH AND PRACTICE |

TABLE 4—Prevalence of Diagnosed Mental Conditions Among Inmates of State and Federal Prisons and Local Jails, and Use of Psychiatric Medications and Counseling Before and During Incarceration: SISFCF, 2004, and SILJ, 2002

| | Federal Inmates | | State Inmates | | Jail Inmates | |
|---|---|---|---|---|---|---|
| | No. | % (SE) | No. | % (SE) | No. | % (SE) |
| Any diagnosed mental condition | 19 117 | 14.8 (2.6) | 312 768 | 25.5 (1.3) | 157 634 | 25.0 (0.7) |
| Medication[a] | | | | | | |
| Ever took medication for emotional or mental problem[b] | 13 674 | 71.6 (3.9) | 233 456 | 74.6 (1.5) | 116 011 | 73.7 (1.1) |
| Was taking medication at time of arrest[c] | 3 481 | 25.5 (7.5) | 69 088 | 29.6 (2.8) | 44 526 | 38.5 (1.5) |
| Taking medication since admission[c] | 9 455 | 69.1 (4.8) | 160 048 | 68.6 (1.9) | 52 755 | 45.5 (1.6) |
| Counseling[a] | | | | | | |
| Ever received for mental or emotional problem | 12 140 | 63.6 (4.4) | 196 494 | 62.9 (1.8) | 99 906 | 63.4 (1.3) |
| Received at any time during 12 mo before arrest[d] | 3 754 | 30.9 (7.6) | 66 578 | 33.9 (3.0) | 43 007 | 43.1 (1.6) |
| Received since admission[d] | 7 090 | 58.4 (5.9) | 126 049 | 64.2 (2.2) | 24 146 | 24.2 (1.5) |

*Note.* SISFCF = Survey of Inmates in State and Federal Correctional Facilities; SILJ = Survey of Inmates in Local Jails. Mental conditions included prior diagnosis of depressive disorder, bipolar disorder, schizophrenia, posttraumatic stress disorder, anxiety or panic disorder, personality disorder, or other mental condition.
[a]Among those with a mental condition.
[b]Prescribed by a psychiatrist or other doctor.
[c]Among those who were ever prescribed a medication.
[d]Among those who had ever received counseling.

availability of addiction and mental health treatment; providing better supervision to reduce physical and sexual assault; maintaining Medicaid eligibility for inmates[8]; and improving the planning of inmates' discharge and facilitating their reintegration into the community.[25–27]

## Limitations

Although access to care in local jails appears to be worse than in federal and state prisons, this result may simply reflect the shorter duration of incarceration among jail inmates. We were unable to validate inmates' responses; however, the anonymous and confidential nature of the survey should have maximized inmates' candor. It is possible that some inmates who reported taking prescription medications that were discontinued at the time of incarceration had actually been switched to a therapeutic equivalent but did not recognize it as such or had a condition that no longer warranted treatment at admission. Furthermore, among those with chronic conditions, no assessment of medications begun following incarceration was possible. Although our measures of access to care among inmates have not been validated, we believe that they have

sufficient face validity to support a presumption that health care in prisons and jails is far from adequate. Unfortunately, we have no information on the quality of pharmacological and other medical care. Hence, our data refer only to the most minimal standards of care (i.e., any medical evaluation, any testing, or any treatment).

## Conclusions

Providing inmates with health care is politically unpopular. Indeed, former Surgeon General Richard H. Carmona stated that the Bush administration had blocked the release of the Surgeon General's Report, *Call to Action on Corrections in Community Health*, for fear that the report would increase government spending on inmates.[28] However, the constitutional, public health, and human rights imperatives of improving health care in prisons and jails are clear. ∎

## About the Authors

*At the time of this study, Andrew P. Wilper, Steffie Woolhandler, Karen E. Lasser, Danny McCormick, David H. Bor, and David U. Himmelstein were with the Department of Medicine, Cambridge Health Alliance, Cambridge,* MA. J. Wesley Boyd is with the Department of Psychiatry, Cambridge Health Alliance, Cambridge.

*Requests for reprints should be sent to Andrew P. Wilper, MD, MPH, Boise Veterans Affairs Medical Center, 500 West Fort St, Boise, ID 83702 (e-mail: wilp9522@u.washington.edu).*

*This article was accepted August 1, 2008.*

## Contributors
A.P. Wilper designed the study, planned the analysis, performed statistical analysis and data management, and interpreted the analysis. A.P. Wilper, S. Woolhandler, and D.U. Himmelstein drafted the article. J.W. Boyd, K.E. Lasser, D. McCormick, and D.H. Bor performed critical revisions of the article. S. Woolhandler supervised all aspects of the study design, analysis planning, interpretation, and article preparation.

## Acknowledgments
Andrew P. Wilper was supported by the Health Resources and Service Administration National Research Service Award (5T32 HP110011).

We thank Robert Griefinger, MD, and William J. Sabol, PhD, for their comments on earlier drafts of the article.

## Human Participant Protection
The institutional review board of the Cambridge Health Alliance approved this study.

## References
1. King's College London. International Centre for Prison Studies. Entire world–prison population rates per 100,000 of the national population. Available at: http://www.prisonstudies.org. Accessed February 8, 2008.

2. Bureau of Justice Statistics, US Department of Justice. Prison statistics, summary findings. Available at: http://www.ojp.usdoj.gov/bjs/prisons.htm. Accessed February 8, 2008.

3. *Estelle v Gamble*, 429 US 97 (1976).

4. Clemmitt M. Prison health care. *Congr Q*. 2007;17:1–24.

5. Lindquist CH, Lindquist CA. Health behind bars: utilization and evaluation of medical care among jail inmates. *J Community Health*. 1999;24(4):285–303.

6. Moore S. Using muscle to improve health care for prisoners. *New York Times*. August 27, 2007. Available at: http://www.nytimes.com/2007/08/27/us/27prisons.html. Accessed November 18, 2008.

7. Freudenberg N. Jails, prisons, and the health of urban populations: a review of the impact of the correctional system on community health. *J Urban Health*. 2001;78(2):214–235.

8. National Commission on Correctional Health Care. *The Health Status of Soon-to-Be-Released Inmates, Vol. 1*. Available at: http://www.ncchc.org/pubs/pubs_stbr.vol1.html. Accessed July 10, 2008.

9. Bureau of Justice Statistics, US Department of Justice. Survey of inmates in state and federal correctional facilities, 2004. Available at: http://www.icpsr.umich.edu/cocoon/NACJD/STUDY/04572.xml. Accessed August 20, 2007.

10. Bureau of Justice Statistics, US Department of Justice. Survey of inmates in local jails, 2002. Available

| RESEARCH AND PRACTICE |

at: http://www.icpsr.umich.edu/cocoon/NACJD/STUDY/04359.xml. Accessed August 30, 2007.

11. National Center for Health Statistics, Centers for Disease Control and Prevention. Survey operations manuals, brochures, and consent documents: 1999–current National Health and Nutrition Examination Survey. Available at: http://www.cdc.gov/nchs/about/major/nhanes/currentnhanes.htm. Accessed April 2, 2008.

12. Klein RJ, Schoenborn CA. *Age Adjustment Using the 2000 Projected US Population.* Hyattsville, MD: National Center for Health Statistics; 2001. Healthy People Statistical Notes no. 20.

13. National Commission on Correctional Health Care. *The Health Status of Soon-To-Be-Released Inmates, Vol. 2.* Available at: http://www.ncchc.org/pubs/pubs_stbr.vol2.html. Accessed July 10, 2008.

14. Centers for Disease Control and Prevention. A glance at the HIV/AIDS epidemic. Available at: http://www.cdc.gov/hiv/resources/factsheets/At-A-Glance.htm#1. Accessed February 10, 2008.

15. Maruschak LM. HIV in prisons, 2004. Available at: http://www.ojp.usdoj.gov/bjs/pub/pdf/hivp04.pdf. Accessed February 10, 2008.

16. Macalino GE, Vlahov D, Sanford-Colby S, et al. Prevalence and incidence of HIV, hepatitis B virus, and hepatitis C virus infections among males in Rhode Island prisons. *Am J Public Health.* 2004;94(7):1218–1223.

17. Khan AJ, Simard EP, Bower WA, et al. Ongoing transmission of hepatitis B virus infection among inmates at a state correctional facility. *Am J Public Health.* 2005;95(10):1793–1799.

18. James DJG, Lauren E. Mental health problems of prison and jail inmates. Available at: http://www.ojp.usdoj.gov/bjs/pub/pdf/mhppji.pdf. Accessed February 10, 2008.

19. Lamberti JS, Weisman R, Faden DI. Forensic assertive community treatment: preventing incarceration of adults with severe mental illness. *Psychiatr Serv.* 2004;55(11):1285–1293.

20. Restum ZG. Public health implications of substandard correctional health care. *Am J Public Health.* 2005;95(10):1689–1691.

21. Glaser JB, Greifinger RB. Correctional health care: a public health opportunity. *Ann Intern Med.* 1993;118(2):139–145.

22. MacNeil JR, McRill C, Steinhauser G, Weisbuch JB, Williams E, Wilson ML. Jails, a neglected opportunity for tuberculosis prevention. *Am J Prev Med.* 2005;28(2):225–248.

23. Berkman A. Prison health: the breaking point. *Am J Public Health.* 1995;85(12):1616–1618.

24. Binswanger IA, White MC, Perez-Stable EJ, Goldenson J, Tulsky JP. Cancer screening among jail inmates: frequency, knowledge, and willingness. *Am J Public Health.* 2005;95(10):1781–1787.

25. Binswanger IA, Stern MF, Deyo RA, et al. Release from prison—a high risk of death for former inmates. *N Engl J Med.* 2007;356(2):157–165.

26. Jacobi JV. Prison health, public health: obligations and opportunities. *Am J Law Med.* 2005;31(4):447–478.

27. Lee J, Vlahov D, Freudenberg N. Primary care and health insurance among women released from New York City jails. *J Health Care Poor Underserved.* 2006;17(1):200–217.

28. Donnelly J. Inmate health program: a model. *Boston Globe.* September 3, 2007. Available at: http://www.boston.com/news/local/massachusetts/articles/2007/09/03/inmate_health_program_a_model/?page=2. Accessed on November 18, 2008.

# Exhibit E



Office of the Inspector General
U.S. Department of Justice

# Review of the Federal Bureau of Prisons' Medical Staffing Challenges

Evaluation and Inspections Division 16-02                    March 2016

# EXECUTIVE SUMMARY

## Introduction

The Federal Bureau of Prisons (BOP) is responsible for incarcerating federal inmates and is required to provide them with medically necessary healthcare. However, recruitment of medical professionals is one of the BOP's greatest challenges and staffing shortages limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs. Additionally, medical staff shortages can impact prison safety and security. For example, according to an After-Action Report prepared after a riot at a BOP contract prison, the BOP noted that while low medical staffing levels alone were not the direct cause of the disturbance, they affected security and health services functions.[1]

As of September 2014, the BOP had 3,871 positions in its institutions' health services units to provide medical care to 171,868 inmates. Of those 3,871 positions, only 3,215 positions (83 percent) were filled.[2] Although BOP policy states that the vacancy rate shall not exceed 10 percent during any 18-month period, we found that only 24 of 97 BOP institutions had a medical staffing rate of 90 percent or higher as of September 2014.[3] Further, 12 BOP institutions were medically staffed at only 71 percent or below, which the BOP's former Assistant Director for Health Services and Medical Director described as crisis level.

Both civilian and uniformed staff hold these 3,215 filled healthcare positions. This includes 2,382 civil service employees and 833 commissioned officers of the U.S. Public Health Service (PHS), an agency of the U.S. Department of Health and Human Services, which provides public health services to underserved and vulnerable populations. The Department of Justice's Office of the Inspector General (OIG) conducted this review to assess challenges the BOP faces in hiring medical professionals and its use of PHS officers as one method of addressing those challenges.

## Results in Brief

The OIG found that recruitment and retention of medical professionals is a serious challenge for the BOP, in large part because the BOP competes with private

---

[1] Department of Justice (DOJ) Office of the Inspector General (OIG), *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves County, Texas, to Operate the Reeves County Detention Center I/II, Pecos, Texas,* Audit Report 15-15 (April 2015), https://oig.justice.gov/reports/2015/a1515.pdf (accessed February 8, 2016).

[2] This reflects the population in BOP-managed institutions only. Inmates in contract institutions and residential reentry centers are excluded.

[3] There were 121 BOP-managed institutions as of September 2014, but the BOP considers correctional complexes (multiple institutions co-located) to be a single institution when reporting staffing levels. This reduces the number of institutions to 97.

employers that offer higher pay and benefits.  We further found that the BOP has not proactively identified and addressed its medical recruiting challenges in a systemic way.  Rather, it has attempted in an uncoordinated fashion to react to local factors influencing medical recruiting at individual institutions.  Moreover, we found that the BOP does not take full advantage of staffing flexibilities the PHS offers that could assist in addressing some of its most difficult medical staffing challenges.

*The BOP's Compensation and Incentives Offered to Civil Service Medical Staff Are Not Sufficient to Alleviate Staffing Shortages*

Multiple factors, including the location of institutions, pay, and the correctional setting, negatively impact the BOP's ability to recruit and retain medical professionals.  Civil service employee pay is governed by the General Schedule (GS) pay scale and U.S. Office of Personnel Management policies regarding how positions are classified.  We found a significant gap between GS salaries and local average salaries for comparable healthcare positions; these gaps persisted across multiple medical professions and in both urban and rural communities.  For example, BOP staff told us that it was particularly difficult to recruit pharmacists and we found that the average pharmacist salary in communities where BOP institutions are located was approximately double the mid-range salary the BOP can offer.[4]  In an attempt to narrow these gaps, the BOP has increasingly relied on monetary and nonmonetary incentives and it plans to implement an alternative federal pay system for psychiatrists in fiscal year (FY) 2016.  However, we found that these are not always sufficient to reduce the medical staffing vacancies the BOP faces.  Faced with continuous understaffing, the BOP uses temporary duty (TDY) assignments and contracted medical providers to ensure that it can continue to provide inmates with necessary medical care.  However, both of these options come with additional costs.  Additionally, according to BOP officials, the limits of the GS pay scale mean that PHS compensation and benefits are more competitive for some professions.

*The BOP Does Not Identify or Address Recruiting Challenges in an Agency-wide and Strategic Manner*

The BOP's current method of addressing medical recruiting challenges focuses primarily on individual institutions' immediate needs.  As a result, the BOP does not strategically assess which vacancies have the greatest overall impact on its ability to provide medical care to inmates.  The BOP collects and maintains data that, if analyzed, could help it better assess and prioritize its needs and develop a strategy to meet those needs agency-wide.  Such a process would include evaluating vacancies, the use of incentives, the use of TDY assignments, and the cost of outside medical care across all institutions.  This would help the BOP identify the vacancies that are most costly to leave unfilled and to prioritize staffing in those locations.

---

[4]  We compared average salaries reported by the Bureau of Labor Statistics with salaries in the middle of the range on the General Schedule salary table.  For more information, see Appendix 1.

*The BOP Does Not Use the Authority It Has to Assign PHS Officers to Positions Based on Greatest Need*

The conditions of PHS officers' employment make them more mobile than civil service employees, and the PHS has created promotion incentives that benefit PHS officers who change duty stations; but the BOP does not take advantage of these flexibilities to assign PHS officers to positions based on greatest need. BOP officials expressed concerns to us that one method of using those flexibilities, involuntary transfers, could lead to unintended effects, such as PHS officers leaving the BOP for work in other agencies. However, involuntary transfers are not the BOP's only option for determining where PHS officers should work, as the BOP may alternatively require PHS officers to spend their first few years with the BOP filling high-priority positions, which could appeal to PHS officers seeking promotion. We believe the BOP should better utilize PHS officer flexibility to address medical vacancies of greatest impact.

**Recommendations**

As the BOP struggles to fill its medical staffing needs, and as medical costs continue to rise, the BOP must collect better information on its priority health services vacancies and find solutions to meet the medical needs of its inmates. In this report, we make two recommendations to help the BOP improve its ability to assess the impact of medical vacancies on BOP operations and to develop a strategy to better utilize PHS officer flexibility to address medical vacancies of greatest impact.

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................. 1

   The BOP's Responsibility to Provide Medical Care to All Inmates ................. 2

   Scope and Methodology of the OIG Review ............................................. 6

RESULTS OF THE REVIEW ........................................................................... 7

   The BOP's Compensation and Incentives Offered to Civil Service
   Medical Staff Are Not Sufficient to Alleviate Staffing Shortages ................. 7

   The BOP Does Not Identify or Address Recruiting Challenges in
   an Agency-wide and Strategic Manner ................................................... 16

   The BOP Does Not Use Its Authority to Assign PHS Officers to
   Positions Based on Greatest Need ......................................................... 20

CONCLUSION AND RECOMMENDATIONS ...................................................... 26

   Conclusion ........................................................................................ 26

   Recommendations ............................................................................. 27

APPENDIX 1:  EXPANDED METHODOLOGY .................................................... 28

   Data Analysis .................................................................................... 28

   Interviews ......................................................................................... 29

   Site Visits ......................................................................................... 29

   Additional Objectives .......................................................................... 29

APPENDIX 2:  THE BOP'S RESPONSE TO THE DRAFT REPORT .......................... 31

APPENDIX 3:  OIG ANALYSIS OF THE BOP'S RESPONSE .................................. 33

# INTRODUCTION

As of September 2014, the Federal Bureau of Prisons (BOP) employed over 2,300 civil service employees and over 800 U.S. Public Health Service (PHS) officers to provide medical care to an inmate population of 171,868 in 121 institutions.[5]  However, these staffing levels fell short of the BOP's staffing goals:  from fiscal year (FY) 2010 to FY 2014, the BOP's total medical staff was approximately 17 percent less than what the BOP projected was necessary to provide what it considers to be "ideal" care.

Staffing shortages are a reflection of the BOP's challenges to recruit and retain medical staff.  Although BOP policy states that "the vacancy rate of staff positions that work directly with inmates shall not exceed 10 percent during any 18 month period," the BOP as a whole is unable to achieve this medical staffing goal, as only 24 institutions had a medical staffing rate of 90 percent or higher as of September 2014.[6]  Further, 12 institutions were medically staffed at only 71 percent or lower, which the BOP's former Assistant Director for Health Services and Medical Director described as crisis level.[7]

The Office of the Inspector General's (OIG) previous report on the BOP's aging inmate population found that understaffing in institutions' health services units limits inmate access to medical care, results in an increased need to send inmates outside the institution for medical care, and contributes to increases in medical costs.[8]  Moreover, the BOP's staffing shortages continue despite significant increases in its spending on medical care.[9]  The BOP's spending on medical care increased 21 percent, from $905 million in FY 2010 to $1.1 billion in FY 2014, while

---

[5] This reflects the pre-trial and sentenced population in BOP-managed institutions only. Inmates in contract institutions and residential reentry centers are excluded.

[6] BOP, Program Statement 3000.03, Human Resource Management Manual (December 19, 2007).  Vacancy rates are calculated as a percentage of positions assigned to an institution.

At a meeting to discuss a working draft of this report, the BOP's Assistant Director for Human Resource Management said that while the BOP advocates for institutions to fully staff their medical positions, budgetary realities often make this unachievable.  As a result, the BOP's Central Office recognizes that institutions must balance staffing needs in all aspects of institution operations.

[7] This official oversaw the BOP's medical care of inmates during our review, but retired in October 2015.

[8] DOJ OIG, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons,* Evaluation and Inspections Report 15-05 (May 2015).  See https://oig.justice.gov/reports/2015/e1505.pdf (accessed February 8, 2016).

[9] In 1994 the Government Accountability Office (GAO) reported that the BOP acknowledged nursing staff shortages but was unable to recruit staff to fill the positions because its salaries were well below that offered in the community.  GAO, *Bureau of Prisons Health Care: Inmates' Access to Health Care is Limited by Lack of Clinical Staff,* GAO-HEHS-94-36 (February 1994).

In response to a working draft of this report, the BOP noted that other costs beside staffing, such as the costs of pharmaceuticals and medical procedures, also contribute to increased medical spending.

the BOP's overall budget increased 11 percent over that time, from $6.1 billion to $6.8 billion.

We conducted this review to build on our previous report's findings by further examining the BOP's medical staffing challenges, as well as its use and management of PHS officers as one means to address these challenges. In this section, we describe the BOP's responsibility to provide medical care to inmates in its custody, the government-wide mission and role of the PHS, and the role of PHS officers who provide medical care inside BOP institutions. In addition, we outline the memorandum of understanding (MOU) between the BOP and the PHS and the process used by BOP institutions to hire medical staff.

## The BOP's Responsibility to Provide Medical Care to All Inmates

The BOP is responsible for confining offenders in environments that are safe, humane, cost-efficient, and appropriately secure. As part of this mission, the BOP provides medical care to federal inmates.[10] Federal inmates receive medical care through institution health units or outside medical providers. In FY 2014, the BOP employed 3,215 medical staff, including 2,382 civil servants and 833 PHS officers, to meet this need. However, many institutions remain understaffed, limiting the amount of care that an institution can provide. Specifically, in FY 2014, 20 BOP institutions had a medical staff vacancy rate of 25 percent or higher and 3 institutions had a vacancy rate of 40 percent or higher. Hiring the medical professionals necessary to maintain the care that institutions must provide has proved challenging for the BOP. We discuss these challenges later in this report.

### Established Health Units in Each BOP Institution Provide Medical Care

To provide medical care to inmates, every BOP institution operates a health services unit. Most units have examination rooms, treatment rooms, dental clinics, radiology and laboratory areas, a pharmacy, and administrative offices. The BOP staffs these health units with medical professionals who provide urgent and routine medical care on an ambulatory or observation basis. These medical professionals, who may be either civil service employees or PHS officers, include physicians, dentists, nurses, pharmacists, and mid-level practitioners.[11] (See Figure below.) For inmates who require more intensive, specialty care than the health services units can provide, the BOP seeks care outside the institution.[12]

---

[10] We conducted a broad review of the BOP's management of inmate medical care in 2008. See DOJ OIG, *The BOP's Efforts to Manage Inmate Healthcare,* Audit Report 08-08 (February 2008), https://oig.justice.gov/reports/BOP/a0808/final.pdf (accessed February 8, 2016).

[11] The BOP also contracts with medical providers to offer clinics and specialty services inside the institutions to complement the primary care offered by the civil service and PHS-employed staff.

[12] For outside medical care, the BOP signs contracts with community hospitals and physicians with close proximity to the institution. The BOP negotiates rates with community hospitals using comprehensive medical contracts whenever possible. The OIG is currently conducting a related review of the effect of these rates on the BOP's budget.

**Figure**

**BOP Medical Staff, Fiscal Year 2010 to Fiscal Year 2014**



Source:  BOP staffing data

Civil service employees constitute the majority of health services staff.  The BOP uses recruitment, retention, and relocation incentives to entice civil service medical professionals to join the BOP.  Typically, the BOP uses incentives for positions that are critical for the operation of health services units or for those that are difficult to fill, allowing the BOP more flexibility in compensation.  For example, the BOP can use a recruitment bonus to increase an employee's annual rate of pay up to 25 percent, in exchange for a 2-year service commitment.[13]  The BOP also uses retention bonuses, relocation bonuses, student loan repayments, annual leave credits, and "above the minimum rate" pay to incentivize employment.[14]  When using any incentive, an institution must prepare a narrative showing that it has a great need for the employee, and that without the incentive the institution would lose an existing employee or be unable to fill a vacancy.[15]  Officials in the BOP's Central Office must approve all incentives before they can be paid to employees.[16]

---

[13]  In response to a working draft of this report, the BOP noted that the BOP Director may approve a shorter service agreement for recruitment bonuses.

[14]  Relocation bonuses are offered to current BOP employees who relocate to a hard to fill location.  Student loan repayment can be awarded up to $10,000 annually for loans covering education required for a position, such as a loan to pay for medical school.  Annual leave credit increases the rate at which one earns annual leave each pay period.  "Above the minimum rate" pay allows an agency to pay a new employee above the initial grade and step that would normally be required by the GS scale to meet the superior qualifications of a candidate.

[15]  The narrative includes information such as the qualifications needed for the position, the qualifications of the candidate, labor market factors that that affect the ability to recruit, and recent turnover, if any.

[16]  The type of incentive determines whether BOP officials in the Health Services Division or Human Resource Management Division approve the incentive.

*PHS Officers Compose the Remainder of the Health Services Staff*

In FY 2014, 833 of the BOP's 3,215 health services staff at the institutions (26 percent) were PHS officers.[17] The PHS is led by the Surgeon General and is an agency of the U.S. Department of Health and Human Services. The PHS has commissioned over 6,500 officers who are assigned to 23 federal agencies and the District of Columbia.[18] PHS officers serve in a variety of positions, treating underserved and vulnerable populations in the areas of public health. The underserved communities that PHS officers treat include populations such as federal inmates or Native American communities living on remote tribal lands. Most PHS officers are involved in medical care delivery, disease control and prevention, biomedical research, treatment of mental health and drug abuse, or disaster response efforts. Within the BOP, PHS officers work both in positions that provide direct clinical care to inmates and in medical care management.

The PHS is part of the uniformed service rather than the civil service. As such, PHS officers operate under a separate personnel system with additional obligations, and they are paid according to the Uniformed Service Compensation table used for the military rather than the General Schedule table used for civil service employees. In exchange for their willingness to serve, PHS officers also receive uniformed service benefits, including health insurance at no expense, tax-free housing and subsistence allowances, and access to military base facilities. The PHS also offers 30 days of vacation per year, financial support for education through the Post-9/11 GI Bill, access to the U.S. Department of Veterans Affairs' home loan program, and retirement eligibility benefits after 20 years of service.

With these benefits come additional responsibilities, such as being on call at all times and deploying on critical public health missions. PHS officers are considered available for duty at any time and are therefore not eligible to earn overtime pay. The PHS has several types of response teams that can immediately deploy to regional, national, and international public health emergencies, such as Hurricane Katrina or the Liberian Ebola crisis. Additionally, PHS officers must continue medical education and maintain professional competence through additional training and certifications.

The BOP's partnership with the PHS to provide medical care to underserved inmate populations dates back to the BOP's creation in 1930. In 1991, the BOP and the PHS signed an MOU to establish the conditions, responsibilities, and procedures

---

[17] The BOP also employs both civil service and PHS officer health services staff in its Regional Offices and Central Office. However, for this review we focused only on health services staff in the institutions.

[18] Some of these agencies include the BOP, the U.S. Marshals Service, the Food and Drug Administration, the Indian Health Service, the Centers for Disease Control and Prevention, the National Institutes of Health, the Department of Defense, and the District of Columbia Commission of Mental Health Services.

that would guide PHS officers working throughout the BOP.[19]  Under the terms of the MOU, the BOP annually notifies the PHS of the number of PHS officers it needs and is responsible for the cost of PHS officer compensation and benefits.  The BOP transfers funds to the PHS for this purpose quarterly, and the PHS in turn pays and manages PHS officer benefits using these funds.

*Civil Service Employees and PHS Officers Are Considered Equally for Vacant Positions, and Fill the Same Duties Once Hired*

The BOP delegates the hiring of health services staff, including PHS officers, to each BOP institution, with selection authority for most BOP institution staff delegated to the institution's Warden.[20]  Consequently, individual institutions advertise vacancies and institution staffs focus their recruitment efforts primarily on the local community surrounding each institution.[21]  Although civil service employees and PHS officers have two separate personnel systems, their position duties and responsibilities at the BOP are the same.  Hiring officials told us they select and hire qualified candidates without differentiating between the civil service and the PHS, primarily because the need for such staff is greater than the availability of candidates from either type.  One institution's Human Resource Manager told us, "Whoever comes to us, however we get that person, if they are a civilian, and we can meet their needs, we're taking them.  If they are PHS, and we can meet their needs, we are taking them.  Medical is so hard for us to recruit and hire.  If you bring us your credentials and say you're willing to work here, we'll figure it out."

During our review, BOP officials also described the challenges that can arise from having to integrate these two separate personnel systems into their health services operations to provide inmates with medical care.  Among the relevant differences we identified were leave policies, awards, drug testing, and training opportunities.  BOP officials also described how this problem is exacerbated by what they see as discordant legal decisions in response to grievances from unionized BOP employees on the one hand, and PHS officers on the other hand, over issues relating to relative seniority between the two groups.  While we did not focus our review on these challenges, we did note that several BOP officials described the inevitable tensions that can arise in a workforce where staff members share the

---

[19]  The relationship between the BOP and the PHS is also defined by statute.  See 18 U.S.C. § 4005 and 42 U.S.C. § 250.  In response to a working draft of this report, the PHS noted that these two statutes underpin the MOU.

[20]  The Warden has selection authority for all institution staff below the assistant department head level and for medical officers and dental officers in consultation with the BOP Medical Director. This encompasses all staff members who provide medical care to inmates.  See BOP, Program Statement 3000.03, section 250.1.

[21]  The BOP also advertises nationwide job announcements for some positions, such as nurses. However, applicants select their preferred locations as part of the online application process.  When institutions have vacancies in positions that were advertised under a nationwide job announcement, the institution receives only the names of applicants who selected as a preferred location the institution.

same jobs, workplace, and mission, yet can receive meaningfully different compensation and benefits.[22]

**Scope and Methodology of the OIG Review**

Our review examined the BOP's medical staffing challenges and its use of PHS officers to address those challenges.  We also evaluated the BOP's ability to transfer PHS officers to different locations based on staffing needs.  We analyzed BOP staffing data for both civil service employees and PHS officers from FY 2010 through FY 2014.  Specifically, our review focused on medical professionals and those employees who help the BOP provide direct care inside BOP institutions.  For the purposes of this review, we excluded all other staff.  We also analyzed the cost data associated with BOP civil service.

Our fieldwork, which we conducted from April 2015 through October 2015, included interviews, data collection and analyses, and document reviews.  We interviewed BOP Central Office officials in the Administration, Human Resource Management, and Health Services Divisions, as well as an official in the BOP's union.  We also interviewed an official in the PHS Division of Commissioned Corps Personnel and Readiness.  We used video teleconference to conduct site visits to five BOP institutions and to interview institution officials.  A detailed description of the methodology of our review is in Appendix 1.

---

[22]  In Appendix 1, we describe the extent to which we examined these issues, and our decision to focus the review on medical staffing challenges, in more detail.

# RESULTS OF THE REVIEW

## The BOP's Compensation and Incentives Offered to Civil Service Medical Staff Are Not Sufficient to Alleviate Staffing Shortages

Despite the BOP's increased use of incentives for civil service employees, the BOP remains challenged to recruit and retain medical professionals. Specifically, we found that the salaries and incentives the BOP offers are not competitive with those of the private sector, particularly given the need for the BOP to compensate its employees for the safety and security factors intrinsic to working in a correctional setting. As of September 2014, the BOP was operating at an 83 percent medical care staffing level, 7 percent below its goal of 90 percent. As a result, health services units are left understaffed, with increased workloads that limit the amount of medical care that can be provided inside an institution. The BOP's resulting need to rely on temporary duty (TDY) assignments shifts its staffing resources among institutions, and its reliance on contractors to augment the medical care it can provide contributes to the BOP's overall spending on outside medical care.

### The BOP is Disadvantaged in Its Efforts to Recruit Civil Service Medical Professionals

While recruitment is a challenging area for many healthcare organizations, it is particularly challenging for the BOP because of its geographic locations and local market competition, the limits on the pay it can offer its medical staff, and its correctional setting.[23] The BOP's Assistant Director for Human Resource Management said that recruitment is also difficult because the recruiting challenges the BOP faces vary across institutions. As of September 2014, there were 121 BOP-managed institutions located across the United States, in both urban and rural areas.

We found that in major metropolitan areas, the BOP's greatest recruiting challenge is attracting candidates that are also qualified to work in private organizations, such as hospitals and local medical centers. For example, at one institution with several major universities in the surrounding area, the BOP has been unable to attract recent graduates who are willing to occupy entry-level positions. The Human Resource Manager of that institution told us that the major universities have more prestigious medical facilities and offer higher pay.

At the BOP's more rural locations, we found that the remoteness of the institution often deters medical professionals. A Warden at a more remote institution said that because the area is isolated, most medical professionals are in the area only to work at a particular, respected community hospital. Staff at another institution told us that being in close proximity to a respected community

---

[23] In response to a working draft of this report, the BOP noted that there are shortages of medical professionals in a variety of fields, making its challenges not unlike those the general medical community faces.

hospital is both good and bad overall, but definitively unhelpful to recruiting. While the institution can use the hospital for services that cannot be provided inside the institution, it becomes nearly impossible to compete with the hospital for staff, because of the hospital's favorable reputation and higher pay. An Associate Warden at another institution told us that when competing with other organizations, the institution is often unable to attract candidates. He said that when the institution is able to hire employees, they typically leave shortly after they are hired for more lucrative offers.

*Position Grades and Compensation, Even with Incentives, Are Not Competitive with Local Markets*

In many instances, regardless of location, the federal limits on pay and incentives that hiring officials can offer potential employees pose a significant challenge for BOP institutions. BOP hiring officials we interviewed told us that the compensation offered is not enough to competitively attract or retain medical professionals. We found that this is especially true for the positions, such as doctors, pharmacists, and dentists, which are necessary to operate health units.

The BOP is required to classify positions according to the General Schedule (GS) pay scale, and, for physical therapists and pharmacists especially, we found the BOP struggles to offer competitive pay because the assigned grade of the positions limits the salaries they can offer.[24] According to the BOP's Chief of Health Services Staffing and Recruitment, the current grade of physical therapist and pharmacist positions on the GS scale makes it very difficult to hire individuals into civil service positions.[25] Rather, as of September 2014, the majority of medical professionals in those positions at BOP institutions are PHS officers. According to BOP officials, this is because the GS grade levels the Office of Personnel Management (OPM) assigned to these civil service positions are too low and the PHS compensation and benefits are more attractive in comparison. A Warden told us that if the BOP could offer more competitive pay through the civil service, it would be in a much better position when it comes to recruitment.

The BOP's Chief of Health Services Staffing and Recruitment said that attracting candidates for most medical positions in a correctional setting already requires the use of incentives. However, we found that even with incentives, the BOP cannot offer competitive salaries because of the limitations imposed by the current GS pay scale. Using data from the BOP, OPM, and the Bureau of Labor Statistics (BLS), we found that there is a large gap between the salaries the BOP pays its medical employees and those offered for similar positions in the local areas

---

[24] The General Schedule is the position classification and pay system governing the majority of salaried personnel positions within the civil service. OPM is responsible for administering the GS classification standards, qualifications, and pay structure.

[25] Further, he said that most physical therapist positions are at the doctorate level and the BOP's current classification of this position does not account for that. In response to a working draft of this report, the BOP said that this is because the BOP must follow OPM's Classification Standards, in accordance with 5 U.S.C. Chapter 51.

surrounding institutions.[26]  For example, the BLS reports that the average salary for a nurse in the local area is 34 percent higher than step 1 of the highest grade for a BOP nurse.  We found that the gap widens for other positions, with a 60 percent difference for physicians, a 102 percent difference for pharmacists, and a 133 percent difference for dentists.[27]  We also found that the salary gap was significant in both rural and metropolitan areas.  (See Table 1 below.)

**Table 1**

**OPM and the BLS Salary Comparison in Rural and Metropolitan Areas, FY 2014**

| Rural Area | Top GS Grade, Step 1 | BLS Average | Percent over BOP | Metropolitan Area | Top GS Grade, Step 1 | BLS Average | Percent over BOP |
|---|---|---|---|---|---|---|---|
| Nurse | $47,923 | $61,110 | 28% | Nurse | $51,723 | $77,468 | 50% |
| Physician | $114,872 | $187,734 | 63% | Physician | $123,981 | $192,476 | 55% |
| Pharmacist | $57,982 | $120,241 | 107% | Pharmacist | $62,579 | $120,034 | 92% |
| Dentist | $69,497 | $170,508 | 145% | Dentist | $75,008 | $159,368 | 112% |

Note:  This table does not include special pay.  See footnotes.

Sources:  BOP spending data, BLS occupational employment statistics, and OPM classification standards and locality pay tables

The BOP's Assistant Director for Human Resource Management told us that the GS scale does not meet the BOP's current needs because the assigned grades of many medical positions are too low.  The BOP's former Assistant Director for Health Services and Medical Director told us that the system is antiquated and no longer reflects today's reality or position requirements.  The BOP's Personnel Director told us that OPM convened a workgroup to rewrite the classification standards for nurses across the federal government.  However, we found that the BOP's discussions with OPM to restructure position classifications have not produced results.  The Assistant Director for Human Resource Management said that the lack of change was frustrating because nurses, for example, qualify only for a GS-5 classification, which is not competitive.[28]

---

[26]  For this analysis, we used the GS scale and step 1 of the position's highest grade to balance the variance in staff pay based on their status as a new versus more experienced employee. For example, OPM classification standards state that a non-supervisory pharmacist can be grade 7, 9, or 11, so we used grade 11, step 1 for our analysis.  Neither the OPM data nor the BLS data includes the value of benefits in their calculations.  See Appendix 1 for more information.

[27]  This analysis does not include special pay.  OPM establishes special pay at a rate higher than basic pay for a group or category of positons in certain geographic locations where there are significant hiring challenges.  We found that even when accounting for salary increases from special pay, the gap between the BOP and the local area remains large.  For example, in Lexington, Kentucky, a dentist with special pay can earn $78,000 in the BOP while the BLS average is $176,000.  The BOP's Assistant Director for Human Resource Management said, "OPM works with the BOP on special salary rates but it's a Band-Aid on a much bigger issue."

[28]  According to the 2015 GS pay table, the base salary of a GS-5 position is $27,982.  This figure does not account for locality pay.

Position classifications are also problematic for mid-level practitioners such as physician's assistants and nurse practitioners. The BOP's former Assistant Director for Health Services and Medical Director said that mid-level practitioners are significantly underpaid and that even incentives do not address the pay disparity. For example, the Health Services Administrator at one institution in need of a nurse practitioner told us it has been unable to fill the vacancy because the salary is not commensurate with the education and experience required. Specifically, she said that one of the nurse practitioner applicants to her institution had 6 years of education, but the BOP could offer only a GS-9 salary.[29]  In comparison, she further said that the BOP could offer a similar salary to a paramedic even though, in her state, paramedic qualifications can be obtained with less education. Citing anomalies such as these, the BOP's Assistant Director for Human Resource Management described the GS scale as a one-size-fits-all system that does not always fit everyone.

In addition, we found that the private sector pays medical professionals who are not working in correctional settings significantly more than BOP civil service employees in the same positions, indicating that the salaries the BOP offers do not factor in the fact that its employees face inherent security risks associated with working in a correctional setting. The BOP's Assistant Director for Human Resource Management said that many medical professionals do not find working in a correctional setting appealing because it is vastly different from a hospital. The BOP's former Assistant Director for Health Services and Medical Director agreed, saying not everyone wants to work in a place that could present a threat to his or her well-being. Despite this challenge, the BOP tries to market the benefits associated with working in a correctional setting. As law enforcement officers, all BOP employees gain access to the law enforcement federal retirement system, health benefits, and annuity. Still, the compensation offered to the BOP's medical professionals is less than what is offered in the local community hospitals and medical centers where there are fewer safety risks.

*Since FY 2010, the BOP Has Increased Its Use of Incentives to Recruit and Retain Civil Service Medical Employees*

Like most other federal agencies, the BOP must operate within the GS scale and is limited in what it can offer potential employees by the grade and classification of the position. However, when the requirements and responsibilities of a position warrant more compensation than its grade and salary, the BOP can supplement compensation with various incentives. According to BOP data, from FY 2010 to FY 2014, the BOP consistently used incentives for positions for which it had the greatest needs, including clinical nurses, general practice medical officers, and mid-level practitioners. The BOP's Assistant Director for Human Resource Management, who has been with the BOP for 27 years, said that the BOP did not regularly need to use incentives until approximately 2000. He said that now the BOP encourages institutions to be aggressive in recruiting for positions that have

---

[29]  According to the 2015 GS pay table, the base salary of a GS-9 position is $42,399.  This figure does not account for locality pay.

been difficult to staff and to offer as much as they can for an acceptance. We found that more institutions have been requesting incentives to help attract medical employees who provide direct clinical care. For example, in FY 2010, 70 percent, or 65 of 93 BOP institutions, requested incentives for their medical employees.[30] We found that this increased to 89 percent in FY 2014, when 87 of 98 institutions requested incentives.

Consequently, from FY 2010 to FY 2014, the number of BOP medical employees receiving at least one incentive increased 74 percent. Specifically, during FY 2010, the BOP awarded 409 incentives to medical employees, including 219 monetary incentives that were valued at $2.7 million.[31] During FY 2014, the BOP awarded 712 incentives, including 342 monetary incentives that were valued at $4.5 million.[32] (See Table 2 below.)

### Table 2
### Incentives Awarded by Fiscal Year and Type, in Thousands

| Fiscal Year | Recruitment Bonus | Relocation Bonus | Retention Allowance | Student Loan Repayment | Above Minimum Rate | Annual Leave Credit | Total |
|---|---|---|---|---|---|---|---|
| 2010 | 104 | 4 | 80 | 31 | 93 | 97 | **409** |
|  | $1,445 | $60 | $932 | $279 | — | — | **$2,716** |
| 2014 | 101 | 5 | 140 | 96 | 146 | 224 | **712** |
|  | $1,752 | $77 | $1,793 | $900 | — | — | **$4,522** |

Notes: Monetary totals are in thousands. As noted above, "above the minimum rate" pay allows an agency to set higher pay to meet the superior qualifications of a candidate or the special need of an agency.

Source: BOP incentives data

According to BOP data, institutions frequently use recruitment and retention bonuses as incentives. Table 3 below shows our analysis of the incentives offered to employees in positions with the greatest pay disparity when compared to the BLS average. As noted above, special pay and incentives can help lessen the gap; but overall, BOP salary averages remain low in comparison for recruitment.

---

[30] The BOP maintains data on correctional complexes in the aggregate, rather than separately for each institution within the complex. As a result, the total number of locations requesting incentives is less than the overall total of 121 institutions.

[31] Of the 409 incentives the BOP awarded, 190 were for annual leave credit or above the minimum rate pay. The BOP does not assign monetary value for these incentives because they vary substantially by employee rate of pay. For example, hiring officials can increase an employee's leave accrual rate from 4 hours per pay period to either 6 or 8, but the monetary value of that leave would depend on his or her salary.

[32] Of the 712 incentives the BOP awarded, 370 were for annual leave credit or rate of pay above the minimum.

**Table 3**

**Incentives Awarded by Position, FY 2014, in Thousands**

| FY 2014 | Recruitment Bonus Total | Relocation Bonus Total | Retention Allowance Total | Student Loan Repayment Total | Incentives Total | Average Monetary Incentives per person |
|---|---|---|---|---|---|---|
| Nurse | $603 | — | $227 | $102 | **$932** | $7 |
| Physician | $414 | $25 | $480 | $63 | **$982** | $15 |
| Pharmacist | $10 | — | $59 | — | **$69** | $12 |
| Dentist | $196 | — | $280 | $40 | **$516** | $20 |

Notes: Totals are in thousands. For analysis, the category "Physician" combines data for general practice medical officers, internal medicine medical officers, and general medical officers.

Source: BOP incentives data

For many nurses and medical doctors, student loan repayment is also an attractive incentive. However, the BOP's Assistant Director for Human Resource Management said that for the BOP, student loan repayment is limited to $10,000 per employee each year.[33] An additional incentive the BOP can use for some positions is accelerated promotion, which shortens the amount of time between salary increases. Yet, these incentives, while helpful, have not resulted in bringing BOP medical staffing to sufficient levels. A Health Services Administrator told us that her institution recently hired a Chief Dentist after 4 years of vacancy and was able to do that only by offering multiple incentives. The Human Resource Manager at another institution told us that he uses a combination of incentives but even with multiple incentives, recruitment is still difficult.

We also found that institution efforts to obtain approval to use incentives are time-consuming, which sometimes results in the BOP losing candidates to other employers; but Central Office and institution staff do not agree on the reason for the delays. Central Office staff attributes the long approval process to institution Human Resource Managers' lack of information and knowledge of the requirements for processing incentives. The BOP's Chief of Health Services Staffing and Recruitment said that institution Human Resource Managers deal with labor relations issues, grievances, performance, and the Union, and that medical recruitment is just one small piece of the puzzle. However, an institution Health Services Administrator told us that the paperwork required to process each one is extremely cumbersome.

The BOP's incentive approval process requires that each incentive be processed separately, even when a single employee will be receiving multiple incentives. BOP officials told us that institution staffs wait for incentives to reach the final stages of approval at the BOP's Central Office before offering them to

---

[33] Federal law imposes a $10,000 annual cap per employee and an overall cap of $60,000 per employee. See 5 U.S.C. § 5379(b)(2). The BOP's Assistant Director for Human Resource Management also noted that medical school loans are often in the range of six figures and that the amount of student loan repayment the BOP can offer does not compare to that of the private sector.

potential candidates because they are unsure which incentives they can authoritatively present to candidates prior to confirmation. For example, a Human Resource Manager told us that because incentives are not final until approved, he has little room for negotiation and that what he can offer in competition with the local market is initially hypothetical. The BOP's Personnel Director acknowledged that institution hiring officials lack confidence that incentives will be approved. But, he told us, institutions should offer all they can because in practice incentives are rarely denied. The BOP has considered automating the incentive approval process by creating a standard template for every incentive. According to the BOP's Personnel Director, through automation, incentives would be approved more quickly and more information regarding incentive availability would be accessible. However, the BOP has not yet implemented this change.

*Because Incentives Are Not Always Enough, the BOP Has Sought Other Alternatives to Attract Medical Professionals*

The BOP supplements its use of incentives with other alternatives that also have the effect of increasing pay. One of these is the Physicians and Dentists Comparability Allowance Program (PCA Program).[34] The PCA Program allows the BOP to adjust physician and dentist compensation up to $30,000 when it faces difficulty in recruiting.[35] The adjustment for each employee is determined through negotiation with that employee and the BOP Medical Director's approval of the employee's credentials. Eligible physicians or dentists must also enter a 1- or 2-year service agreement with the BOP. The BOP's former Assistant Director for Health Services and Medical Director told us that this program generally makes the civil service a more lucrative option for physicians.[36] However, the higher salary potential under the PCA Program is not always lucrative enough for other positions, such as psychiatrists.

The BOP recently received approval from the Justice Management Division and OPM to determine pay for psychiatrists using the laws governing medical professional compensation in the U.S. Department of Veterans Affairs (Title 38).[37] Under Title 38, the BOP can increase an individual's compensation package up to a maximum of $260,000 per year, based on his or her rating from an approval

---

[34] 5 U.S.C. § 5948(a).

[35] Recruitment difficulty is determined by a number of factors, including length of position vacancy, number of unqualified applicants, number of interviewed but underqualified applicants, and number of physicians rejecting offers of employment and citing inadequate compensation as the reason.

[36] Physicians and dentists can earn up to $203,000 in annual salary under the PCA Program.

[37] The Justice Management Division provides senior management guidance as it relates to DOJ policy for all matters pertaining to organization, management, and administration.

A majority of employees of the federal government are employed under personnel laws contained in Title 5 of the United States Code, which covers administrative law. Title 38, the section of federal law covering veterans' benefits, includes an alternate personnel system for specific occupations such as medical professionals. Under Title 38, employees are paid under separate pay schedules and pay is determined under rules separate from Title 5.

panel.[38]  The panel will determine the salary for each individual from tiers that the Department of Veterans Affairs has established based on resume, tenure, and certifications.  The BOP is also working with the National Finance Center to modify the system for salary payment processing and anticipates implementing Title 38 authority in the spring of 2016.  If the initiative is successful, the BOP told us it will consider expanding Title 38 to other positions that are difficult to staff, such as pharmacists.  BOP officials said that initially there would be minimal budgetary impact because the BOP employs relatively few psychiatrists, but that future budgets would need to incorporate increased costs if the principles of Title 38 were extended to more professions.[39]

Another benefit available to some BOP medical personnel is the opportunity to convert to the PHS from the civil service.  A PHS officer we interviewed told us that she originally took a pay cut when she joined the BOP as a civil service employee, but did so with the prospect of converting to the PHS for greater uniformed service benefits.[40]  She said that she also began her career as a civil service employee and converted to the PHS because the compensation package was more lucrative.[41]  For positions such as registered nurses and pharmacists, for which the BOP is not able to offer competitive salaries within GS constraints, we found PHS officers are likely to fill these positions.  In particular, the BOP's Assistant Director for Human Resource Management said that the BOP staffs a high number of PHS pharmacists because the BOP cannot offer a comparable salary for pharmacists.  In FY 2014, 145 of 194 pharmacists (75 percent) at BOP institutions were PHS officers, rather than civil service employees.[42]

The PHS accepts applications for a commission during defined periods throughout the year, which vary by profession.  The PHS accepts applications from physicians and dentists at any time, but accepts applications from other professions only during limited windows during the year.[43]  The PHS allows agencies employing

---

[38]  The panel will include representatives from the BOP's Health Services Division, the BOP Union, and medical doctors.

In response to a working draft of this report, the BOP estimated that typical compensation packages would not exceed $240,000 per year based on individual factors.

[39]  The BOP reported that, as of November 2015, it employed 25 psychiatrists.

[40]  The BOP allows qualified and eligible employees to convert to the PHS personnel system as long as their application for a commission is approved by the PHS.

[41]  We attempted to compare compensation in the GS and PHS systems but determined that we could not do so because the process of setting PHS officer pay is more individualized than the process of setting civil service employee pay.  For additional information, see Appendix 1.

[42]  We also found that the appeal of joining the PHS is lower when civil service salaries become more competitive.  The Chief of the BOP's Staffing and Recruitment Section told us that a majority of BOP dentists used to be PHS officers until the BOP decided to increase the position grade for dentists.  Since that change, he said, he has seen an increase in the number of BOP dentists who are civil service employees.

[43]  In previous years, the PHS application process was open to all professions at all times.  In 2010, the PHS streamlined the application process to allow applications only from certain professions at certain times throughout the year.  For example, in 2015, the PHS opened its application process to
(Cont'd.)

14

its officers a limited number of waivers that can be submitted outside of the normal application window for applicants that are deemed critical by the agency. However, the BOP's PHS Liaison told us that if an employee stationed at an institution that is already well-staffed wants to convert to the PHS, he or she must transfer to a location where there is a shortage of medical staff. The BOP's former Assistant Director for Health Services and Medical Director said that because the PHS does not commission many new officers during the regular application windows, waivers are consequently very valuable tools. However, the number of waivers the PHS allocates to the BOP each year remains limited: 15 in 2014 and 17 in 2015. At institutions with several vacancies, or at new institutions, the BOP will offer conversions to the PHS as an incentive to transfer between institutions or to stay with the agency. Institution staff we interviewed acknowledged that being able to offer the option to convert to PHS is a recruitment tool they could use for hard to fill positions. We discuss the BOP's management of PHS officers in more detail below.

*Institutions Must Rely on TDY Assignments and Contracted Medical Care because of Continuous Understaffing*

The BOP's inability to recruit and retain medical professionals has led to institutions operating at unfavorable staffing levels. Institution staff told us that when staffing levels are low they depend on TDY assignments and medical contractors for assistance. The BOP uses TDY and Regional Medical Assistance Support Teams to provide additional resources to its six regions. These teams were created in 2011 to assist institutions with critical medical staffing needs. According to BOP officials, these teams are used when institutions' health services units are 30 to 40 percent understaffed. Both civil service employees and PHS officers serve on Regional Medical Assistance Support Teams and enlist on weeklong TDY assignments to assist. An official at one institution in particular told us that even with PHS officers on staff, it relies on TDY from other institutions to accomplish its mission. In FY 2014, this institution had a vacancy rate of 21 percent for medical professionals. However, according to institution staff, relying on TDY for support is a temporary fix and should not replace a permanent solution for staffing shortages. The BOP's Assistant Director for Human Resource Management told us that rather than continuous TDY, it would be more beneficial for the BOP to pay an incentive to hire a full-time employee. With this approach, fewer long-term expenses would stem from the repetitive use of TDY.

We found that staffing shortages lower staff morale, increase staff workload, and ultimately can reduce inmates' access to routine medical care. A Human Resource Manager told us that because correctional settings require around-the-clock staffing, all vacancies affect staff morale. He said that because operations never cease, the lower the staffing levels, the greater the need to use mandatory overtime and double shifts. Additionally, staffing shortages increase the workload of those remaining staff. The BOP's PHS Liaison told us that when there are vacancies, the existing staff becomes overworked. A Physician's Assistant told us

---

pharmacists only during the month of August. The BOP PHS Liaison told us that the new application process limits the number of applications the PHS processes each year.

that increased workloads can easily drain staff, which, for him, makes some of the routine care a lower priority. A Health Services Administrator also told us that when health units do not have the staff to see inmates, they have to send them outside the institution for basic medical care because they are unable to meet their needs inside the institution. The Warden at the same institution agreed, stating that staffing shortages greatly increase outside medical trips, subsequently resulting in an increase in outside medical spending.

Staff vacancies have an adverse impact on institution health services units and ultimately increase the BOP's outside medical spending when care cannot be provided inside the institution. In FY 2014, the BOP spent $60 million in overtime payments to salaried employees to transport inmates outside the institution for medical care, an increase of 22 percent from the $49 million spent in FY 2010. While acknowledging that the BOP faces many challenges to recruit and retain medical staff, particularly because of the geographic locations of institutions, the limitations of the GS scale, and the prison work environment, we believe the BOP could be doing more to proactively identify and address its medical staff vacancies. In the remainder of this report, we discuss strategies the BOP could adopt to address these challenges.

### The BOP Does Not Identify or Address Recruiting Challenges in an Agency-wide and Strategic Manner

The BOP delegates many of the actions necessary for recruiting and hiring medical staff to its individual institutions. These actions include conducting recruitment activities in the local labor market, advertising vacancies, interviewing candidates, preparing incentive request paperwork, and managing the institution's staffing budget. As a result, the BOP's actions to address its recruiting challenges tend to involve reactively addressing specific problems faced by individual institutions rather than proactively identifying, prioritizing, and responding to regional or national trends in a coordinated fashion across all of its institutions.

At the Central Office level, the BOP's Health Services Division has a Staffing and Recruitment Section that has both short-term and long-term responsibilities. In the short term, the section is responsible for understanding institutions' immediate medical staffing needs, explaining to institution human resources staff the incentives available for medical professionals, and guiding medical professionals through the BOP's hiring process. In the long term, the section is responsible for increasing the pool of medical professionals who are interested in BOP vacancies. The section does not advertise vacancies or make hiring decisions; these actions are delegated to each institution. Further, the Chief of Health Services Staffing and Recruitment told us that institutions must request the section's assistance in addressing recruiting challenges. Even when an institution requests assistance, it is not required to follow the section's guidance. This reactive, locally delegated response to recruitment challenges has prevented the BOP from assessing which vacancies have the greatest negative impact on its ability to adequately provide medical care to inmates.

We further found that, even when the BOP has taken steps to address recruitment challenges across all of its institutions, these efforts have not resulted in a uniform approach to the issue. For example, officials throughout the BOP have designated medical vacancies as hard to fill to justify their use of incentives to enhance recruiting. However, we found that the BOP does not have a clear definition of this term. As a result, it cannot easily describe the degree to which any one position is hard to fill and it cannot use this designation to help it set priorities among medical vacancies. To illustrate, BOP policy identifies the length of time a position has been vacant as one factor that would justify using the Physicians and Dentists Comparability Allowance Program (PCA Program), but it does not give any guidance as to when the length of a vacancy should be considered problematic.[44] The Assistant Director for Human Resource Management said that a position is considered hard to fill once the Human Resource Manager has communicated to Central Office that all recruitment efforts, absent incentives, have made hiring challenging. Yet one institution's Human Resource Manager told us that *any* position requiring an incentive is considered hard to fill, while a different Human Resource Manager at another institution said that he considers a position hard to fill if he does not receive any applications after two or three advertisements. A third Human Resource Manager said that, on paper, none of the positions at her institution is hard to fill; but she went on to tell us that they experienced such difficulty trying to fill a psychiatrist vacancy that the BOP's Central Office eventually reallocated the position to a different institution.

We found that one primary obstacle to the BOP developing a truly proactive, coordinated approach to addressing recruitment challenges is that it does not analyze the data it already collects to assist it in identifying and prioritizing these challenges across all of its institutions. For example:

- *Vacancy Data:* The Central Office Staffing and Recruitment Section monitors medical vacancies, but the Chief of Health Services Staffing and Recruitment said that the data they monitor does not differentiate between positions that are vacant because of recruitment challenges and positions that are vacant for other reasons.[45]

- *Incentive Data:* Although the BOP collects data on the use of recruitment and retention incentives, which could help the BOP identify locations in which institutions have difficulty filling medical vacancies, the BOP does not analyze any of the data it collects on incentives for this purpose. The BOP's Personnel Director told us that the BOP reserves for Central Office officials final approval authority for recruitment and retention incentives, instead of

---

[44] BOP, Program Statement 6010.05, Health Services Administration (June 26, 2014), paragraph 17f.

[45] The Chief of Health Services Staffing and Recruitment explained that, because hiring decisions are decentralized to the institution level, institutions sometimes freeze vacancies instead of filling them to ensure that funds are available in the institution's budget to cover overtime, outside medical expenses, and other costs. He said that if an institution is not actively attempting to fill a vacancy, he would not consider that position difficult to fill.

delegating that authority to Wardens, in part so that the BOP can collect data on the use of these incentives.[46] However, she also said that the BOP tracks the use of incentives only to ensure that spending remains within budgetary limits, and not for the purpose of helping to identify the hardest to fill vacancies in the BOP system.

- *TDY Assignment Data:* The former Assistant Director for Health Services and Medical Director told us that when an institution resorts to requesting TDYs, it is usually because it cannot find anyone to fill the vacancies it is advertising. Data on institution requests for support through TDY assignments could therefore help the BOP's Central Office identify institutions that are struggling to find permanent staff; but this information is not available at the Central Office level because the Regional Offices manage TDY requests and assignments.

- *Outside Medical Care Cost Data:* Our May 2015 review of the impact of an aging inmate population found that understaffing in health services units increases the need for outside care.[47] The cost of this care varies because the BOP signs a separate contract with each institution with local medical providers.[48] Further, the BOP's care level system means that inmates with more significant medical needs are concentrated in a handful of institutions, with the result that staff vacancies at these institutions can have a more significant impact.[49] A Health Services Administrator at a BOP

> **Budgetary Impact of Understaffing on Outside Medical Costs**
>
> We identified one complex for which medical staffing dropped from 35 of 46 positions filled (76 percent) in FY 2010 to 25 of 42 positions filled (60 percent) in FY 2014. Of all BOP institutions, this institution paid the highest rates for outside medical care, with contract costs more than triple the Medicare rate. We looked at BOP spending data and found that spending on outside medical care at this complex increased 47 percent from FY 2010 to FY 2014 (double the 23 percent increase in this spending seen by the BOP as a whole during that same time). Given the relatively high cost of obtaining outside medical care in this location, a more proactive assessment of staffing needs could be beneficial to the BOP.
>
> Source: OIG analysis of BOP staffing data, contract data, and spending data

---

[46] In response to a working draft of this report, the BOP noted that the Department's Human Resources Order, DOJ 1200.1, states that approval of these incentives may not be delegated below the Personnel Officer level. The BOP further noted that it is required to collect data on incentives to fulfill reporting requirements to the Department and OPM.

[47] DOJ OIG, *The Impact of an Aging Inmate Population,* 18.

[48] These costs also vary depending on whether an inmate requires inpatient or outpatient care.

[49] The BOP assigns each inmate a care level from 1 to 4 based on documented medical history, with Care Level 1 being the healthiest inmates and Care Level 4 being inmates with the most significant medical conditions. The BOP also assigns each institution a care level from 1 to 4, based on the institution's level of medical staffing and resources. For more information about the BOP's care level system, see OIG, *The BOP's Efforts to Manage Inmate Healthcare.*

medical center said that by assessing only staffing levels, the BOP overlooks the needs of high care-level institutions. We believe this causes the BOP to underestimate the value of filling priority vacancies at high care-level institutions where a greater proportion of inmates are very ill. The Health Services Administrator emphasized, "The Bureau [of Prisons] is sending us the sickest of the sickest guys to take care of, and if we don't have the staff on board here to do even some of the basics that we need to do with them, then we end up having to send them into the community to get it done." Because the BOP does not take these variations in medical need or medical cost into account, it does not optimally prioritize filling the positions that cost the most to leave vacant.

We found that the BOP has been aware for some time that its locally delegated, reactive approach is ill suited for the medical staffing challenges it faces. Yet it has also declined opportunities to establish a more coordinated, proactive approach. Specifically, in June 2009, a BOP working group established to examine the BOP's medical recruitment challenges recommended that the BOP centralize medical recruitment into the BOP's Consolidated Employee Services Center in Grand Prairie, Texas.[50] The working group recommended centralization to improve customer service to applicants and to manage many functions, such as preparing incentive requests, that are the responsibility of institution staff. In support of its recommendation, the working group wrote: "A dedicated section would allow the agency to aggressively recruit and retain employees in an attempt to proactively address staffing concerns, rather than reactively, which continues to hinder effective operations and negatively impacts existing staff."[51] At its July 2009 meeting, however, the BOP's Executive Staff decided not to approve any of the options the working group developed.

The working group's June 2009 findings included a section for comments from the BOP divisions most likely to be affected by the working group's proposals. In its comments, the Health Services Division said that it could not support any of the working group's proposals for several reasons, including a belief at the time that recruitment was improving and could be further enhanced through additional resources rather than through reorganization. Instead, it recommended hiring someone to verify the professional credentials of candidates for medical vacancies, ensuring that they would be qualified to practice if offered a position. The former Assistant Director for Health Services and Medical Director confirmed that the BOP now employs a nurse for this purpose. The Health Services Division also recommended hiring one medical recruiter for each of the BOP's six regions to target hard to fill locations, and the BOP reported that it hired the six regional recruiters in the fall of 2015.

---

[50] The Consolidated Employee Services Center centralizes some aspects of the hiring process and provides guidance to the institutions on hiring procedures.

[51] Facilitator, National Health Care Staffing and Recruitment Workgroup, BOP, Executive Staff Paper, National Health Care Staffing and Recruitment Enhancement, June 9, 2009, 14. In addition to its recommended option, the working group also researched and presented two other options in its report.

Since the 2009 comments, however, we found that the health services vacancy rate has actually risen at BOP institutions, from 15 percent in FY 2010 to 17 percent in FY 2014. The BOP's decision to continue addressing its struggles with medical recruitment by reacting to individual institution requests rather than by developing a strategic, coordinated plan, has not led to improved results. Meanwhile, spending on outside medical care has increased 23 percent, from $351 million in FY 2010 to $434 million in FY 2014.

This lack of strategic planning also means that the BOP cannot fully take advantage of an annual opportunity it has to articulate its staffing priorities to the PHS. The memorandum of understanding (MOU) between the BOP and the PHS requires the BOP to "notify PHS at least annually, and more frequently if necessary, of the number of PHS Commissioned Officers, by training and experience, needed to fulfill the requirements of BOP."[52] BOP officials told us that, while they respond to the PHS annually with this information, they do not base their response on a systemic assessment of the BOP's medical staffing needs. Instead, they simply report the number of PHS officers already employed in BOP positions. The former Assistant Director for Health Services and Medical Director told us that he did not think increasing the number reported would make a difference. However, we note that the PHS already knows how many of its officers work for the BOP because it pays PHS officers and manages their benefits using BOP funds.[53] The PHS's Deputy Director of the Division of Commissioned Corps Personnel and Readiness (PHS Deputy Director, DCCPR) told us that the PHS requests this annual projection of need in order to help shape the Commissioned Corps' annual recruitment plan and support limited force planning.

We believe that the BOP is missing an important opportunity by providing the PHS with data it *has* rather than conducting a robust analysis to determine what kind of medical staffing its institutions *need*. If the BOP analyzed its recruitment challenges and prioritized vacancies based on the impact those vacancies have on the BOP's ability to care for its inmate population, this could help the BOP articulate specific numbers and types of PHS officers that would be of greatest benefit to address its staffing challenges.

## The BOP Does Not Use Its Authority to Assign PHS Officers to Positions Based on Greatest Need

Both PHS policy and the PHS officers' sworn oath give the BOP the authority to place PHS officers in positions where they are most needed. PHS officer appointees swear an oath that they are "willing to serve in any area or position or wherever the exigencies of the Service may require." However, the BOP does not

---

[52] MOU between the BOP, DOJ, and the PHS, Department of Health and Human Services, September 1991, paragraph III.B.

[53] The BOP's Chief of Budget Execution told us that every month the Department of Health and Human Services generates a payroll report of PHS officers employed at the BOP, which the BOP's Budget Execution Office reconciles to ensure they transfer the appropriate amount of funds to the PHS to pay for these salaries and benefits.

take full advantage of this flexibility because, as noted above, it does not address recruitment challenges in a strategic, coordinated way and therefore does not place PHS officers in positions that maximize their benefit to the BOP. In the section below, we discuss options that the BOP might consider to increase the efficiency of its assignment of PHS officers.

The PHS encourages its officers to pursue diverse work experiences throughout their careers.[54] To incentivize transfers, PHS promotion boards place value on an officer's mobility, with multiple moves expected of officers seeking promotion to the higher ranks. The PHS's Commissioned Corps Personnel Manual, which governs human resources policy for PHS officers, gives the BOP authority to initiate voluntary transfers to meet its needs or the needs of PHS officers. It also gives the BOP the authority to initiate involuntary transfer of PHS officers at any time to meet the BOP's needs. We found that the BOP does not currently manage these positions in ways that would encourage PHS officers who are interested in responding to the PHS incentives to transfer in ways that also benefit the BOP.

Specifically, we found that the BOP does not currently use involuntary transfers of PHS officers to address its staffing needs. BOP officials said that they initiate involuntary PHS transfers only for disciplinary reasons or for instances in which an officer needs to be moved to a location where he or she can receive additional training and oversight. PHS officers we interviewed at BOP institutions recognized that their status as Commissioned Officers meant that they were potentially subject to a change of duty station, but they also told us that such transfers were not actually used. Instead, both PHS officers and civil service employees control their own duty stations in the same way: by deciding whether to apply to an advertised vacancy at a particular institution.[55] The BOP's Personnel Director told us, "they know where the vacancies are so if they wanted to apply to there, they easily could." Once hired, PHS officers may also stay in a position for as long as they like, assuming satisfactory performance, just like civil service employees.

We also found that the BOP has not been proactive about using PHS officers to fill vacancies where individual institutions are struggling with particularly challenging medical personnel staffing needs. Institution staff further told us that lengthy vacancies are common. For example, staff at one institution told us that their Clinical Director position has gone unfilled for 15 years.[56] A PHS nurse at

---

[54] The PHS recommends that officers have at least three different geographic or programmatic assignments during their careers, but it does not have a specific requirement for the frequency of moves. The BOP's PHS Liaison recommends that officers seeking promotion move every 3 to 5 years and told us that the PHS revised its application process in 2013 to require officers to be more mobile.

[55] The BOP and the union have an informal agreement that all initial vacancies will be advertised, with both civil service employees and PHS officers eligible to apply. The former Assistant Director for Health Services and Medical Director said that the BOP made this agreement because it would be unfair to make any vacancy open only to PHS officers.

[56] The Clinical Director is the lead physician in an institution's health services unit and is responsible for all clinical care provided at the institution. The Health Services Administrator at this
(Cont'd.)

another institution told us that her position had been vacant for approximately 2 years by the time she was hired and that at the time of our interview her institution had been without a Clinical Director for nearly a year.  The BOP Union President told us that a physician position at a third institution remained vacant for 5 years, which pushed more responsibility onto the mid-level providers who remained on the staff.  He questioned why the BOP allowed that position to remain unfilled instead of transferring a PHS physician from another location.

*More Effective Use of PHS Location Assignments Could Take Multiple Forms*

Multiple BOP and PHS officials told us that the BOP could do more with voluntary and involuntary transfer authorities to better align PHS officers' duty stations with the BOP's greatest needs.  In this section, we outline three options that the BOP could consider to use PHS officers as a means of addressing some of its most challenging medical staffing problems.

Involuntary Transfers

The use of involuntary transfers for all PHS officers would mirror the military's requirement of frequent transfers and reassignments, a process known as "force management."  BOP officials acknowledge that PHS policies give them the authority to implement force management if they choose to do so, but they told us that this would require at least three changes in how BOP institutions are managed:

1. reducing the level of control that Wardens currently have over the selection of employees to fill institution vacancies,

2. matching all PHS officers with positions available, and

3. reducing the control PHS officers currently have over their duty station.

Effectively using involuntary transfers would also require changes in how the BOP as a whole is managed, because the BOP would also need to assess which vacancies are of such high priority that they should be staffed by a transferring PHS officer rather than remaining vacant.  BOP officials told us that they had not implemented involuntary transfers because they were concerned that such a change could reduce employee engagement and increase medical staffing vacancies.  The PHS Deputy Director, DCCPR acknowledged these concerns, recommending that agencies minimize the risk of disengagement by transferring officers for defined periods of time and by giving the officers some say in the

---

institution told us that, in the absence of a Clinical Director, they had a contract physician who visited the institution twice a week, as well as three additional contract physicians who each visited the institution once a month; the Clinical Director of a different institution participated via phone in decisions concerning whether an inmate should be referred for medical care outside the institution. We note, however, that the Clinical Director providing this assistance works at an institution that is 750 miles away from the institution we interviewed, and in a different time zone.  Therefore, the lack of a Clinical Director means that onsite physician care for the 1,268 inmates at this institution is limited.

location of their subsequent transfer.[57]  Regarding the BOP's concern that involuntary transfers would cause PHS officers to leave the BOP for other agencies, he said that while the PHS encourages its officers to be mobile, it also requires a minimum 2-year commitment at each duty station and therefore will not process transfer requests for a PHS officer more frequently.

<u>Targeted Force Management</u>

BOP officials and institution staff suggested to us that the BOP could take better advantage of the PHS requirement for officer mobility by using force management in a targeted, rather than broad manner.  Some institution staff suggested that the BOP require PHS officers to spend their first few years with the BOP working in institutions that have the greatest difficulty filling vacancies.  A PHS Health Assistant Specialist told us that if someone was "hungry" enough for a PHS commission, he or she would go anywhere to take a position.  An institution's Human Resource Manager said that this would be preferable to transferring PHS officers who were already employed in the BOP, which would create a vacancy at the PHS officer's previous institution.  While the BOP told us that it tries to use its limited number of PHS waivers in this manner, we believe it could achieve more effective results if it also used this approach with all PHS officers who are new to the BOP.  In FY 2014, 17 BOP civil service employees converted to the PHS using waivers, but the BOP gained an additional 61 PHS officers in other ways.[58]

We also found that the BOP has a precedent of using targeted force management for some entry-level PHS officers.  Students entering their final year of school or professional training are eligible to apply to the PHS Senior Commissioned Officer Student Training and Extern Program (Senior COSTEP).  Those accepted by the PHS are sponsored by an agency such as the BOP, paid at the entry-level ensign rank while completing their education, and agree to work for their sponsoring agency as a PHS Commissioned Officer immediately following graduation.[59]

---

[57]  BOP officials said that it would be easier for the military to give officers a voice in the location of a subsequent transfer because all military personnel face transfer, making it easier to predict when particular positions and locations will have vacancies.  This would be more difficult in the BOP because medical positions can be also be filled by civil service employees, who cannot be transferred as easily as PHS officers can.

[58]  The BOP reported that in FY 2014, 15 civil service employees who already worked for the BOP converted to the PHS during regular application windows, 21 newly-commissioned PHS officers joined the BOP, and 25 experienced PHS officers joined the BOP from other agencies.

[59]  Ensign is the most junior officer rank in the PHS.  The required PHS service commitment is twice the length of time the Senior COSTEP officer received financial support while in school.  For example, the BOP's COSTEP program statement requires Senior COSTEP officers to serve a minimum of 8 months in training, followed by a minimum 16-month commitment to the BOP.  In 2015, the BOP and the National Institutes of Health were the only agencies who sponsored Senior COSTEP officers.

These officers are referred to as Senior COSTEP officers despite being entry-level because the PHS also has a Junior COSTEP program.  Junior COSTEP officers have more than 1 year left of their schooling and may temporarily work for the BOP, or other agencies that employ PHS officers, during semester breaks.

23

The BOP's COSTEP Program Statement specifies that assignments for entry-level officers participating in the Senior COSTEP program are based on the BOP's needs.[60] A PHS officer working at the BOP's Central Office serves in the role of COSTEP Coordinator and is responsible for assessing the BOP's needs for Senior COSTEP officers and for assigning them to institutions.[61] Institutions request to participate in the Senior COSTEP program with the knowledge that this would result in the assignment of an entry-level PHS officer to their institution rather than the selection of a local candidate after advertising a vacancy. The COSTEP Coordinator considers the types of vacancies institutions are seeking to fill, whether the institutions asking to participate in the Senior COSTEP program are a good fit for an entry-level medical professional, and the location preferences of the Senior COSTEP officers.[62] However, the BOP's former Assistant Director for Health Services and Medical Director said that because the BOP's goal with the Senior COSTEP program is to maximize the retention of these officers beyond their initial service commitment, the location preferences of the Senior COSTEP officers and the availability of mentors are often more important than institution needs when determining where the Senior COSTEP officers should be assigned.

If the BOP gave greater priority to institution needs, and broadened its assessment to include positions that should be filled by a more experienced clinician as well as entry-level positions, then its approach to staffing Senior COSTEP officers could be expanded to maximize the efficiency of PHS officer placements more broadly. Such an expansion could accommodate either a decision to implement force management broadly for all PHS officers or more narrowly for only those PHS officers who are new to the BOP.[63] However, in order for these assessments to be successful, the BOP would first have to be more strategic about analyzing and prioritizing its overall recruitment needs.[64]

### BOP Needs Aligned with PHS Promotion Incentives

The BOP could also consider better aligning its needs with the PHS's promotion incentives, particularly the PHS's recent emphasis on mobility. One long-time PHS officer told us that at the time he was commissioned, the PHS promoted as a perk the fact that its officers would not be subjected to involuntary

---

[60] BOP, Program Statement 6021.04, Commissioned Officer Student Training Extern Program (COSTEP) (August 1, 2003), paragraphs 16, 17.

[61] In a given year, no more than 30 Senior COSTEP officers are assessed for placement in BOP institutions.

[62] The BOP PHS Liaison told us that because Senior COSTEP officers are entry level, it would not be appropriate to assign them to an institution where they would have to work independently or be the senior clinician.

[63] PHS officers who are new to the BOP do not necessarily have to be entry level. For example, civil service employees who convert to the PHS after they start work at the BOP already have some clinical experience.

[64] In response to a working draft of this report, BOP officials noted that when making decisions concerning the effective management of PHS officers, they must consider the human resource implications when developing an approach to better utilizing PHS officers.

transfers.  However, the BOP's PHS Liaison told us that in 2013 the PHS revised its application process to require mobility and now screens out applicants who are not willing to move.  As a result of these changes, mobility has become a more important benchmark in the PHS promotion process.[65]

The BOP Union President told us that the BOP historically has not required PHS officers to move and has instead accommodated PHS officers who are promoted in rank by giving them additional responsibilities at their current institutions.  He suggested that the BOP's use of PHS officers would be more effective if PHS officers who needed to take on additional responsibilities due to a promotion were moved to a position in a different institution.  We believe that by encouraging such transfers, the BOP could better staff the locations where need is greatest, while also helping the transferred PHS officer demonstrate continued mobility in his or her next application for a promotion.

Like mobility, receipt of PHS awards is another factor that the PHS promotion board considers when making promotion decisions.  One such award is the PHS's isolated hardship award given to PHS officers who serve at least 180 consecutive days in an area designated as isolated, remote, insular, or constituting a hardship duty assignment.  The BOP has already sought to incentivize PHS officers' transfers by having successfully petitioned the PHS to designate five BOP institutions as "isolated hardship locations" eligible for the award.[66]  The BOP's PHS Liaison told us that a request for a sixth isolated hardship designation for the newly activating Administrative U.S. Penitentiary, Thomson, Illinois, is pending.  We believe the BOP should consider requesting additional isolated hardship designations in the future, although we note that according to the BOP's PHS Liaison, the PHS is in the process of revising its criteria for awarding the designation.

---

[65] PHS officer promotions in rank are based on the extent to which an officer meets a number of benchmarks, including performance appraisals, awards, history of assuming roles of increasing responsibility, continuing education, mobility, willingness to take on collateral duties, integrity, participation in PHS advisory groups, mentoring, and maintenance of basic readiness standards to respond to public health emergencies.  PHS officers told us that promotions become more competitive at higher ranks because the higher ranks have fewer positions available.  A PHS promotion board, not the BOP, makes PHS promotion decisions.

[66] The five institutions with the designation as of October 2015 are Federal Correctional Institution (FCI) Safford in Arizona, FCI Manchester in Kentucky, FCI Estill in South Carolina, Federal Prison Camp Yankton in South Dakota, and FCI Three Rivers in Texas.

# CONCLUSION AND RECOMMENDATIONS

## Conclusion

In addition to the unavoidable challenges within the BOP's correctional setting, the medical staffing challenges the BOP faces stem in part from local market factors and the limitations of the General Schedule (GS) scale and position classifications that the BOP cannot adjust without approval from the Office of Personnel Management (OPM). We found that the BOP has taken a number of steps to address pay disparities and understaffing challenges, particularly by increasing its use of incentives and obtaining approval to use an alternate compensation scale for psychiatrists. However, the approval process for incentives is laborious, time-consuming, and requires extensive knowledge that not all institution staffs possess. Further, we found that the continued reliance on short-term solutions such as temporary duty (TDY) assignments and contracted medical care has an adverse impact on overall medical costs. We believe that in order to be more efficient with resources, the BOP must look at other avenues to increase medical staffing levels.

We also found that the BOP needs to take a more strategic, coordinated, and agency-wide approach to its recruitment challenges. Such an approach should begin by improving the BOP's use of data to identify, prioritize, and address recruitment challenges and medical staffing needs. For example, the BOP does not currently prioritize medical staffing vacancies based on the cost of leaving the vacancies unfilled. These costs can be determined by analyzing the care level of particular institutions, the extent to which institutions rely on TDY assignments, or the cost of contracting for care that would be provided if the vacancy were filled. Similarly, the BOP currently collects position-specific data on the use of incentives but does not analyze it for recruitment purposes. If the BOP were to analyze this data to identify positions and locations that are heavily reliant on incentives, then it could use that information to more accurately identify pay disparities, assess how frequently supplemental pay is required, and compare the cost of applying multiple incentives for lower graded positions with the cost that the BOP would incur if medical positions were reclassified to higher grades. We believe this data would also be valuable in helping the BOP support its position to the Office of Personnel Management that the reclassification of certain positions on the GS scale is necessary for effective recruitment.

Because the BOP has not prioritized medical staffing vacancies through a strategic, national assessment of its needs, it cannot place PHS officers more efficiently throughout its institutions. PHS policy offers the BOP a great amount of latitude in determining where to station PHS officers, but the BOP does not currently take advantage of these flexibilities. The BOP has several options for managing PHS officer placements on a national level, and we believe it can do so in ways that could benefit both the BOP and the individual PHS officers' needs. Better assessment of priority medical vacancies could also help the BOP better articulate its requirements to the PHS when it responds to the PHS's annual request for information on the amount of PHS officers the BOP needs. We acknowledge that

with approximately 6,500 total officers working across 23 federal agencies and the District of Columbia, the PHS is not a panacea for the BOP to fill all of its staffing needs. However, a more thorough analysis of staffing needs throughout the BOP, rooted in a more strategic approach, could help the BOP better describe its challenges to the PHS and identify where additional staff are most acutely needed.

**Recommendations**

To ensure the BOP can recruit and retain the medical professionals that are necessary to provide medical care to the BOP's inmate population, and to foster a proactive, coordinated strategy that will allow the BOP to better use its PHS officers, we recommend that the BOP:

1.  Develop a plan to use available data to assess and prioritize medical vacancies based on their impact on BOP operations.

2.  Develop strategies to better utilize Public Health Service officers to address the medical vacancies of greatest consequence, including the use of incentives, assignment flexibilities, and temporary duty.

**APPENDIX 1**

## EXPANDED METHODOLOGY

**Data Analysis**

*Public Health Service and Civil Service Salary Comparison*

We attempted to compare the uniformed service pay scale with the General Schedule, but we determined that we could not accurately compare the salaries because some of the factors that influence Public Health Service (PHS) officer salaries do not have an equivalent in civil service salaries, resulting in great variance.[67]  A 2013 University of Maryland study of the PHS found that the costs associated with the PHS could not be easily quantified for comparison to the civil service.[68]  Further, the PHS Deputy Director of the Division of Commissioned Corps Personnel and Readiness (PHS Deputy Director, DCCPR) confirmed that because of the variance, the pay scales are too dissimilar to compare.

*Bureau of Labor Statistics Salary Analysis*

We used publicly available data from the Office of Personnel Management (OPM) and the Bureau of Labor Statistics (BLS) to analyze the differences in salaries between medical professionals working at the BOP and the overall salary averages of medical professionals in a given geographic location.[69]  We based our selection of geographic locations on counties that were in close proximity to BOP institutions.  We then used the county of the institution to select the applicable region for BLS data and the applicable locality for OPM data.  When analyzing OPM data, we used the highest available grade, but the lowest step for the given position according to OPM's position classification standards.  For example, dentists in the BOP can be either grade 11 or grade 12, so we used the salary of grade 12, step 1 for our analysis.  We believe this allowed for a reasonable comparison with the BLS averages because it represented a salary in the middle of the allowable range for that position.  In a separate analysis, we examined special pay tables that OPM had established for dentists and pharmacists in some BOP institutions, but we concluded that special pay was not sufficient to address the wage gap we found when comparing locality pay tables with BLS data.

---

[67]  Specifically, pay for PHS officers varies based on geographic location, base pay, years of service, dependents, specialty, allowance for subsistence, and rank.  The PHS Deputy Director, DCCPR noted that some portions of PHS officer pay are also tax-exempt.

[68]  According to the University of Maryland, the effectiveness, efficiency, efficacy, and comprehensive value of the PHS cannot be determined based on cost factors alone because there exist too many variables, inconsistencies, and un-measurable attributes to make a meaningful evaluation.  Muhiuddin Haider, *The USPHS Commissioned Corps:  A Study on Value and Contributions to DHHS Mission and National and Global Health Priorities and Initiatives* (University of Maryland, 2013).

[69]  BOP salary averages are included in the data captured by the Bureau of Labor Statistics.

*Incentives Awarded by Position*

The BOP provided data on recruitment and retention incentives awarded from FY 2010 to 2014. We used this data to total the number of incentives awarded, and the cost associated with those of monetary value. Our analysis of monetary incentives compared the incentives by type and position and used position counts to calculate averages. In determining position counts, we accounted for those individuals who received more than one incentive.

**Interviews**

We interviewed Central Office officials, including the Assistant Directors of the Human Resource Management and Health Services Divisions; the BOP's Personnel Director; the BOP PHS Liaison; the Chief of Budget Execution; and the Chief of Health Services Staffing and Recruitment.

We visited five institutions via video teleconference and, during those visits, we interviewed institution senior management, as well as staff who provide direct clinical care to inmates. We interviewed four Wardens, one Associate Warden, five Health Services Administrators, five Business Administrators, five Human Resource Managers, a Leave Maintenance Clerk, and BOP and PHS clinical staff, including: an occupational therapist, a health systems specialist, four non-supervisory registered nurses, a physician assistant, a nurse practitioner, and two pharmacists.

At PHS Headquarters, we interviewed an official in the DCCPR.

**Site Visits**

The team conducted video teleconferences with the five following institutions, representing all four healthcare levels: Federal Medical Center Butner, Federal Correctional Institution (FCI) Danbury, Federal Medical Center Rochester, FCI Sandstone, and Federal Detention Center SeaTac. We selected these five institutions because they had a combination of a high number or high percentage of PHS staff in FY 2014. We were also able to use these locations to assess hiring challenges across medical, detention, and standalone institutions, in both rural and metropolitan locations.

**Additional Objectives**

At the outset of this review, we included a report objective examining the BOP's oversight of PHS officer leave, awards, drug testing, and correctional training. We reviewed BOP and PHS policies related to these topics and asked questions on these topics during Central Office interviews and site visits described above. However, during these interviews we learned about larger concerns that BOP staff had regarding medical staffing in general. We met with officials from the BOP's Program Review Division and Health Services Division in September 2015 to formally close the original objective. At that meeting, we also added a review

objective examining the challenges and limitations the BOP faces in hiring medical professionals to work in its institutions.[70]  The BOP officials we met with in September 2015 said that recruitment and retention of quality medical professionals is the BOP's biggest challenge.

---

[70] We conducted some of our Central Office interviews after this meeting to discuss the topics raised in our new objective.

**APPENDIX 2**

# THE BOP'S RESPONSE TO THE DRAFT REPORT



**U.S. Department of Justice**

Federal Bureau of Prisons

*Office of the Director*          *Washington, DC 20534*

March 15, 2016

MEMORANDUM FOR NINA S. PELLETIER
              ASSISTANT INSPECTOR GENERAL
              OFFICE OF INSPECTOR GENERAL
              EVALUATION AND INSPECTIONS DIVISION

*Thomas R. Kane*

FROM:         Thomas R. Kane, Acting Director

SUBJECT:      Response to the Office of Inspector General's (OIG)
              DRAFT Report:  OIG Review of the Impact of the
              Federal Bureau of Prisons' Medical Staffing
              Challenges, Assignment Number A-2015-005

The Bureau of Prisons (BOP) appreciates the opportunity to respond
to the open recommendations from the draft report entitled OIG Review
of the Impact of the Federal Bureau of Prisons' Medical Staffing
Challenges.

Therefore, please find the Bureau's response to the recommendations
below:

**Recommendations**

To ensure the BOP can continue to recruit and retain the medical
professionals that are necessary to provide medical care to its
inmate population, and to foster a proactive, coordinated strategy

31

that will allow the BOP to better use its PHS officers, we recommend that the BOP:

**Recommendation 1:**  "Develop a plan to use available data to assess and prioritize medical vacancies based on their impact on BOP operations."

**Response:**  The BOP agrees with this recommendation and will explore options to better assess and provide targeted strategies for medical vacancies, resulting in an identified plan that will be provided to the OIG.

**Recommendation 2:**  "Develop strategies to better utilize Public Health Service officers to address the medical vacancies of greatest consequence, including the use of incentives, assignment flexibilities, and temporary duty."

**Response:**  The BOP believes the history and complexity of the relationship between the civil service and Public Health Service (PHS) personnel systems is not adequately detailed in the OIG report, and has a significant impact on BOP's management of those staff. Nevertheless, the BOP agrees with this recommendation, and will explore and develop strategies to better utilize PHS officers to address the medical vacancies of greatest consequence.  As discussed during the exit conference for this review, BOP will explore the OIG's proposed solutions in its report, as well as other options that may appropriately address the situation.

If you have any questions regarding this response, please contact Steve Mora, Assistant Director, Program Review Division, at (202) 353-2302.

2

**APPENDIX 3**

# OIG ANALYSIS OF THE BOP'S RESPONSE

The Office of the Inspector General (OIG) provided a draft of this report to the Federal Bureau of Prisons (BOP) for comment.  The BOP's response is in Appendix 2.  Below, we discuss the OIG's analysis of the BOP's response and actions necessary to close the recommendations.

**Recommendation 1:**  Develop a plan to use available data to assess and prioritize medical vacancies based on their impact on BOP operations.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with the recommendation and stated that it would develop a plan by assessing medical vacancies and develop more targeted strategies to fill them.

**OIG Analysis:**  The BOP's planned actions are responsive to our request.  By June 30, 2016, please provide the BOP's plan illustrating the strategies developed to fill medical vacancies.  As part of the plan, please explain how the BOP will prioritize medical vacancies based on the length of vacancies, patterns in institutions' use of incentives, patterns in institutions' use of temporary duty, the cost of outside medical care, and any other sources of data that the BOP believes demonstrate the impact of leaving the positions vacant.  Additionally, please describe how frequently the BOP plans to reassess medical vacancies and reconsider their prioritization.

**Recommendation 2:**  Develop strategies to better utilize Public Health Service officers to address the medical vacancies of greatest consequence, including the use of incentives, assignment flexibilities, and temporary duty.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with the recommendation and stated that it would explore and develop strategies to better utilize PHS officers to address the medical vacancies of greatest consequence.  The BOP further stated that it would explore the options outlined in this report, as well as other options that may appropriately address the situation.

**OIG Analysis:**  The BOP's planned actions are responsive to our request.  By June 30, 2016, please describe how the BOP plans to better use PHS officer incentives, assignment flexibilities, and temporary duty to fill the highest priority medical vacancies identified through the strategy developed in response to Recommendation 1.  As part of this response, please describe how the BOP considered the options discussed in the report.



*The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations.  Information may be reported to the DOJ OIG's hotline at www.justice.gov/oig/hotline or (800) 869-4499.*



Office of the Inspector General
U.S. Department of Justice
www.justice.gov/oig